FILED

2007 Oct-03  PM 07:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| In re HEALTHSOUTH CORPORATION SECURITIES LITIGATION | ) ) ) ) | Consolidated Case No. CV-03-BE-1500-S |
| | ) | <u>CLASS ACTION</u> |
| This Document Relates To: | ) ) | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF |
| *In re HealthSouth Corporation Stockholder Litigation*, Consolidated Case No. CV-03-BE-1501-S | ) ) ) ) ) ) | MOTION FOR CLASS CERTIFICATION ON BEHALF OF THE STOCKHOLDER CLASS AND THE MERGER SUBCLASSES |

## TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ...................................................................2

II.  FACTUAL BACKGROUND.........................................................................3

III.  ARGUMENT.................................................................................................11

    A.  The Rule 23(a) Standards for Class Certification Are Satisfied .........12

        1.  The Members of the Class Are so Numerous that Joinder
            Is Impracticable...................................................................................12

        2.  This Action Involves Questions of Law and Fact
            Common to Stockholder Plaintiffs and the Class .....................13

        3.  The Proposed Class Representatives' Claims Are Typical
            of the Putative Class Members' Claims....................................14

        4.  The Adequacy Prong Is Satisfied.............................................16

            a.  The Proposed Representatives Have Already
                Demonstrated They Will Adequately Represent the
                Proposed Class and Subclasses .......................................16

                (1)  Central States.....................................................19

                (2)  New Mexico .......................................................20

                (3)  Michigan..............................................................22

                (4)  Julius McQueen.................................................23

                (5)  Merger Subclass Plaintiffs .............................24

            b.  Proposed Class Counsel Are Adequate ..........................24

    B.  The Rule 23(b)(3) Standards for Class Certification Have Been
        Met............................................................................................................25

        1.  Common Questions of Law or Fact Predominate Over
            Questions Affecting Only Individual Class Members..............26

**Page**

2.    HealthSouth Stock Traded in an Efficient Market and Stockholder Plaintiffs Are Entitled to the Fraud-on-the-Market Presumption of Reliance ...............................................27

  a. Trading on NYSE .........................................................28

  b. Weekly Volume ...........................................................29

  c. Analyst Coverage.........................................................29

  d. Market Makers and Arbitrage.......................................30

  e. Eligibility to File Form S-3 .........................................30

  f. Price Reaction to New Material Information ................30

3.    While Not a Proper Inquiry at Class Certification, Stockholder Plaintiffs Have Demonstrated that Classwide Issues of Loss Causation Predominate....................................33

4.    The Class Action Mechanism Is Superior to Other Available Methods of Adjudication..........................................37

IV. CONCLUSION..............................................................................38

# TABLE OF AUTHORITIES

**Page**

## CASES

*Amchem Prods. v. Windsor*,
521 U.S. 591 (1997)..................................................................26

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)..................................................................27

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989)...........................................28, 29

*Cheney v. Cyberguard Corp.*,
213 F.R.D. 484 (S.D. Fla. 2003)......................................... *passim*

*Cooper v. Pac. Life Ins. Co.*,
229 F.R.D. 245 (S.D. Ga. 2005) ...........................................13, 15

*Cox v. Am. Cast Iron Pipe Co.*,
784 F.2d 1546 (11th Cir. 1986) ...................................................13

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)..............................................................33, 35

*Freeland v. Iridium World Communs., Ltd.*,
233 F.R.D. 40 (D.D.C. 2006) .....................................................34

*Freeman v. Laventhol & Horwath*,
915 F.2d 193 (6th Cir. 1990) ......................................................28

*In re Amerifirst Sec. Litig.*,
139 F.R.D. 423 (S.D. Fla. 1991)..................................................27

*In re Catalina Mktg. Corp. Sec. Litig.*,
No. 8:03-cv-1582 (M.D. Fla. Jan. 29, 2006) .................................34

*In re Cisco Systems, Inc. Sec. Litig.*,
No. C-01-20418-JW (N.D. Cal.) .................................................20

*In re HealthSouth Corp. Sec. Litig.*,
213 F.R.D. 447 (N.D. Ala. 2003) ....................................... *passim*

**Page**

*In re Miller Indus. Sec. Litig.*,
    186 F.R.D. 680 (N.D. Ga. 1999) ...........................................................16, 26

*In re NTL Sec. Litig.*,
    No. 02 Civ. 3013 (LAK) (AJP),
    2006 U.S. Dist. LEXIS 5346 (S.D.N.Y. Feb. 14, 2006) ...............................35

*In re Parmalat Sec. Litig.*,
    376 F. Supp. 2d 472 (S.D.N.Y. 2005) ...........................................................33

*Kirkpatrick v. J.C. Bradford & Co.*,
    827 F.2d 718 (11th Cir. 1987) ............................................................. *passim*

*Lagrasta v. First Union Secs., Inc.*,
    No. No. 2:01-cv-251-FTM-290NF,
    2005 U.S. Dist. LEXIS 20207 (M.D. Fla. Aug. 8, 2005)...............................12

*Lipton v. Documation Inc.*,
    734 F.2d 740 (11th Cir. 1984) .......................................................................27

*Simpson v. AOL Time Warner, Inc.*,
    452 F.3d 1040 (9th Cir. 2006) .......................................................................33

*Unger v. Amedisys Inc.*,
    401 F.3d 316 (5th Cir. 2005) .........................................................................28

*Valley Drug Co. v. Geneva Pharm., Inc.*,
    350 F.3d 1181 (11th Cir. 2003) .....................................................................11

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §77 ....................................................................................................13, 27, 33
    §77k ................................................................................................................13
    §77o ................................................................................................................13
    §78j(a) ............................................................................................................13
    §78(b) .............................................................................................................13
    §78j(c) ............................................................................................................13
    §78n(a) ...........................................................................................................13
    §78t(a) ............................................................................................................13

**Page**

Federal Rules of Civil Procedure
    Rule 23......................................................................2, 3, 11, 16
    Rule 23(a) ................................................................... *passim*
    Rule 23(a)(1)...............................................................12, 13
    Rule 23(a)(2)...............................................................13, 14
    Rule 23(a)(3)......................................................................14
    Rule 23(a)(4)...............................................................16, 25
    Rule 23(b)..............................................................11, 25, 37
    Rule 23(b)(3) ............................................................... *passim*

17 C.F.R.
    §240.10b-5...............................................................13, 33, 34
    §240.10b-5(a)....................................................................33
    §240.10b-5(c)....................................................................33
    §240.14.............................................................................13
    §240.14a-9........................................................................13

Lead Stockholder Plaintiffs Central States, Southeast and Southwest Area's Pension Fund ("Central States"), New Mexico State Investment Council and the Educational Retirement Board of New Mexico ("New Mexico"), the State of Michigan Retirement Systems ("Michigan") and Julius McQueen and Merger Subclass Plaintiffs Marsha Kouba, David Dubrow (NSC Merger), Donald Angle, Jack Kennedy, Dale Willetts (TCD Merger), Franklin and Rosalyn Ross, Trustees of the Franklin A. Ross and Rosalyn J. Ross Revocable Living Trust (Horizon Merger) (collectively "Stockholder Plaintiffs") move for Class Certification, seek to be appointed class representatives and seek the appointment of Coughlin Stoia Geller Rudman & Robbins LLP and Labaton Sucharow LLP as Co-Class Counsel.[1] Stockholder Plaintiffs bring this motion pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and ask that the following class and subclasses be certified:

> All persons who, between April 24, 1997 and March 18, 2003 (the "Stockholder Class Period"), purchased or otherwise acquired the stock or options of HealthSouth Corporation ("HRC," "HealthSouth" or the "Company"), and were damaged thereby (the "Stockholder Class"). Included in the Stockholder Class are persons who acquired HealthSouth securities in exchange for the stock or options of the National Surgery Centers, Inc. ("NSC"), Horizon/CMS Healthcare Corporation ("Horizon") and The Company Doctor ("TCD") mergers (the "Merger Subclasses"). Excluded from the Stockholder Class and Merger

---

[1]    On June 24, 2003, this Court entered an order creating the Merger Subclasses and appointed Coughlin Stoia Geller Rudman & Robbins LLP as lead counsel for the Stockholder Plaintiffs  and Schatz Nobel Izard P.C. and Ragsdale LLC as additional counsel for the Merger Subclasses.

Subclasses are current and former defendants, members of the immediate family of any current or former defendants, the directors, officers, subsidiaries and affiliates of HealthSouth, any person, firm, trust, corporation, officer, director or other individual or entity in which any current or former defendant has a controlling interest, and the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.[2]

## I.     PRELIMINARY STATEMENT

Class actions provide an efficient mechanism to resolve numerous, related claims in one forum, establish uniform standards for conduct, preserve judicial resources, and serve the "public interest[] in the private enforcement of various regulatory schemes, particularly those governing the securities markets." *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 727 (11th Cir. 1987).   Securities matters, such as this one, where fraudulent conduct, and false and misleading statements and omissions, are alleged to have deceived investors are ideally suited for class treatment under Rule 23 of the Federal Rules of Civil Procedure ("Rule 23").   *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 489 (S.D. Fla. 2003).   As shown below, Stockholder Plaintiffs satisfy each of the Rule 23 certification requirements.

_____

[2]     As a result of this Court's previous rulings, different liability periods apply in this matter.  As to the Stockholder Plaintiffs' claims against Richard Scrushy, the applicable liability period is April 24, 1997 through March 18, 2003.  As to defendant Ernst & Young ("E&Y"), the liability period is March 30, 2000 through March 18, 2003. As to defendant UBS AG, Benjamin Lorello, William McGahan and Howard Capek (collectively the "UBS Defendants"), the liability period is July 30, 1999 through March 18, 2003.

## II.    FACTUAL BACKGROUND[3]

It is now well known that between 1997 and 2003, HealthSouth by and through their employees including CEO Richard Scrushy reported false financial and operating results for HealthSouth, including overstated revenue, net income, earnings-per-share, assets and stockholders' equity.  ¶2.[4]  HealthSouth also took advantage of its high stock price to acquire other companies throughout the nineties into 1998, and issued billions in debt through false and misleading Registration Statements.  ¶3.  Insiders, including Scrushy, dumped tens of millions of dollars worth of inflated HealthSouth stock on the market.  Subsequent to the financial fraud revelations becoming public, HealthSouth fired E&Y, its outside auditor during that time, and untimely warned investors not to rely on any of the E&Y audited HealthSouth financial statements.  ¶2. The Company eventually restated its financial results, eliminating over $2.8 billion in previously reported net income and wiping out any profit ever reported by HealthSouth as a public company.  *Id.*

On March 22, 2003, HealthSouth's board of directors established the Special Audit Review Committee ("SARC") and directed it to conduct an independent forensic investigation of accounting irregularities at HealthSouth.  After a fourteen

---

[3]     Given the Court's and parties' familiarity with the allegations in this matter, Stockholder Plaintiffs have not included a full summary of the wrongdoing alleged in the Joint Third Amended Complaint.

[4]     All ¶___ cites are to the Joint Third Amended Complaint (doc. #721).

month investigation, on May 28, 2004, the SARC completed a forensic accounting report ("SARC Report") detailing the information it uncovered.  ¶11.  The SARC Report documented the following:  (a) identification of $2.741 billion in "false or unsupported entries"; (b) identification of $632 million in other accounting issues and transactions that were "sufficiently aggressive or questionable to warrant discussion"; (c) E&Y had declined to furnish the SARC with access to its workpapers; (d) "nearly 80% of the overstatement of HealthSouth's pre-tax income" arose from "[i]mproper revenue recognition attributable to reductions of contractual adjustments"; (e) reported cash balances were overstated by approximately $373 million; (f) the Company's books carried $18 million in outstanding loans to employees "despite the absence of timely (or in some cases any) repayment"; (g) "[a]n assessment of whether E&Y fulfilled its responsibilities was beyond the scope of the Committee's investigation"; and (h) "HealthSouth's internal controls [continue to] have serious weaknesses, especially in the areas of contractual allowances, receivables, and fixed assets." ¶58.[5]

Scrushy and the other former HealthSouth employees involved in the fraud and merger Registration Statement misstatements could not have perpetrated this deception without the knowledge and involvement of HealthSouth's outside auditor – E&Y – and investment bankers – UBS Defendants.  As summarized briefly below,

---

[5]    The SARC's work was limited by at least a couple inhibiting factors.  First, E&Y refused to grant the SARC access to workpapers for the years 1996 to 2002.  Second, HealthSouth's email retention policy resulted in the elimination of most e-mails during the relevant period.

E&Y and the UBS Defendants made false and misleading statements and omissions and played active and critical roles in the scheme to inflate HealthSouth's financial condition, thereby causing the HealthSouth's investors to suffer billions of dollars in losses.

**E&Y's Involvement in the Misconduct**

The fraudulent and deceptive conduct engaged in at HealthSouth could not have been possible without the active participation of E&Y, HealthSouth's outside auditor at the time.

By early 1994, E&Y was well aware that HealthSouth had improperly overstated its 1993 earnings by $27 million, through three improper activities: (i) overstating revenue by shifting extraordinary revenue items into ordinary recurring revenues; (ii) understating its allowance for contractual adjustments; and (iii) under-accruing expenses, thereby deferring those expenses to later periods. In fact, as E&Y concluded its audit of HealthSouth's 1993 financial statements, the E&Y audit engagement partner, G. Marcus Neas, informed Michael Martin, HealthSouth's then CFO, that the Company would have to acquiesce to E&Y's accounting treatment of $3 million in investment banking fees because E&Y had looked the other way on the $27 million earnings overstatement. Specifically, Neas told Martin, in words or substance: "Don't question me on this; I turned my head on the $27 million." While the amounts of the overstatements would grow far greater in later years, the improper accounting

practices known to E&Y as early as 1994 would remain substantially the same throughout the Class Period.  ¶¶396, 471.

Additionally, in March 1995, the Center for Financial Research & Analysis ("CFRA") issued a report on HealthSouth which concluded that there were operational concerns and a weak control environment at HealthSouth and that the Company engaged in aggressive accounting for acquisitions and for startup and related costs.  A copy of that report was attached to an internal E&Y memorandum from James P. Conley to Neas who, as noted previously, was aware from his work as the E&Y audit engagement partner that HealthSouth was falsifying its earnings and assets.

In exchange for "turning its head" to HealthSouth's wrongful accounting practices, E&Y received lucrative payments from the Company, many of which were concealed by mislabeling them as payments for "audit-related services."  For example, as part of a program commenced in 1996 at Scrushy's insistence, E&Y was hired and paid millions of dollars to conduct "Pristine Audits" – checks of the cleanliness and physical appearance of HealthSouth's approximately 1,800 surgical and rehabilitation facilities.  In some years, HealthSouth paid E&Y more for the Pristine Audits than it paid for year-end financial statement audits.  ¶¶422-429.

E&Y regularly turned a blind eye to material issues during the course of its audits of HealthSouth's financial statements and yet still issued clean audit opinions year after year.  In sworn testimony, Emery Harris detailed how E&Y, after

discussions with HealthSouth's senior management, systematically issued unqualified auditor's reports on HealthSouth's financial statements when, in fact, E&Y had open audit questions on those financial statements and concerns about the accounting practices being utilized by the Company.  Harris also testified that the accounting fraud at HealthSouth should have been "obvious" to E&Y, and that the only rational explanation for E&Y's failure to expose the fraud was a desire by E&Y to avoid jeopardizing its highly lucrative relationship with a long-standing client.  ¶¶394-395, 475.

E&Y also deliberately ignored red flags that signaled fraud.  E&Y failed to extrapolate audit problems found in HealthSouth's Florida facilities (which were subject to separate state-required audits) to the rest of the country, insist on access to HealthSouth financial and accounting computer systems, reconcile cash receipts with revenue and review or request fixed asset schedules from the Company.  ¶¶476, 483-487.  E&Y signed off on leases and special purpose entity accounting, without any due diligence.  ¶¶479-480.  E&Y also never required back-up or conducted any due diligence on the accounting for the Horizon acquisition.  A simple check would have revealed the obvious improper use of over $400 million in a suspense account to eliminate false earnings.  ¶¶477-478.  Even when former HealthSouth employee Michael Vines told E&Y of the falsification of records regarding fixed assets purportedly acquired by HealthSouth, E&Y never contacted Vines to discuss the

improprieties identified in his email, nor followed up on the information in any meaningful way.  ¶10.

As HealthSouth's outside auditor, E&Y did not simply fail to put a stop to, or catch, the Company's wrongful accounting practices; rather, it actively and knowingly facilitated these practices in order to profit lucratively from them.  As noted by the SARC: "The magnitude of the fraud and the length of time over which it occurred inevitably raise questions about the role, responsibilities, and effectiveness of the Company's former outside auditors."  SARC at 38 n.49.

**The UBS Defendants' Involvement in the Misconduct**

The UBS Defendants played a very active and vital role in Scrushy and HealthSouth's fraudulent scheme to inflate the Company's financial condition.  The UBS Defendants made materially false and misleading statements in Registration Statements and Prospectuses utilized by HealthSouth and its investment banks to raise billions of dollars of new capital for HealthSouth, and also made materially false and misleading statements in analysts' reports written and issued by UBS, which artificially inflated the trading price of HealthSouth's publicly traded securities. Furthermore, as thoroughly detailed in the Third Amended Complaint, the UBS Defendants devised and executed fraudulent financing schemes that were vital to the success of Scrushy and HealthSouth's overall scheme using special purpose entities,

stock repurchase programs and acquisitions to defraud its investors. ¶¶12-18, 299-328, 332-333, 434-465.[6]

In order to perpetuate the fraudulent scheme, Scrushy and HealthSouth needed constant infusions of new capital to help cover up the true (and undisclosed) poor state of the Company's operations, to pay taxes on fictitious revenue, and to help fund the growth by acquisitions scheme. Scrushy turned to his trusted investment bankers, Lorello and McGahan, to provide this funding. Working side-by-side on an almost daily basis during the Class Period with Lorello and McGahan, HealthSouth completed scores of acquisitions, adding hundreds of millions of dollars in annualized revenues and selling more than $4 billion in new securities to investors via Citi/Salomon and UBS. McGahan and Lorello closely controlled the due diligence on the acquisitions and bond offerings to ensure the financial fraud remained hidden. ¶¶434-450. These defendants provided capital infusions through bond offerings and credit facilities that permitted HealthSouth to keep its doors open and the deception of HealthSouth's investors to continue.

In addition to providing HealthSouth with capital necessary to keep the fraud hidden, the UBS Defendants devised the means to continue to manipulate HealthSouth's reported financial results to hide the financial fraud using acquisitions

_____

[6]     The bond between UBS and Scrushy and HealthSouth ran so deep that illicit campaign contributions were made through UBS on behalf of Scrushy and HealthSouth. *See* ¶¶466-470.

and special purpose entities, and actively worked to achieve those ends.  The UBS Defendants also directed Scrushy and HealthSouth to initiate an aggressive repurchase of HealthSouth's stock in order to inflate HealthSouth's stock price further.  When the Securities and Exchange Commission ("SEC") started investigating Scrushy's 2002 stock sales, the UBS Defendants also provided Scrushy with an "exit strategy" which consisted of taking HealthSouth private in a Leveraged Buy-out and worked diligently to start that process.

Lorello, McGahan and Capek had direct knowledge of the fraudulent nature of HealthSouth's accounting as they were helping HealthSouth to arrange its stream of acquisitions, selling billions of dollars of HealthSouth securities to investors, and issuing glowing analyst research reports, often "strongly" recommending that investors buy HealthSouth securities.  ¶¶12-18, 299-328, 332-333, 436-475.

McGahan had personal knowledge of the Company's financial fraud in 1993 and provided his consulting services accordingly, so as to allow the fraud to continue. ¶300.  Capek had knowledge of the fraud by no later than the summer of 1999, however, he continued to publish analyst reports touting HealthSouth's strong financial condition and results.  *See* Appendices to Joint Amended Consolidated Complaint for Violations of the Federal Securities Law at Tab 6.  In fact, Capek, at the very same time he had a "Strong Buy" recommendation on HealthSouth securities and was publicly extolling the purported strength of HealthSouth's business, privately told a favored client in writing that because HealthSouth was a "mess" and a "pig" he

"wouldn't own a share [of this stock]." ¶314. Lorello was also well aware of the fraud at HealthSouth and, indeed, affirmatively took steps to insure that it would continue. ¶18(d). Among other things, Lorello worked with McGahan to devise strategies to avoid the exposure of the financial fraud through due diligence on acquisitions and the debt offerings. Lorello also worked to secure credit line financing for HealthSouth and used his position at UBS to waive an underwriting fee that was diverted to the former governor of Alabama in the form of a bribe on behalf of HealthSouth and Scrushy.

The UBS Defendants walked hand in hand with HealthSouth and Scrushy as they deceived the market concerning HealthSouth's financial status and business promise. The UBS Defendants' role was central, active and essential to maintain the illusion that HealthSouth was a strong, vital company.

## III. ARGUMENT

The Eleventh Circuit has treated securities class actions favorably. *In re HealthSouth Corp. Sec. Litig.*, 213 F.R.D. 447, 456 (N.D. Ala. 2003) ("*HealthSouth I*"). A securities suit may be maintained as a class action if all four subsections of Rule 23(a) and at least one of the subsections of Rule 23(b) are satisfied. *Kirkpatrick*, 827 F.2d at 721 n.2. A trial court may consider the merits of the case only to the degree necessary to determine whether the requirements of Rule 23 are satisfied. *See Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 n.15 (11th Cir. 2003). As such, trial courts are not permitted to "reject class

certification based only on an assessment of Plaintiffs' likelihood of success on the claim." *Lagrasta v. First Union Secs., Inc.*, No. No. 2:01-cv-251-FTM-290NF, 2005 U.S. Dist. LEXIS 20207, at *7 (M.D. Fla. Aug. 8, 2005) (quoting *Kirkpatrick*, 827 F.2d at 723).

## A.    The Rule 23(a) Standards for Class Certification Are Satisfied

Rule 23(a) establishes four requirements for class certification. A representative party or parties may sue on behalf of a class if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). As set forth below, this action clearly meets each of these requirements.

### 1.    The Members of the Class Are so Numerous that Joinder Is Impracticable

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). As this Court has previously stated, "[i]mpracticable does not mean impossible; plaintiffs need only show that it would be extremely difficult or inconvenient to join all members of the class." *HealthSouth I*, 213 F.R.D. at 457 (internal quotes and citations omitted). In fact, "[c]ourts generally presume that plaintiffs establish numerosity when the claims involve securities traded nationally." *Id*.

HealthSouth's stock traded on the New York Stock Exchange. *Id.* During the Class Period, thousands of different people and entities owned as much as 423 million shares of HealthSouth common stock and billions of dollars of debt securities. Second Amended Consolidated Class Action Complaint [Legal Theories and Claims] at ¶6 (doc. #720). As this Court found in its previous class certification order, "a common sense assumption" should be made that the potential class meets the numerosity requirement of Rule 23(a)(1). *HealthSouth I*, 213 F.R.D. at 457.

### 2. This Action Involves Questions of Law and Fact Common to Stockholder Plaintiffs and the Class

Rule 23(a)(2) demands that Stockholder Plaintiffs show that class members share common questions of law or fact. Fed. R. Civ. P. 23(a)(2). It is not, however, necessary that all questions of law or fact be common. C*ox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1557 (11th Cir. 1986). "The threshold for establishing commonality under Rule 23(a)(2) is not onerous – where a common scheme of deception is credibly alleged, Rule 23 (a)(2) is met." *Cooper v. Pac. Life Ins. Co.*, 229 F.R.D. 245, 257 (S.D. Ga. 2005).

While this list certainly is not exhaustive, the members of the Stockholder Class and Merger Subclasses have the following questions of law and fact in common:

(a)   Whether the Securities Exchange Act of 1934 ("Exchange Act") §§10(a), (b) and (c), 14(a) and 20(a), and Rules 14a-9 and 10b-5 were violated by defendants;

(b)   As to the Merger Subclasses, whether the Securities Act of 1933 ("Securities Act") §§11 and 15 of the Securities Act were violated by defendants;

- 13 -

(c)     Whether defendants misrepresented material facts, including issuing false or misleading merger Registration Statements to the Merger Subclasses;

(d)     Whether defendants' statements omitted material facts necessary to cause the statements made, in light of the circumstances under which they were made, not misleading;

(e)     Whether defendants participated in a scheme to defraud the Stockholder Class and Merger Subclasses;

(f)     Whether the defendants knew or recklessly disregarded that their statements were false and misleading;

(g)     Whether the prices of HealthSouth securities were artificially inflated during the Class Period; and

(h)     The extent of damage sustained by members of the Stockholder Class and Merger Subclasses, and the appropriate measure of damages.

As both the factual and legal issues necessary to prove these claims and establish the liability of defendants are essentially identical for the members of the Stockholder Class, the commonality requirement has been met.  *HealthSouth I*, 213 F.R.D. at 458 ("[t]he court concludes that some questions of law or fact are common to the class and, thus, plaintiffs have met the minimum requirement of Fed. R. Civ. P. 23(a)(2)").

### 3.     The Proposed Class Representatives' Claims Are Typical of the Putative Class Members' Claims

The typicality requirement of Rule 23(a)(3) dictates that the claims of the representative parties have the same essential characteristics as those of the class at large.  Fed. R. Civ. P. 23(a)(3).  It is not critical that the class representatives' claims are factually identical to those of the proposed class. *See HealthSouth I*, 213 F.R.D at

460 ("mere factual differences within the class generally do not make a claim atypical").   Instead, "[t]he important inquiry is whether the proposed class representatives' claims have the same essential characteristics as those of the proposed class."  *Id.* at 458.

Here, the proposed Class Representatives satisfy the typicality requirement because each representative purchased or otherwise acquired HealthSouth stock during the Class Period, and each representatives' claims "arise from the same event or pattern or practice and are based on the same legal theory" as the claims of other class members.  *Cooper*, 229 F.R.D. at 257.

As set forth in the commonality section above, Stockholder Plaintiffs seek to recover damages on behalf of the Stockholder Class caused by defendants' false and misleading statements, material omissions and deceptive conduct in furtherance of the scheme to defraud HealthSouth's shareholders.  Each proposed Class Representative is typical of other class members because each: (i) purchased or acquired HealthSouth shares that were artificially inflated as a result of defendants' false statements, omissions and deceptive conduct; and (ii) suffered damages common to all other class members when the artificial inflation was removed from the stock price.  In short, "defendant's actions impact[ed] the named representatives in substantially the same way as other class members."  *Cooper*, 229 F.R.D. at 257.

Moreover, any suggestion that the representatives' claims are atypical lacks merit.  The proposed Stockholder Class includes subclasses for each of the relevant

mergers – Horizon, NSC and TCD, and separate representatives for each of these proposed subclasses to represent those class members who seek to recover damages.

### 4. The Adequacy Prong Is Satisfied

Rule 23(a)(4) requires Stockholder Plaintiffs to show that they will fairly and adequately protect the interests of all class members.  To satisfy this requirement, Stockholder Plaintiffs must demonstrate that: (1) their interests are not antagonistic to those of the other putative class members, and (2) their attorneys are qualified, experienced, and generally able to conduct the litigation. *Kirkpatrick*, 827 F.2d at 726.

### a. The Proposed Representatives Have Already Demonstrated They Will Adequately Represent the Proposed Class and Subclasses

Rule 23's adequacy requirement is designed to ferret out actual conflicts between the proposed representatives and the class.  "The adequacy inquiry . . . serves to uncover conflicts of interest between named parties and the class they seek to represent." *In re Miller Indus. Sec. Litig.*, 186 F.R.D. 680, 686 (N.D. Ga. 1999). However, courts tend to reject arguments that hypothetical conflicts or antagonisms that theoretically could exist between the class representatives and the class members defeat certification. *Id.*

Here, no cognizable conflicts or antagonisms exist between the proposed class representatives and the other class or subclass members.  The proposed class representatives possess claims under the federal securities laws against the defendants

in connection with their purchase or acquisition of HealthSouth securities during the Class Period.  Like the members of the proposed class and subclasses, each of the Stockholder Plaintiffs suffered damages because of defendants' misrepresentations, omissions or fraudulent conduct during the Class Period.  Thus, Stockholder Plaintiffs and the classes of investors they seek to represent have the same interests in recovering damages caused by defendants' wrongful conduct.[7]

Indeed, the Stockholder Plaintiffs have been involved in this litigation for a considerable amount of time – some over nine years – and are dedicated to successfully litigating this case.  The Stockholder Plaintiffs have participated in motions to be appointed lead plaintiffs, amended the complaints, reviewed motions filed by Lead Counsel, reviewed and approved a partial settlement, reviewed and approved the dismissal of numerous pleading defendants, responded to extensive document requests, responded to numerous interrogatories, and have prepared for and given depositions.

The time and dedication to the prosecution of this action that the Stockholder Plaintiffs have already given are the hallmarks of a responsible and adequate class representative.  The Stockholder Plaintiffs have responded to and produced documents

---

[7]     Moreover, the Stockholder Plaintiffs have addressed the Court's concern that conflicts existed that compromised the adequate representation of all class members' interests.  *See HealthSouth I*, 213 F.R.D. at 462.  With the creation of the Merger Subclasses, and the appointment of separate representatives and counsel for these subclasses, there is no possibility of a conflict of interest between those class members who purchased their HealthSouth stock on the open market and those who acquired their HealthSouth stock as a result of the Horizon, NSC or TCD mergers.

pursuant to document requests defendants have served on them.[8]  Completing this task

required the proposed class representatives to search for hard copy documents located

at their homes or offices and search their computer systems for responsive electronic

documents.  With the assistance of Lead Counsel, the proposed class representatives

have also responded to a number of interrogatories defendants have served on them.

The proposed class representatives have also spent a considerable amount of time

preparing for and giving their depositions.  The extensive amount of time and work

the proposed class representatives have spent on this litigation surely demonstrates

their adequacy in representing the Stockholder Class.

      Moreover, the representatives have also shown knowledge of the litigation

beyond that which the law requires of a class representative.  *Kirkpatrick*, 827 F.2d at

726 (adequacy inquiry focused  on whether plaintiffs' counsel are qualified,

experienced, and able to conduct the litigation).  As discussed below, the record shows

that they have acted in the best interests of absent class members by taking an active

role in monitoring and controlling the litigation.[9]

---

[8]      While E&Y and UBS served document requests on the proposed representatives for the
Merger Subclasses, they accepted the Merger Subclasses' objection to providing documents to E&Y
and UBS on relevancy grounds given that the Merger Subclasses have no pending claims against any
defendant but Scrushy.  To date, Scrushy has not served written discovery on the proposed Merger
Subclass representatives, nor sought to take their depositions.

[9]      Attached as Exhibits 1-10 are declarations in further support of the proposed class
representative's adequacy.

### (1)    Central States

Proposed Class Representative Central States is one of the largest Taft-Hartley benefits funds in the country; it consists of the Pension Fund and the Health and Welfare Fund.  As part of their fiduciary responsibilities to the members of Taft-Hartley pension funds, the Department of Labor has recommended that the pension funds take active roles in shareholder litigations.

Central States deputy general counsel, James Condon, testified that he reports to the pension fund's board at least every other month concerning this and other litigation that Central States is involved in.  Condon Depo. at 11:9 – 14; 38:8 – 40:10 attached as Ex. 11.  Aside from briefing the board regarding this litigation, Mr. Condon has discussed Central State's involvement in this case with his superiors at Central States.  *Id*. at 15:20 – 16:13; 17:13 – 19:1.

Central States maintains a firm understanding of the major developments and issues in the litigation and reviews the important pleadings that are filed.  *Id*. at 130:19 – 131:2; 40:2-10; 178:8 – 179:10.  As Mr. Condon testified, Central States reviewed the amended complaints and discussed them with counsel.  *Id*. at 218:22 – 220:10.  Central States has also reviewed most of the other pleadings filed in the case. *Id.* at 220:11 – 221:3.  Central States also undertook substantial efforts related to the discovery process in this litigation, including efforts to preserve and produce relevant documents, and responding to defendants' interrogatories.  *Id*. at 176:10 – 199:11; 252:16 – 270:16.

Central States also attended the mediations that resulted in the partial settlement of this litigation with HealthSouth and agreed to the terms of the settlement. *Id.* at 233:22 – 234:22; 235:13 – 237:7. In fact, Mr. Condon and counsel from Coughlin Stoia presented the Central States board with the settlement terms prior to the board approving the settlement. *Id.* Central States also approved the decision to dismiss the pleading defendants from the litigation. *Id.* at 241:17 – 242:20.

Based on its experience in securities litigations and with other cases in the federal court system, Central States is confident it can be an asset to the Stockholder Class. *Id.* at 216:4 – 218:8. Central States is wholly aware that it will be representing the interests of the entire Stockholder Class and not just its own. *Id.* at 198:7-11. Indeed, in addition to the settlement of $445 million that Central States has already obtained for investors in this litigation, Central States was previously successful in obtaining a settlement of approximately $99.25 million for shareholders in *In re Cisco Systems, Inc. Sec. Litig.*, No. C-01-20418-JW (N.D. Cal.). As such, Central States' ability to avidly pursue the interests of the class members it seeks to represent cannot reasonably be called into question.

### (2)    New Mexico

New Mexico consists of two large pension funds: the New Mexico State Investment Council and the Educational Retirement Board of New Mexico. As large institutional investors, both of these funds have previously taken active roles in various securities class actions. Jacksha Depo. at 88:15 – 89:4, attached as Ex. 12.

Moreover, New Mexico has played a substantial role in representing the interests of the shareholders in this action since joining the litigation in 2005.

Members from both of the New Mexico funds played an active role in selecting counsel for this litigation. *Id.* at 73:20 – 74:18.  Moreover, Mr. Jacksha testified that New Mexico frequently discussed various courses of action in this litigation with their counsel to determine which actions to pursue for New Mexico and the class.  *Id.* at 98:12 – 99:14.  They undertook substantial efforts to facilitate this litigation by preserving and producing relevant documents.  *Id.* at 104:11 – 120:2.

New Mexico has demonstrated its understanding of the allegations involved in this litigation, and the facts supporting those allegations.  *See id.* at 134:23 – 138:12; 160:12 – 162:2; 170:8 – 172:17.  Furthermore, as part of their commitment as Co-Lead Plaintiff, New Mexico has maintained a consistent awareness of the major developments in this litigation and has reviewed important pleadings prior to their filing.  *Id.* at 127:22 – 132:21.  New Mexico has shown that it has a clear understanding of its responsibility to take actions to serve and protect the best interests of the class.  *Id.* at 96:1 – 97:24; 242:21 – 247:7.

New Mexico was also actively involved in, and thoroughly informed of, the negotiations that resulted in the partial settlement in this litigation.  *Id.* at 233:2 – 236:9; 250:1 – 254:7.  Moreover, it also conducted its own in-house analysis of the settlement terms before offering its approval.  *Id.* at 236:1-9.  Mr. Jacksha testified

that New Mexico was actively involved in, and fully endorsed, the decision to dismiss the pleading defendants from this litigation. *Id.* at 258:5 – 261:11.

### (3)   Michigan

Michigan consists of the Michigan Public School Employees' Retirement System, the State of Michigan Employees' Retirement System, the State Police Retirement System and the Judges Retirement System. Ronald Jones, the Michigan State Treasurer employee who is overseeing the litigation on behalf of Michigan, has an extensive background in securities related matters. Jones Depo at 23:13 – 26:4, attached as Ex. 13. In fact, Mr. Jones has testified as an expert in a prior securities fraud case. *Id*. at 23:15 – 24:22.

Michigan has played an active role in this litigation since getting involved in 2005. Mr. Jones testified to having extensive conversations with Michigan's counsel concerning the factual and procedural developments of the case. *Id*. at 226:15-16. In furtherance of its efforts to become a class representative, Michigan has also undertaken considerable efforts to produce documents and respond to interrogatories. *Id*. at 228-240.

Michigan's active involvement in this case is further demonstrated by Mr. Jones' testimony that he reviewed the three complaints that have been filed to date, read motions prior to them being filed, and reviewed the Court's rulings in the case. *Id*. at 17:3-6; 23:20-22; 213:13-20; 218:1-15. Moreover, Michigan also understands

the facts of the case and the role of each remaining defendant played in the fraud.  *Id*.
at 224:5 – 226:12.

Additionally, Michigan actively participated in the partial settlement with
HealthSouth.  Mr. Jones testified that he discussed the settlement between plaintiffs
and HealthSouth with the State Treasurer and others in the Treasurer's office.  *Id*. at
221:10-19.  Michigan believed that the settlement was fair and reasonable to the
Class.  *Id*. at 221:1-3.  Finally, Michigan understood the reasoning behind and
approved of the dismissal of the pleading defendants from this case.  *Id*. at 222:4-18.

### (4)     Julius McQueen

Proposed class representative Julius McQueen has dedicated a substantial
amount of time – since 1998 – litigating this case on behalf and to the benefit of the
entire Stockholder Class.  McQueen Depo. at 161:16 – 162:4 attached as Ex. 14.  As
he stated at his most recent deposition in this matter, Mr. McQueen continues to read
the briefs that are filed and contacts Lead Counsel when he has questions regarding
the litigation.  *Id.*

Mr. McQueen has also appeared twice for his deposition, once on August 30,
2001 and again on July 9, 2007.  He also spent a considerable amount of time
searching for documents in response to defendants' document requests and responding
to defendants' interrogatories.  *Id*. at 20:10-14; 24:22 – 25:8.  Mr. McQueen also
testified that, he has participated in this litigation to the benefit of the Stockholder
Class without any promises being made to him by Lead Counsel.  *Id*. at 259:9-17.

### (5)     Merger Subclass Plaintiffs

As set forth in the attached declarations, each of the proposed Merger Subclass Plaintiffs (Marsha Kouba, David Dubrow (NSC Merger), Donald Angle, Jack Kennedy, Dale Willetts (TCD Merger), and Franklin and Rosalyn Ross, Trustees of the Franklin A. Ross and Rosalyn J. Ross Revocable Living Trust (Horizon Merger)) have also dedicated substantial time and effort to litigate this case on behalf and to the benefit of the Merger Subclasses.  *See* Exs. 5-10.  Each proposed Merger Subclass Plaintiff has actively monitored and participated in the litigation, including reviewing pleadings and consultations with Merger Subclass Counsel.  *Id*.

### b.     Proposed Class Counsel Are Adequate

The proposed class representatives have retained attorneys who possess extensive experience litigating class and securities actions and who have demonstrated their commitment to aggressively asserting the interests of the class and subclasses in this case.[10]  Co-Lead Counsels' dedication to litigating this case on behalf of the Stockholder Class is demonstrated by the following:

- •     moved for their clients to be appointed lead plaintiffs;

- •     amended the complaint three times;

- •     defeated defendants' numerous motions to dismiss;

- •     interviewed nearly 100 former employees;

---

[10]     *See* Class Counsels' Resumes attached as Exhibits 15-20 as support of class counsels' adequacy.

- obtained documents from the DOJ, SEC and EC committee;

- obtained $445 million in settlement from HealthSouth and other settling defendants; and

- received over 20 million pages of documents from defendants and third parties.

Because the proposed class representatives' interests are not antagonistic to the class members' interests and their counsel are fully qualified, the two-fold standard of Rule 23(a)(4) is satisfied.

## B.   The Rule 23(b)(3) Standards for Class Certification Have Been Met

In addition to meeting the requirements of Rule 23(a), this litigation also satisfies the requirements of Rule 23(b).  Rule 23(b)(3) requires Stockholder Plaintiffs to demonstrate that common questions of law or fact predominate over individual questions, and that a class action is superior to other available methods of adjudication.  The inquiry under Rule 23(b)(3) is whether certification will ensure economies of time, money and judicial resources by allowing a few representatives to proceed on behalf of a larger group so that a class action would be the most efficient method of proceeding.  *See, e.g.*, Fed. R. Civ. P. 23(b)(3) Advisory Committee Note, 1966 Amendment ("[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action . . . .").  Here, common questions of law and fact predominate and a class action is the superior method available to fairly and efficiently litigate the claims against defendants.

### 1. Common Questions of Law or Fact Predominate Over Questions Affecting Only Individual Class Members

The Supreme Court has noted that "[p]redominance is a test readily met" in securities cases. *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997). Stockholder Plaintiffs do not have to show that all questions of law or fact are common, "but only that some questions are common and that they predominate over individual questions." *Miller Indus.*, 186 F.R.D. at 688.

As stated above, the questions of law and fact in this litigation are, indeed, common amongst all the class members and predominate. *See* §II.A.2. Common amongst all the class members is whether the defendants violated the securities laws, whether defendants misrepresented material facts, whether defendants omitted material facts, whether defendants participated in a scheme to defraud, whether defendants acted with scienter, whether HealthSouth stock was artificially inflated during the Class Period and the extent of the damages sustained by the Stockholder Class and Merger Subclasses. Proving that defendants' committed the violations detailed in the complaint "will be common for the class" as "[t]he claims of the class indeed arise out of the same set of operative facts." *HealthSouth I*, 213 F.R.D. at 464. Moreover, "[t]he class as a whole faces the legal question of whether the alleged misrepresentations qualify as security fraud." *Id*.

2. **HealthSouth Stock Traded in an Efficient Market and Stockholder Plaintiffs Are Entitled to the Fraud-on-the-Market Presumption of Reliance**

Stockholder Plaintiffs have provided competent evidence to invoke the fraud-on-the-market presumption of class-wide reliance under the Exchange Act.[11] "[W]here plaintiffs demonstrate that they relied upon the integrity of the market in purchasing or selling securities in an open and developed market, they need not establish that they relied on specific misrepresentations." *In re Amerifirst Sec. Litig.*, 139 F.R.D. 423, 429 (S.D. Fla. 1991) (quoting *Kirkpatrick*, 827 F.2d at 722). "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988); *see also Lipton v. Documation Inc.*, 734 F.2d 740, 747-48 (11th Cir. 1984) (the fraud-on-the-market theory recognizes that "reliance may be presumed where securities are traded on the open market"). To invoke the "fraud on the market" presumption of reliance, plaintiffs need only make a preliminary showing that the market for their securities was informationally efficient; that is, the market price promptly responds to and thus

-----

[11]     The Merger Subclass Plaintiffs need not establish reliance to recover under their Securities Act claims for the misrepresentations and omissions in the Merger Registration Statements.

reflects public information that is material to the investment.  *See Cheney*, 213 F.R.D. at 501.

The following factors have been determined to indicate an efficiently traded security: (1) a large weekly trading volume, (2) a significant number of securities analysts followed and reported on the company's stock during the applicable period, (3) the stock had numerous market makers and arbitrageurs, (4) the company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, the ineligibility was the result of timing factors and not because the minimum stock requirements set forth in the Form S-3 instructions were not met, and (5) an historical showing of immediate price response to unexpected corporate events or financial releases.  *See*, *e.g.*, *Cammer v. Bloom*, 711 F. Supp. 1264, 1285-87 (D.N.J. 1989); *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005); *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 197 (6th Cir. 1990).  As Stockholder Plaintiffs' expert Bjorn I. Steinholt demonstrates, HealthSouth's securities traded in an efficient market during the Class Period.  *See* Expert Report of Bjorn I. Steinholt, CFA at ¶¶7-27 ("Steinholt Report") attached as Ex. 21.

### a.    Trading on NYSE

During the Class Period, HealthSouth was listed on the NYSE and traded under the ticker symbol HRC.  Every stock on NYSE is assigned to a specialist, whose responsibility it is to maintain a fair, competitive, orderly and efficient market for the securities assigned to them.  In short, the listing of HealthSouth stock on the NYSE

guaranteed that it was traded in an open market that a large number of investors could readily buy or sell its stock. [12]  *See* Steinholt Report at ¶11.

### b.    Weekly Volume

The high level of trading activity of HealthSouth stock indicates that HealthSouth stock traded in a liquid market.  During the Class Period, HealthSouth had a reported trading volume of more than 3.8 billion shares with a dollar trading volume of almost $45 billion.  *See id*. at ¶14.  Average reported daily trading volume during the Class Period was more than 2.5 million shares with an average daily dollar volume of more than $30 million.  *Id*.  The large amount of trading in HealthSouth's common stock demonstrates that HealthSouth common stock traded in an efficient market.  *Id*.

### c.    Analyst Coverage

The large number of security analyst's reporting on the financial condition and prospects of HealthSouth further demonstrates that HealthSouth stock traded in an efficient market.  During the Class Period, numerous analysts covered HealthSouth, including but not limited to UBS, Credit Suisse, First Boston, Salomon Smith Barney, J.P. Morgan, Chase H&Q, Bear Stearns, S.G. Cowen, Morgan Stanley and Goldman Sachs.  *Id*. at ¶16.  In addition to the analysts, hundreds of articles concerning

---

[12]    "[A]t a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System."  *Cammer*, 711 F. Supp. at 1292.

HealthSouth appeared in major financial news sources such as the *Dow Jones News,*
*Business Wire, Federal Filings Newswires* and *The Wall Street Journal*.  The large
number of analysts constitutes definitive evidence that: (i) securities analysts
monitored HealthSouth and provided investors with research on the Company; and
(ii) there was enough demand from investors for research on HealthSouth to justify
the economic cost for the investment research on the Company.  *Id*.  This evidence
further demonstrates that HealthSouth traded in an efficient market.  *Id*.

### d.    Market Makers and Arbitrage

During the Class Period, the short interest in HealthSouth common stock ranged
from approximately 5 million shares to a high of more than 33 million.  Steinholt
Report at ¶¶17-18.  Moreover, the majority of HealthSouth's shares were owned by
large sophisticated institutions.  *Id*. at ¶19.  These facts further demonstrate that
HealthSouth's stock traded in an efficient market.  *Id*. at ¶¶17-19.

### e.    Eligibility to File Form S-3

During the Class Period, filed Form S-3 registration statements thereby further
demonstrating the efficiency of the market for HealthSouth stock.  *Id*. at ¶20.

### f.    Price Reaction to New Material Information

The final factor by which to demonstrate market efficiency requires empirical
evidence that HealthSouth stock quickly incorporated new material information into

its stock price.[13]  *Id*. at ¶21.  Mr. Steinholt performed an event study that examined the publicly available, company specific information contemporaneous with significant common stock price returns of HealthSouth common stock.   Mr. Steinholt's comprehensive event study demonstrates that HealthSouth stock reacted to the release of new material information regarding HealthSouth and thus traded in an efficient market during the Class Period.  *Id*. at ¶¶21-118.

Mr. Steinholt analyzed HealthSouth's price reaction following two key disclosures – the September 30, 1998 disclosure and the August 27, 2000 disclosure – that revealed, at least partially, HealthSouth's true economic prospect previously concealed by the fraud by HealthSouth, UBS, E&Y, and Scrushy:

- On September 30, 1998, before the market had opened, HealthSouth warned about pricing pressure from managed care companies and its adverse impact on the Company's operating results going forward. (Complaint ¶561).  The Company's September 30th warning about the potential negative impact of increased pricing pressure from managed care clients on HealthSouth's future operating results represents new, material information that, in an efficient market, would be expected to result in a significant decline in its stock price.  As expected, on September 30, 1998, HealthSouth's stock price closed down at $10.50 per share from a closing price the previous day of $14.63 per share, a decline of $4.13 per share or more than 28%, on volume of more than 23.6 million shares or more than 11 times the Company's median volume during the Class Period.  [Exhibit H, page 21].  The cause and effect relationship between the new, material adverse information disclosed and HealthSouth's subsequent price decline was also discussed

---

[13]     The regression analysis used for the event study, and specific examples of the effects of material, new and unexpected information on HealthSouth's share price are detailed in Mr. Steinholt's expert report.

in numerous articles, including for example a Dow Jones Online News Report following the market close on September 30, 1998.

- On August 27, 2002, before the market had opened, HealthSouth disclosed that it was discontinuing earnings guidance for 2002 and 2003, and that the Company's EBITDA (earnings before interest, taxes, depreciation and amortization) would be negatively impacted by $175 million annually. The Company's August 27th reduction in EBITDA forecast, and discontinuation of 2002 and 2003 earnings guidance, represented new, material information that, in an efficient market, would be expected to result in a significant decline in its stock price. As expected, on August 27, 2002, HealthSouth's stock price closed down at $6.71 per share from a closing price the previous day of $11.97 per share, a decline of $5.26 per share or more than 43%, on volume of more than 42.5 million shares or 21 times the Company's median volume during the Class Period. [Exhibit H, page 67]. As discussed in the loss causation section below, this price decline was statistically significant at the 99% level of confidence. The cause and effect relationship between the new material adverse information disclosed and HealthSouth's subsequent price decline was widely discussed in numerous articles including by way of example a Dow Jones News Service article following the market close on September 30, 1998.

*Id.* at ¶¶22-24.

Mr. Steinholt opines that "HealthSouth's stock price reaction to the new, material information disclosed on September 30, 1998 and August 27, 2002, demonstrates that such new, material information was quickly incorporated into the Company's stock price, and, thereby, provides direct evidence that the market for HealthSouth's common stock was efficient." *Id.* at ¶25. He concludes that the market for HealthSouth's common stock during the Stockholder Class Period was impersonal, open, well developed, and efficient, in that the market price of the Company's common stock during this time period reflected the publicly available information concerning HealthSouth. *Id.* at ¶26. Because Stockholder Plaintiffs' evidence

- 32 -

establishes that HealthSouth common stock traded in an efficient market during the Class Period, they are entitled to the presumption of reliance and have satisfied the predominance requirement of Rule 23(b)(3).[14]

> ### 3. While Not a Proper Inquiry at Class Certification, Stockholder Plaintiffs Have Demonstrated that Classwide Issues of Loss Causation Predominate

Defendants will inevitably assert that under *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005), this action cannot be certified because Stockholder Plaintiffs cannot show that loss causation can be proven on a common basis throughout the Class Period. These forthcoming assertions fail.

First, any attempt to resolve loss causation at the class certification stage is improper:

---

[14]    Stockholder Plaintiffs evidence demonstrating that HealthSouth stock traded in an efficient market entitles them to invoke the presumption of reliance in support of all their claims under Rule 10b-5, including their claims under Sections (a) and (c) that defendants made materially false statements and omissions and engaged in deceptive conduct as part of a scheme to artificially inflate the price of HealthSouth stock. In upholding Stockholder Plaintiffs' allegations under Rule 10b-5(a) and (c), this Court already necessarily rejected defendants' assertions that Stockholder Plaintiffs' scheme allegations allowed "plaintiffs to circumvent the reliance requirement." *See* the UBS Defendants' Memorandum in Support of their Motion to Dismiss Plaintiffs' Amended "Scheme" and Securities Act Theories ("UBS Motion") (doc. #500) at 24-25. Defendants' inevitable attempt in their forthcoming opposition to rehash at class certification this long-defeated argument that Stockholder Plaintiffs are not entitled to the presumption of reliance for their claims under Rule 10b-5(a) and (c) should be rejected. Moreover, reliance in a scheme to defraud should be presumed. In *Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1052 (9th Cir. 2006), the court held the presumption applicable to plaintiffs' claims for scheme liability, stating "a plaintiff may be presumed to have relied on the scheme . . . and the defendants' conduct therein, was disseminated into an efficient market and was reflected in the market price." Similarly, in *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 509 (S.D.N.Y. 2005), the Court applied the fraud-on-the-market presumption to claims against secondary actors even though only the issuer made public misrepresentations to the market.

> While the matter of loss causation may become pertinent to the merits of
> Plaintiffs' claims and the timing of purchases may impact on damages
> and the asserted defenses must be addressed in due course, the court is
> not now in a position to, nor must it determine, whether Plaintiffs can
> meet their burden of proof on these substantive issues before deciding
> the class certification issue.

*In re Catalina Mktg. Corp. Sec. Litig.*, No. 8:03-cv-1582, *slip op.* at 36 (M.D. Fla. Jan. 29, 2006), attached as Ex. 22. A number of other courts have similarly held that class certification is an improper stage at which to determine loss causation. *See Freeland v. Iridium World Communs., Ltd.*, 233 F.R.D. 40, 47 (D.D.C. 2006) (refusing to determine whether plaintiff would "not be able to prove in his Rule 10b-5 claim that the decline in the price of his stock was proximately caused by Defendants alleged misrepresentations" because it "would require the Court to venture into the merits of [plaintiff's] claim").

Assuming, *arguendo*, that the Court addresses loss causation at this juncture of the proceedings, class certification here is appropriate because common issues of loss causation predominate. To begin, the Court has already upheld Stockholder Plaintiffs' allegations that, Scrushy, the UBS Defendants and E&Y made false statements and omissions and engaged in deceptive conduct that artificially inflated HealthSouth's stock price and caused Stockholder Plaintiffs' losses when the relevant truth was partially revealed on September 30, 1998, August 27, 2002 and March 18, 2003.[15]

---

[15]   THE COURT: . . . I have looked at it pretty extensively. I don't think the loss causation is insufficiently pled at all in this case.

Indeed, defendants' forthcoming opposition to class certification on this ground essentially is yet another motion to dismiss on loss causation grounds. *See In re NTL Sec. Litig.*, No. 02 Civ. 3013 (LAK) (AJP), 2006 U.S. Dist. LEXIS 5346, at *37 n.15 (S.D.N.Y. Feb. 14, 2006) (rejecting defendants' *Dura* argument and certifying a class). Any *Dura* arguments at this stage must fail, as *Dura* was not a class certification case, and Stockholder Plaintiffs already satisfied *Dura* when the Court denied defendants' motions to dismiss on loss causation grounds.

Indeed, Stockholder Plaintiffs have provided more than sufficient evidence that defendants' false statements, omissions and deceptive conduct artificially inflated HealthSouth's stock price and caused investors' losses. Mr. Steinholt analyzed the price reaction of HealthSouth stock following these partial disclosures of the relevant truth:

- On September 30, 1998, HealthSouth disclosed that, as a result of pressure from managed care firms to renegotiate existing contracts, the Company might have to revise earnings guidance going forward. (Complaint ¶¶222, 561-562). This was the first time the Company made such an admission that their previous guidance likely would have to be lowered, the September 30 disclosure caused a statistically significant price decline in HealthSouth's stock price.

---

\*      \*      \*

THE COURT: I don't want to go to loss causation; that is covered sufficiently in your briefs. I have read the allegations in the complaint on that. And I think they are sufficient.

February 9, 2006 Hearing Transcript at 70:9-22.

- On August 27, 2002, HealthSouth reduced its EBITDA (earnings before interest, taxes, depreciation and amortization) guidance by $175 million annually. (Complaint ¶¶284-290). The August 27 announcement disclosed, at least partially, the impact of properly accounting for outpatient and group therapy billings according to the Medicare rules set forth in Transmittal 1753. Furthermore, the August 27 disclosure caused a statistically significant price decline in HealthSouth's stock price.

- On March 18, 2003, after the market closed, HealthSouth disclosed that it was under investigation by the FBI. (Complaint ¶¶742-744). This disclosure of the relevant truth ends the Class Period. It also caused the SEC to halt the trading in HealthSouth's common stock for five trading days. Additional information was released the following days, these disclosures caused a statistically significant price decline in HealthSouth's stock price when the stock resumed trading on March 26, 2003.

Steinholt Report at ¶¶49, 106, 116, 119-125. Mr. Steinholt then concludes that: (1) each of these disclosures was "a partial disclosure of HealthSouth's true operating performance, financial condition and prospects in contrast to the false statements, omissions and conduct alleged in the Complaint that inflated the Company's stock price"; and (2) "had this information released on these days been disclosed, HealthSouth's stock price would have declined earlier," as opposed to the statistically significant price declines that took place on September 30, 1998, August 27, 2002 and March 18, 2003. *Id.* at ¶¶122-124.

Should the Court prematurely consider loss causation issues at this class certification stage, this evidence is more than sufficient to demonstrate that defendants' statements, omissions and deceptive conduct caused Stockholder Plaintiffs' losses.

### 4.      The Class Action Mechanism Is Superior to Other Available Methods of Adjudication

Class action treatment is also superior to other methods for the fair and efficient adjudication of these claims.    Rule 23(b) sets forth the following factors to be considered in making a "superiority" determination: "(A) the interest of members of the class in individually controlling the prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by . . . members of the class; (C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action."   Fed. R. Civ. P. 23(b)(3).

The interest of members of the class in "individually controlling" the prosecution of separate actions is minimal.   The costs and expenses of such individual actions, when weighed against the individual recoveries potentially obtainable, would be prohibitive.   This litigation has been pending in this court for nearly nine years and has involved extensive pretrial proceedings on behalf of the members of the proposed Class.   Thus, factors (a) and (b) weigh heavily in favor of class certification here. HealthSouth's headquarters is located in this District.   Much of the evidence and witnesses are also located here.   As such, this Court is the most desirable forum to prosecute this action.   Finally, Stockholder Plaintiffs' attorneys have substantial experience in complex securities fraud class action litigation.   As such, there is no reason to believe that there will be any difficulty in the management of a class action.

In short, "[i]t would be impracticable to permit individual suits by each shareholder of [HealthSouth] stock during the relevant class period as it is alleged that there are thousands of purchasers who have been injured by the alleged wrongful acts of the Defendants." *Cheney*, 213 F.R.D. at 502.

## IV.    CONCLUSION

For all the foregoing reasons, this action should be certified as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

DATED:  October 3, 2007                    Respectfully submitted,

                                           COUGHLIN STOIA GELLER
                                             RUDMAN & ROBBINS LLP
                                           PATRICK J. COUGHLIN
                                           JONAH H. GOLDSTEIN
                                           JOHN J. RICE
                                           JAMES A. CAPUTO
                                           DEBRA J. WYMAN
                                           RYAN A. LLORENS
                                           JENNIFER Y. LAI
                                           NATHAN R. LINDELL


                                           _____
                                                 s/ Patrick J. Coughlin
                                              PATRICK J. COUGHLIN

                                           655 West Broadway, Suite 1900
                                           San Diego, CA  92101
                                           Telephone:  619/231-1058
                                           619/231-7423 (fax)

                                           LABATON SUCHAROW LLP
                                           THOMAS A. DUBBS
                                           JAMES W. JOHNSON
                                           JOSEPH A. FONTI
                                           MICHAEL H. ROGERS
                                           KELSO L. ANDERSON
                                           140 Broadway, 34th Floor
                                           New York, NY  10005
                                           Telephone:  212/907-0700
                                           212/818-0477 (fax)

                                           Co-Lead Counsel for Co-Lead Plaintiffs

WHATLEY, DRAKE & KALLAS, LLC
JOE R. WHATLEY, JR.
RUSSELL JACKSON DRAKE
G. DOUGLAS JONES
OTHNI J. LATHRAM
2001 Park Place North, Suite 1000
Birmingham, AL  35203
Telephone:  205/328-9576
205/328-9669 (fax)

RILEY & JACKSON, P.C.
ROBERT R. RILEY, JR.
1744 Oxmoor Road
Birmingham, AL  35209
Telephone:  205/879-5000
205/879-5901 (fax)

Co-Liaison Counsel for Co-Lead Plaintiffs

O'DONOGHUE & O'DONOGHUE LLP
LOUIS P. MALONE
CHARLES W. GILLIGAN
4748 Wisconsin Avenue, N.W.
Washington, DC  20016
Telephone:  202/362-0041
202/362-2640 (fax)

CICCARELLO DEL GIUDICE &
  LAFON
MICHAEL J. DEL GIUDICE
1219 Virginia Street, East, Suite 100
Charleston, WV  25301
Telephone:  304/343-4440
304/343-4464 (fax)

Additional Counsel for Plaintiffs

SCHATZ NOBEL IZARD, P.C.
ANDREW M. SCHATZ
JEFFREY S. NOBEL
SETH R. KLEIN

           s/ Seth R. Klein
_____
            SETH R. KLEIN

One Corporate Center
20 Church Street, Suite 1700
Hartford, CT  06103
Telephone:  860/493-6292
860/493-6290 (fax)

RAGSDALE LLC
Clay Ragsdale
2100 Third Avenue North, Suite 820
Birmingham, AL  35203
Telephone:  205/251-4775
205/251-4777 (fax)

Additional Counsel for Merger Subclasses

S:\CasesSD\Healthsouth02\BRF00045143-class cert.doc

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 3, 2007.

s/ Patrick J. Coughlin
PATRICK J. COUGHLIN

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail:       patc@csgrr.com

# Mailing Information for a Case 2:03-cv-01500-KOB-TMP

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **R Martin Adams**
  parkman@graceba.net

- **Richard F Albert**
  ralbert@maglaw.com

- **Kelso L Anderson**
  kanderson@labaton.com

- **Robert J Anello**
  ranello@maglaw.com

- **William P Ashworth**
  washworth@wc.com

- **W Michael Atchison**
  wma@starneslaw.com

- **Patrick J Ballard**
  pjballard@ballardlawoffice.com

- **Peter Q Bassett**
  pbassett@alston.com

- **Richard Bemporad**
  rbemporad@ldbs.com

- **Edward J Bennett**
  ebennett@wc.com

- **Max W Berger**
  mwb@blbglaw.com

- **Stanley D Bernstein**
  Bernstein@bernlieb.com

- **Jeffrey R Blackwood**
  jblackwood@bradleyarant.com

- **Carmine D Boccuzzi**
  cboccuzzi@cgsh.com

- **William C Bomar**

WCB@csattorneys.com

- **Bruce R Braun**
  bbraun@winston.com

- **Charles F Brega**
  cbrega@lindquist.com

- **Vincent Briganti**
  vbriganti@ldbs.com

- **Scott S Brown**
  scottbrown@maynardcooper.com

- **Carl S Burkhalter**
  cburkhalter@maynardcooper.com

- **Hope T Cannon**
  hcannon@bradleyarant.com

- **James A Caputo**
  jimc@csgrr.com

- **Michael J Chepiga**
  mchepiga@stblaw.com

- **John P Coffey**
  sean@blbglaw.com

- **Betsy P Collins**
  bcollins@alston.com

- **Bryan E Comer**
  bec@cbcbb.com

- **J Erik Connolly**
  econnolly@winston.com

- **Julia B Cooper**
  jbcooper@bradleyarant.com

- **N Lee Cooper**
  lcooper@maynardcooper.com

- **Patrick C Cooper**
  darceneaux@maynardcooper.com

- **Patrick J Coughlin**
  patc@csgrr.com

- **John T Crowder , Jr**
  jtc@cbcbb.com

- **Robert T Cunningham , Jr**
  rtc@cbycb.com

- **Stephen D Dargitz**
  sdargitz@skadden.com

- **Charles A Dauphin**
  cdauphin@bddmc.com

- **Inayat Delawala**
  idelawala@wc.com

- **Edward P Dietrich**
  EdD@Lerachlaw.com

- **Manuel J Dominguez**
  jdominguez@bermanesq.com

- **David R Donaldson**
  DavidD@dglawfirm.com

- **Richard T Dorman**
  rtd@cbcbb.com

- **Russell Jackson Drake**
  ecf@whatleydrake.com

- **Wayne W Drinkwater**
  jaltobelli@bradleyarant.com

- **Thomas A Dubbs**
  tdubbs@labaton.com

- **Robert D Eckinger**
  robert.eckinger@arlaw.com

- **Jay M Ezelle**
  JME@starneslaw.com

- **Steven M Farina**
  sfarina@wc.com

- **Joseph A Fawal**
  jfawal@bellsouth.net

- **H L Ferguson , Jr**
  hlf@ffdlaw.com

- **Thomas Fitzpatrick**
  tfitzpatrick@tfitzpatrick.com

- **Robert Fleishman**
  rfleishm@steptoe.com

- **Joseph A Fonti**
  jfonti@labaton.com

- **Brian Thomas Frawley**
  frawleyb@sullcrom.com

- **Lauren C Freundlich**
  lfreundlich@lswlaw.com

- **Henry Frohsin**
  hfrohsin@bakerdonelson.com

- **Stephen J Fuzesi**
  sfuzesi@wc.com

- **Daniel M Gitner**
  dgitner@lswlaw.com

- **Robert J Giuffra**
  giuffrar@sullcrom.com

- **Paul Gluckow**
  pgluckow@stblaw.com

- **Beata Gocyk-Farber**
  Beata@blbglaw.com

- **Jonah H Goldstein**
  jonahg@csgrr.com

- **James L Goyer , III**
  jgoyer@maynardcooper.com

- **David C Gray**
  dgray@wc.com

- **Helen A Gredd**
  hgredd@lswlaw.com

- **David J Guin**
  davidg@dglawfirm.com

- **Jeffrey M Haber**
  haber@bernlieb.com

- **William P Hammer , Jr**
  bill.hammer@ey.com

- **Anthony C Harlow**
  ach@starneslaw.com

- **J Mark Hart**
  jmh@hsy.com

- **David R Hassel**
  DavidH@blbglaw.com

- **Frederick G Helmsing**
  fgh@helmsinglaw.com

- **James F Henry**
  jhenry@bradleyarant.com

- **James F Hughey , III**
  jhughey@lfwlaw.com

- **Susan E Hurd**
  shurd@alston.com

- **Harriet Thomas Ivy**
  hivy@bakerdonelson.com

- **B. Keith Jackson**
  kj@rileyjacksonlaw.com

- **Russel N Jacobson**
  rjacobson@labaton.com

- **James W Johnson**
  jjohnson@labaton.com

- **Brice Martin Johnston**
  bmjohnston@csattorneys.com

- **G Douglas Jones**
  ecf@whatleydrake.com

- **Robin H Jones**
  RHJ@starneslaw.com

- **Julia M Jordan**
  jordanjm@sullcrom.com

- **Sheilah M Kane**
  skane@cgsh.com

- **Francis P Karam**
  Karam@bernlieb.com

- **M Kay Kelley**
  kaykelley@mindspring.com

- **Allison R Kimmel**
  akimmel@stblaw.com

- **Jennifer Y Lai**
  jlai@csgrr.com

- **Othni J Lathram**
  ecf@whatleydrake.com

- **Arthur W Leach**
  art@arthurwleach.com

- **Jeffrey N Leibell**
  jeffl@blbglaw.com

- **William S Lerach**
  BillL@Lerachlaw.com

- **Ian N Levy**
  levyi@sullcrom.com

- **Nathan R Lindell**
  nlindell@csgrr.com

- **Ryan A Llorens**
  ryanl@csgrr.com

- **Don B Long , Jr**
  dbl@jbpp.com

- **Mitchell A Lowenthal**
  mlowenthal@cgsh.com

- **Kallie C Lunsford**
  kallie@rileyjacksonlaw.com

- **Enu Mainigi**
  emainigi@wc.com

- **Alan Daniel Mathis**
  adm@jbpp.com

- **Erskine Ramsey Mathis**
  erskinelaw@aol.com

- **Lauren A McMillan**
  laurenm@blbglaw.com

- **Debra M Mestre**
  Mestregfc@aol.com

- **Benjamin M Moncrief**
  bmoncrief@bradleyarant.com

- **Leslie V Moore**
  les.moore@lvmlaw.com

- **Kan M Nawaday**
  knawaday@lswlaw.com

- **James L O'Kelley**
  jimokelley@bellsouth.net

- **Stephen C Olen**
  sco@cbcbb.com

- **Keith F Park**
  keithp@csgrr.com

- **James W Parkman**
  parkman@graceba.net

- **Michael J Pucillo**
  mpucillo@bermanesq.com

- **Maxwell H Pulliam**
  MHPulliam@csattorneys.com

- **Teresa T Pulliam**
  ttpulliam@msn.com

- **Barry A Ragsdale**
  barryrags@aol.com

- **M Clay Ragsdale , IV**
  clay@ragsdalellc.com

- **C Lee Reeves**
  lreeves@sirote.com

- **John J Rice**
  jrice@csgrr.com

- **Robert R Riley , Jr**
  rob@rileyjacksonlaw.com

- **Michael P Roche**
  mroche@winston.com

- **Daniel O Rodgers**
  dor@ffdlaw.com

- **Michael H Rogers**
  mrogers@labaton.com

- **Victoria Radd Rollins**
  vrollins@wc.com

- **Nancy I Ruskin**
  nruskin@cgsh.com

- **Ann N Sagerson**
  asagerson@wc.com

- **Michael Sansbury**
  msansbury@spotswoodllc.com

- **Robert S Saunders**
  rsaunder@skadden.com

- **Andrew M Schatz**
  firm@snlaw.net

- **Jeffrey T Scott**
  scottj@sullcrom.com

- **Anne Marie Seibel**
  aseibel@bradleyarant.com

- **Neil L Selinger**
  nselinger@ldbs.com

- **Maryanne Sexton**
  msexton@maglaw.com

- **Jackson R Sharman , III**
  jsharman@lfwlaw.com

- **Kenneth O Simon**
  KOS@csattorneys.com

- **Henry E Simpson**
  henry.simpson@arlaw.com

- **J Callen Sparrow**
  jcsparrow@hdglawfirm.com

- **Beth A Stewart**
  bstewart@wc.com

- **Tammy McClendon Stokes**
  tstokes@dglawfirm.com

- **Stephen A Strickland**
  sstrickland@rjaffelaw.com

- **Lawrence A Sucharow**
  lsucharow@labaton.com

- **John B Tally , Jr**
  john.tally@arlaw.com

- **Amy M Tully**
  atully@maglaw.com

- **William H Wagener**
  wagenerw@sullcrom.com

- **Dan K Webb**
  dwebb@winston.com

- **Edward P Welch**
  ewelch@skadden.com

- **Joe R Whatley , Jr**
  jwhatley@whatleydrake.com

- **William Calvin White , II**
  parkman@graceba.net

- **Laurent S Wiesel**
  wiesell@sullcrom.com

- **Kenneth Joe Wilson , Jr**
  kjwilson@wardwilsonlaw.com

- **Thomas P Windom**
  twindom@wc.com

- **Nicole E Wrigley**
  nwrigley@winston.com

- **Debra J Wyman**
  debraw@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Eric Green**
RESOLUTIONS LLC
222 Berkeley Street
Boston, MA 02116

**Merger Subclass**
,

**Richard M. Scrushy**
c/o Arthur W. Leach
2310 Marin Drive
Birmingham, AL 35243

**SERVICE BY MAIL**
***In re HealthSouth Sec. Litig.***
**Master File No. CV-03-BE-1500-S**

Served by first-class U.S. Mail:

Eric Green
RESOLUTIONS LLC
222 Berkeley Street
Boston, MA  02116

Suzan M. Sanford
First Assistant Attorney General
Consumer Protection Division
Michigan Attorney General
P.O. Box 30755
Lansing, MI 48909

Andrew J. Entwistle
Robert N. Cappucci
Johnston F. Whitman, Jr.
Entwistle & Cappucci LLP
280 Park Avenue
26th Floor West
New York, New York 10017-1216

Michael A. Cox, Attorney General
Michigan Department of Attorney General
G. Mennen Williams Building, 7th Floor
525 West Ottawa Street
Lansing, MI 48909

S:\CasesSD\Healthsouth02\eFiling_Healthsouth02\Service List\No E-Mail Service List.doc