# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| In re HEALTHSOUTH CORPORATION SECURITIES LITIGATION | ) ) ) ) | Master File No. CV-03-BE-1500-S |
| This Document Relates To: ALL ACTIONS. | ) ) ) ) | |
| In re HEALTHSOUTH CORPORATION STOCKHOLDER LITIGATION | ) ) ) ) | |
| This Document Relates To: ALL ACTIONS. | ) ) ) ) ) | Consolidated Case No. CV-03-BE-1501-S |
| In re HEALTHSOUTH CORPORATION BONDHOLDER LITIGATION | ) ) ) ) | |
| This Document Relates To: ALL ACTIONS. | ) ) ) ) ) ) ) | Consolidated Case No. CV-03-BE-1502-S

CLASS ACTION |

## MEMORANDUM OPINION

This matter is before the court on "UBS's Motion for Summary Judgment on Bondholders' Remaining Section 11 Claims (Substantial Participation Theory)" (doc. 1486); the motion involves Counts XXI through XXIV of the Third Consolidated Amended Class Action Complaint [Bondholder Plaintiffs' Legal Theories and Claims]. In its motion, UBS questions whether Bondholders' "Substantial Participation" theory is legally viable and asserts that, even if

1

it were, Bondholders have adduced no evidence to support that theory.  The Bondholder Plaintiffs assert that UBS qualifies as an "underwriter" as that term is used in Section 11 of the Securities Act of 1933, and thus, is liable for the misrepresentations contained in the Registered Exchange Offers.  The resolution of this motion, therefore, hinges on whether UBS acted as an "underwriter."   All parties have briefed this issue, and the court held a hearing on this motion on January 27, 2009.  For the reasons stated on the record and in this Memorandum Opinion, the court will GRANT UBS's motion for summary judgment.

## I.  FACTS

The background of the fraudulent scheme to deceive investors in HealthSouth securities about HealthSouth's true financial situation is set forth in detail in other opinions of this court and need not be repeated in this opinion.  The current motion before this court involves notes that HealthSouth distributed between 2000 and 20002 in four separate two-step *Exxon Capital* transactions.[1]  The Bondholder Plaintiffs are a putative class of purchasers of those HealthSouth notes.  Although Section 11 liability must be based on distribution of *registered* notes containing misstatements – step two of the *Exxon Capital* transaction – the court will also outline the facts concerning step one to provide a suitable perspective on the transactions in question.  The following facts are presented in the light most favorable to the Bondholder Plaintiffs.

---

[1] An *Exxon Capital* transaction is a capital-raising technique that involves two steps, the first involving a private offering exempt under Rule 144A from registration requirements, and the second involving a SEC-registered exchange offering.  *See* Exxon Capital Holding Corp,. SEC No-Action Letter (May 13, 1988).

### A.  HealthSouth's *Exxon Capital* Transactions

**1.  Step One: Private Placements**

In the first, "Private Placement" step, HealthSouth sold unregistered private notes to a syndicate of fourteen investment banks, including UBS, that participated as initial purchasers in one of more of the Private Placements.  In reliance on the exemption from registration in Securities and Exchange Commission Rule 144A, those initial purchasers in turn resold the Private Notes to "Qualified Institutional Buyers" ("QIBs"). The purchase agreements between the initial purchasers and HealthSouth did not provide for any role by the initial purchasers in the *Exxon Capital* transactions beyond the sale of the Private Notes to QIBs.  In each Purchase Agreement, HealthSouth expressly "represent[ed] and warrant[ed]" that neither the confidential offering memorandum used in each of the Private Placements nor the information incorporated by reference in them contained "any untrue statement of a material fact." (UBS Ex. 15 at 8; UBS Ex. 16 at 8; UBS Ex. 17 at 7-8; UBS Ex. 18 at 7-8).  The four Private Placements in question occurred on or around September 25, 2000; February 1, 2001; September 28, 2001; and May 22, 2002.

UBS was an initial purchaser and held a leadership role in all four Private Placements; it served as the "Sole Bookrunner and Lead Manager"[2] in the first three Private Placements and served as one of the "Joint Book-running and Lead Managers" on the fourth.  Acting on behalf of the syndicate of initial purchasers, UBS approved the retention of the law firm of Pillsbury

---

[2] In the investment banking sphere, a "bookrunner" is the main underwriter or lead manager in the process of issuing securities, and its name is listed first among the other participating underwriters.  If more than one entity functions as bookrunner, then those entities are known as joint bookrunners.

Winthrop Shaw Pittman LLP ("Pillsbury") as syndicate legal counsel and received and approved Pillsbury's bills for payment.

William Horton, HealthSouth's General Counsel, and the law firm of Haskell Slaughter & Young LLC ("Haskell Slaughter"), advised HealthSouth in connection with the four HealthSouth Private Placements, as well as with the subsequent Registered Exchange Offers.

**2.  Step Two: Registered Exchange Offers**

As part of the second step of the *Exxon Capital* process, Horton and the Haskell Slaughter firm prepared and filed with the SEC the HealthSouth Form S-4 Registration Statements several months after each Private Placement. These Registration Statement filings occurred on December 15, 2000; March 30, 2001; November 19, 2001; and August 22, 2002. No dispute exists that the Registration Statements, which incorporated HealthSouth's financials for 1999-2001, were false and misleading. Pursuant to these Registration Statements, HealthSouth offered to exchange registered securities substantially identical to the Private Notes ("Exchange Notes") for the Private Notes (collectively, the "Registered Exchange Offers"). For each of the Registered Exchange Offers, HealthSouth engaged an "exchange agent" to handle the distribution of the Exchange Notes to holders of Private Notes who chose to tender them for exchange.

UBS was *not* the exchange agent in any of the HealthSouth Exchange Offers. UBS did not purchase, sell, or solicit exchanges of the Exchange Notes in the Registered Exchange Offers. Yet, acknowledging these facts, Bondholder Plaintiffs point to other actions of UBS and/or its attorneys in step two to establish underwriter status.

 William Owens, HealthSouth's CFO during the four Registered Exchange Offers,

testified that Horton was responsible for the majority of the step two work for HealthSouth. (UBS Ex. 45 at 567, 571:1-573;5, 1401:12-1404:12). Although Owens testified in a conclusory manner that he believed UBS bankers were involved in the registration process, he could provide no facts based on personal knowledge or company documents to back up that conclusion. No UBS witness testified that anyone from UBS prepared drafts of the Registration Statements, prepared or sent written comments on drafts of the Registration Statements, or orally commented on those drafts to the people who did prepare the Registration Statements.

Although the call log shows that Bill McGahan, a UBS banker and HealthSouth's primary investment banker for the relevant period, called Owens and others at HealthSouth many times during the months between each Private Placement and the filing of each Registration Statement, no evidence exists regarding the content of those calls.

Horton, who as HealthSouth General Counsel was heavily involved in the Registered Exchange Offers, testified in his deposition that UBS was not an underwriter for the Registered Exchange Offers. His statement confirmed representations he had made to the SEC in connection with each of the four Registration Statements that "[n]o underwriter is involved in the transactions that are the subject of the Registration Statement." (UBS Exs. 11 [12/14/2000], 12 [4/26/01], 13 [12/12/01], 14 [8/22/02]). He further testified that he had no recollection that UBS provided any comments or information incorporated into the Registration Statements. The evidence does reflect that Horton contacted UBS bankers, Rod O'Neill and Michael Leder, and Pillsbury attorneys, Nate Cartmell and David Meredith, for advice about lengthening the exchange period for the May 2002 Rule 144A bonds; however, the e-mail supporting this contact occurred almost a month *before* the May 2002 Private Placement, during step one of that *Exxon Capital* transaction – not

between the Private Placement and the Registered Exchange Offerings.

Bondholder Plaintiffs offered no other evidence of UBS's direct involvement in the preparation of the Registration Statements or in any other step two activity. They argued, without legal support, that the listing of the Pillsbury firm on the cover of each of the four Registration Statements filed with the SEC, next to that of HealthSouth and HealthSouth's counsel, somehow demonstrates involvement by UBS in step two. However, Pillsbury was not identified on that cover as counsel to UBS or, for that matter, counsel to the syndicate of initial purchasers.

### B. Relationship between UBS and HealthSouth

The evidence reflects that a close relationship existed between UBS and HealthSouth; by the time of the *Exxon-Capital* transactions made the basis of this suit, UBS had become HealthSouth's investment bank of choice and HealthSouth had become one of UBS's best clients. Two of the UBS bankers, Ben Lorello and Bill McGahan, had developed a relationship with HealthSouth before joining UBS in March of 1999. Lorello was the primary coverage officer/investment banker for HealthSouth from 1987 until 1994, and attended many HealthSouth board meetings beginning in the early to mid 1990's. McGahan was the primary coverage officer/investment banker for HealthSouth from 1994/5 and continued in that role after joining UBS in 1999 and through 2003. He participated in approximately eight to ten HealthSouth board meetings, either in person or via phone conference.

A former HealthSouth CFO, Michael Martin, testified that McGahan and Lorello devised and constructed HealthSouth's first Rule 144A/*Exxon Capital* transaction in the Spring of 1998, before they joined UBS, to avoid a potentially disastrous SEC review of HealthSouth fraudulent financials and accounting practices.

Bondholder Plaintiffs' evidence reflects that McGahan knew about and participated in the fraud at HealthSouth. In January of 1999, Martin advised McGahan that HealthSouth's weekly revenue reports reflected that the company was missing its revenue budgets by $10 million per week, and the financial numbers that the company was reporting to Wall Street mirrored those revenue budgets. McGahan and Martin discussed that HealthSouth could cover up the difference between reported financial numbers and the actual numbers by HealthSouth's acquiring another company and charging the shortfall to the acquisition.

In June of 1999, McGahan was invited to the lakehouse of Richard Scrushy, founder, CEO and Chairman, of HealthSouth. During that visit, Martin told McGahan that HealthSouth would be short of its estimated financial projections for the quarter by $250-300 million. Thus, when HealthSouth told the investing public in August of 1999 that it had met Wall Street financial estimates for the quarter ending June 30, 1999, McGahan knew that those public statements were false. Although he was HealthSouth's primary investment banker, he did not reveal the fraud to the public. Indeed, McGahan had previously taught HealthSouth senior officers how to "bake" earnings by taking overstatements in numerous acquisitions and using those charges to "pad" HealthSouth's earnings. As noted previously, he and Lorella devised a series of *Exxon Capital* transactions to evade the SEC's scrutiny and cover-up the fraud. McGahan also thwarted the due diligence investigations by third party entities such as investment banks or acquired companies; for example, McGahan limited the categories of revenue information that he would request from the company to be acquired by HealthSouth, only asking for categories that HealthSouth could in turn produce without revealing fraud.

McGahan and others at UBS helped facilitate Scrushy's payments to Alabama Governor

Don Seigleman, arranging to reduce an outstanding UBS fee if the client who owed the fee would, in turn, make a sizable donation to Seigleman at Scrushy's direction. Scrushy hand-delivered to Seigleman the UBS client's check for $250,000.

Although Bondholder Plaintiffs have presented substantial evidence of knowledge and complicity of the UBS defendants in the fraud at HealthSouth, the court must examine whether this evidence supports the requirements for Section 11 liability.

## II.  STANDARD OF REVIEW

Summary judgment is proper under Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "[A] party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying [the evidence that demonstrates] the absence of a genuine issue of material fact.  *Id.*  at 323.  After the moving party demonstrates an absence of evidence to support the nonmoving party's case, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact." *Id*. at 247-48.  A dispute of a material fact is genuine if a reasonable jury, applying the relevant law to the evidence presented, could return a verdict for the nonmoving party.  *Wright v. Sanders Lead Co.*, 2006 WL 905336, at *1 (M.D. Ala. 2006) *aff'd,* 217 Fed. App'x 925 (11th Cir. 2007)

*(citing Barfield v. Brierton*, 883 F.2d 928, 933 (11th Cir. 1989)).

When considering a motion for summary judgment, a court must view the facts "in the light most favorable to the non-moving party . . . ." *Harris*, 127 S. Ct. at 1776. The court does not "weigh the evidence and determine the truth of the matter" but rather, simply focuses on whether a genuine issue of material fact exists. *Anderson,* 477 U.S. at 249. Where a reasonable fact finder may "draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd of Public Educ. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

### III.  DISCUSSION

UBS's motion requests this court to grant summary judgment on Bondholder Plaintiffs' claims under Section 11 of the Securities Act of 1933 set forth in Counts XXI through XXIV. A purchaser of a registered security may bring a Section 11 claim when "any part of the registration statement . . . contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading. . . ." 15 U.S.C. § 77k(a). Section 11(a) lists five categories of defendants who may be held liable, including the category of "every underwriter." *Id*. Bondholder Plaintiffs allege that UBS is an

"underwriter" of the four HealthSouth Registered Exchange Offers in question and base their Section 11 claims on that alleged status. Because UBS denies that status, the issue before this court is whether UBS qualifies as an "underwriter" of those Registered Exchange Offers within the meaning of Section 11(a)(5) of the Securities Act of 1933.

> The Securities Act defines the term "underwriter" as
>
>> any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, *or participates or has a direct or indirect participation in any such undertaking*, or participates or has a participation in the direct or indirect underwriting of any such undertaking; but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission.

15 U.S.C. § 77b(a)(11) (emphasis added).

In the instant case, UBS was an initial purchaser in all four HealthSouth Private Placements, taking a leadership role in the initial purchaser syndicate and step one of the *Exxon Capital* process. The SEC and securities market participants recognize the two steps of an *Exxon Capital* transaction to be two separate transactions. SEC letter (UBS Ex. 1); *Am. High-Income Trust v. AlliedSignal*, 329 F. Supp. 2d 534, 541-43 (S.D.N.Y. 2004); *In re Safety-Kleen Corp. Bondholders Litig.*, 2002 WL 32795850, at *2-3 (D.S.C. Mar. 27, 2002). Because a Section 11 claim must be based on a registration statement used in a registered offering of securities, Bondholder Plaintiffs' Section 11 claims are predicated on the four Registered Exchange Offers that represent step two of HealthSouth's *Exxon Capital* transactions and *not* on the step one Private Placements.

UBS was not the exchange agent in any of the Registered Exchange Offers. UBS did not

10

purchase, sell, or solicit exchanges of the Exchange Notes in the Registered Exchange Offers. To establish Section 11 liability, then, Bondholder Plaintiffs argue that the actions of UBS, its bankers, and its lawyers nevertheless fall within the "participation clause" of the statutory definition; Bondholder Plaintiffs claim UBS played an active role and "participated" in the distribution of the securities by their involvement in the *registration process* for the four offerings at issue and thus qualify as an underwriter.

For guidance in applying the Section 11's definition of "underwriter" to the instant case, the court first turns to the case of *Pinter v. Dahl*, 486 U.S. 622 (1988). In that case, the Supreme Court of the United States chose a broad interpretation of Section 11's term "underwriter" and the phrases in that term of "participate in" and "participation." Addressing liability under Section 12 of the Securities Act, the Supreme Court acknowledged that *Section 12* did *not* extend liability to participants collateral to the offer or sale in unlawful sales transactions. However, the Court expanded its discussion beyond Section 12 in *dictum*. It distinguished Section 11, noting that Section 11 *did* extend liability to collateral participants. 486 U.S. 622, 650 n.26.

Despite the inclusion of collateral participants in the group subject to Section 11 liability, courts have recognized that "'[u]nderwriter' is not . . . a term of unlimited applicability that includes anyone associated with a given transaction. 'It is crucial to the definition of underwriter that any underwriter must *participate in the distribution of a security*.'" *In re Refco*, 503 F. Supp. 2d 611, 629 (S.D.N.Y. 2007) (emphasis added) (quoting *McFarland v. Memorex Corp.*, 493 F. Supp. 631, 644 (D.C. Cal. 1980)). As the Seventh Circuit has explained, courts have interpreted the phrases "participate in" and "participation" that are part of the Act's statutory definition of "underwriter" as "encompass[ing] all persons who engage in steps *necessary to the distribution*

11

*of securities.*"  *Harden v. Raffensperger, Hughes & Co., Inc.*, 65 F.3d 1392, 1400 (7th Cir. 1995) (emphasis added) (quoting *SEC v. Holschuh,* 694 F.2d 130, 139 n.13 (7th Cir. 1982)).  Similarly, the Eighth Circuit has explained that "congressional intent in defining 'underwriter' was to cover all person who might operate as conduits for the t*ransfer* of securities to the public."  *Ackerberg v. Johnson*, 892 F.2d 1328, 1335 (8th Cir. 1989) (emphasis added).  These cases demonstrate that participation must be linked to the distribution or transfer of securities to qualify the entity as an underwriter.

      Bondholder Plaintiffs frame the issue presented to the court as whether UBS, directly or indirectly through its attorneys, participated in the *registration process*.  Because UBS counsel, Pillsbury, participated in the *registration process* by placing the Pillsbury name on the Registration Statements and by reviewing and in some cases providing comments on drafts of the Registration Statements, Bondholder Plaintiffs argue that UBS was, therefore, an underwriter within the definition of Section 11.  However, the court disagrees with this interpretation of the statutory definition of "underwriter" and notes that the definition focuses on those entities who participated in the *distribution of securities*, rather than those who may have participated, in any manner whatsoever, in the *registration process*.  *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp.2d 611 (S.D.N.Y 2007) ("*Refco I*") and *In re Refco, Inc. Sec. Litig.*, 2008 WL 3843343 (S.D.N.Y. 2008) ("*Refco II*") (rejecting, in *Refco II,* the argument that the statutory definition of underwriter encompasses those who participate in the registration process by drafting registration statements but who do not participate in the distribution of securities).  Bondholder Plaintiffs submitted no authority holding that the definition of underwriter extends to this length.

      To fall within the participation clause of the statutory definition of "underwriter," UBS

must, therefore, have participated in the "undertaking" of distributing the registered bonds that HealthSouth issued.   When the court separates out the chaff of Bondholder Plaintiffs' allegations and focuses instead on the *evidence* presented, the court finds that Bondholder Plaintiffs do not rest their claims against UBS upon material evidence of UBS's *direct* actions.  Rather, they rest their claims upon evidence that UBS *indirectly* "participated" through the actions of their Pillsbury attorneys in (1) reviewing and/or commenting on drafts of Registration Statements and in (2) placing the Pillsbury name on the front of the Registration Statements.   This evidence, taken as true, fails to create a genuine issue of material fact to support Bondholder Plaintiffs' assertion that UBS is an underwriter.  The court will not stretch the definition of underwriter so far as to impose liability based upon participation – not even by UBS directly but indirectly through its attorney – in the registration process.  *See also Herman & MacLean v. Huddleston*, 459 U.S. 375, 386 n.22 (1983) (noting in *dicta* that Section 11 claims generally do not reach "certain individuals who play a part in preparing the registration statement").  Because Bondholder Plaintiffs have failed to raise a genuine issue of material fact that UBS  was an "underwriter" within the meaning of Section 11, this court will GRANT UBS's motion for summary judgment on the Section 11 claims, Counts XXI-XXIV.

However, the court acknowledges that it does so reluctantly.  The evidence, at least when viewed in the light most favorable to Bondholder Plaintiffs,  reflects that UBS bankers were heavily involved in HealthSouth's nefarious schemes to defraud the investing public.  Bondholder Plaintiffs' evidence indicates that UBS bankers knew about –  and, in some cases, participated in – HealthSouth's fraud in reporting its financial status; they certainly knew about the fraud in the Registration Statements at issue in this case.  In light of that fraud, UBS bankers

13

allegedly engaged with HealthSouth in the *Exxon Capital* transactions as a means of shielding HealthSouth from SEC scrutiny and UBS from Section 11 liability; thus, UBS took the lead bookrunner/underwriting positions in step one of those four transactions, but conveniently bowed out in step two, when liability attached. As the court understands the *Exxon Capital* structure and the Rule 144A safe harbor, the law currently allows UBS to engage in such conduct without Section 11 liability attaching, and although this court must follow that law, the result is nevertheless distasteful.

      The court will enter a separate order consistent with this Memorandum Opinion.

      Dated this 26th day of February, 2009.

                                                      /s/ Karon O. Bowdre
                                                    KARON OWEN BOWDRE
                                                    UNITED STATES DISTRICT JUDGE