# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| In re HEALTHSOUTH CORPORATION SECURITIES LITIGATION | ] ] ] ] | Master File No. CV-03-BE-1500-S |
| This Document Relates To: All Actions. | ] ] ] ] | |
| In re HEALTHSOUTH CORPORATION STOCKHOLDER LITIGATION | ] ] ] ] | Consolidated Case No. CV-03-BE-1501-S |
| This Document Relates To: All Actions. | ] ] ] ] | |
| In re HEALTHSOUTH CORPORATION BONDHOLDER LITIGATION | ] ] ] ] | Consolidated Case No. CV-03-BE-1502-S |
| This Document Relates To: All Actions. | ] ] ] ] | CLASS ACTION |

## MEMORANDUM OPINION

These consolidated securities fraud cases come before the court on motions to certify

classes.  The Bondholder Plaintiffs[1] seek certification of the following class:

> All persons and entities who, during the period beginning July 30,
> 1999 through and including March 18, 2003 (the "Bondholder

---

[1]Lead Plaintiff The Retirement Systems of Alabama ("RSA") and other named Plaintiffs, the Houston Firefighters Relief and Retirement Fund ("HFRRF") and the State Universities Retirement System of Illinois ("SURS") seek to represent the proposed class.

Class Period"), purchased or otherwise acquired the March 1998
Registered and Unregistered Notes, the June 1998 Registered and
Unregistered Notes, the September 2000 Registered and
Unregistered Notes, the February 2001 Registered and
Unregistered Notes, the September 2001 Registered and
Unregistered Notes, or the May 2002 Registered and Unregistered
Notes and who were damaged thereby; and

All Persons and entities who purchased or otherwise acquired the
September 2000, February 2001, September 2001, or May 2002
Registered Notes of HealthSouth pursuant or traceable to their
respective registration statements and who were damaged thereby.[2]

Bondholder Plaintiffs' Motion for Class Certification (doc. 939).

The Stockholder Plaintiffs[3] ask the court to certify the following class: all persons who,

between April 24, 1997 and March 18, 2003 (the "Stockholder Class Period"), purchased or

otherwise acquired the stock or options of HealthSouth Corporation and were damaged thereby

(the "Stockholder Class").  Sought to be included in the Stockholder Class are persons who

acquired HealthSouth securities in exchange for the stock or options of the National Surgery

Centers, Inc. ("NSC"), Horizon/CMS Healthcare Corporation ("Horizon") and The Company

---

[2]Excluded from the class are (a) current or former defendants; (b) any officer or director
during the Bondholder Class Period of HealthSouth or any of its subsidiaries or affiliates; (c)
members of the immediate families of any of the current or former Individual Defendants; (d)
any entity on which any current or former Defendant has or had a controlling interest; and (e) the
legal representatives, heirs, successors or assigns of any such excluded party.

[3]Plaintiffs Central States, Southeast and Southwest Area's Pension Fund ("Central
States"), New Mexico State Investment Council and the Educational Retirement Board of New
Mexico ("New Mexico"), the State of Michigan Retirement Systems ("Michigan"); Julius
McQueen, Marsha Kouba, David Dubrow (NSC Merger); Donald Angle, Jack Kennedy, Dale
Willetts (TCD Merger); Franklin and Rosalyn Ross, Trustees of the Franklin A. Ross and
Rosalyn J. Ross Revocable Living Trust (Horizon Merger) seek to represent the class.

Doctor ("TCD") mergers (the "Merger Subclasses").[4]  Motion for Class Certification (doc. 940).

However, Stockholder Plaintiffs acknowledge that the <u>liability</u> period differs for the remaining defendants[5] based on the court's prior rulings on Statute of Limitations grounds.  As to Defendant Richard Scrushy, who does not contest class certification,[6] the applicable liability period is April 24, 1997, through March 18, 2003.  As to the UBS Defendants,[7] the liability period is July 30, 1999, through March 18, 2003.

These motions have been more than amply briefed and vehemently argued by all parties.[8]  The court conducted a lengthy hearing on March 27, 2009.

At the hearing, counsel for the Bondholder Plaintiffs agreed to submit clarified class definitions.  No final decision will be made regarding class certification for the Bondholder Plaintiffs until receipt of the revised definitions and Defendants' responses.  However, much of the analysis contained in this opinion may have application to the Bondholder Plaintiffs' motion.

---

[4]Excluded from the Stockholder Class and Merger Subclasses are current and former defendants; members of the immediate family of any current or former defendants; the directors, officers, subsidiaries and affiliates of HealthSouth; any person, firm, trust, corporation, officer, director or other individual or entity in which any current or former defendant has a controlling interest; and the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

[5]Just prior to the hearing, the Stockholder Plaintiffs and Ernst & Young ("E&Y") entered into a stipulation for settlement, which the court has preliminarily approved.  *See* docs. 1577, 1579.  Factual allegations as to E&Y referenced for their relevance to Bondholders' claims.

[6]*See* Notice of Non-Opposition to Stockholder Plaintiffs' Motion for Class Certification filed by Stockholder Plaintiffs (doc. 1418).

[7]The UBS defendants are UBS AG, UBS Securities LLC, Howard Capek, Benjamin D. Lorello, and William C. McGahan.

[8]Since the motions were filed October 3, 2008, forty-three documents, many with numerous exhibits, have been submitted in support of or opposition to the motions.

The court has concluded for the reasons stated below hat stockholder classes should be certified with modified class periods to reflect the court's prior rulings as to statute of limitations bars.  At the hearing, counsel for the Stockholder Plaintiffs acknowledged that if the court's earlier decisions on the statute of limitations issues are correct, the appropriate class period as to UBS would be September 20, 2000, through March 18, 2003.

I.      Facts

The general facts of the accounting fraud at HealthSouth Corporation are well known and will not be recited in detail here.  Some basic facts concerning the scope of that fraud are set out as a background for the allegations asserted by the Bondholders against E&Y, HealthSouth's outside auditor, and both Bondholders and Stockholders against the UBS Defendants, HealthSouth's investment banker.

Between 1997 and 2003, HealthSouth reported false financial and operating results including overstated revenue, net income, earnings-per-share, assets and stockholders' equity.  HealthSouth also took advantage of its inflated stock price to acquire other companies throughout the nineties into 1998, and issued billions in debt through false and misleading Registration Statements.  Subsequent to the financial fraud revelations becoming public in the Spring of 2003, HealthSouth fired E&Y and belatedly warned investors not to rely on any of the E&Y audited HealthSouth financial statements.  HealthSouth eventually restated its financial results, eliminating over $2.8 billion in previously reported net income and wiping out any profit ever reported by it as a public company.

The Plaintiffs allege that Scrushy and other former HealthSouth employees involved in the fraud and merger Registration Statement misstatements could not have perpetrated this

4

deception without the knowledge and active involvement of HealthSouth's outside auditor –

E&Y – and investment bankers – UBS Defendants.

A.     E&Y's Involvement in the Misconduct

By early 1994, E&Y was aware that HealthSouth had improperly overstated its 1993

earnings by $27 million, through three improper activities: (i) overstating revenue by shifting

extraordinary revenue items into ordinary recurring revenues; (ii) understating its allowance for

contractual adjustments; and (iii) under-accruing expenses, thereby deferring those expenses to

later periods.  For example, as E&Y concluded its audit of HealthSouth's 1993 financial

statements, the E&Y audit engagement partner informed Michael Martin, HealthSouth's then

CFO, that HealthSouth would have to acquiesce to E&Y's accounting treatment of $3 million in

investment banking fees because E&Y had "looked the other way" on a $27 million earnings

overstatement.  In exchange for "turning its head" to HealthSouth's wrongful accounting

practices, E&Y received lucrative payments from the Company, many of which were concealed

by mislabeling them as payments for "audit-related services."

E&Y regularly turned a blind eye to material issues during the course of its audits of

HealthSouth's financial statements and yet still issued clean audit opinions year after year.  In

sworn testimony, Emery Harris detailed how E&Y, after discussions with HealthSouth's senior

management, systematically issued unqualified auditor's reports on HealthSouth's financial

statements when, in fact, E&Y had open audit questions on those financial statements and

concerns about the accounting practices being utilized by the Company.  Harris also testified that

the accounting fraud at HealthSouth should have been "obvious" to E&Y, and that the only

rational explanation for E&Y's failure to expose the fraud was a desire by E&Y to avoid

5

jeopardizing its highly lucrative relationship with a long-standing client.

      B.     The UBS Defendants' Involvement in the Misconduct

The UBS Defendants played a vital role in HealthSouth's fraudulent scheme to inflate the Company's financial condition.  The UBS Defendants allegedly made materially false and misleading statements and engaged in deceptive conduct in connection with the issuance of bonds to raise billions of dollars of new capital for HealthSouth, and also made materially false and misleading statements in analysts' reports written and issued by UBS.  These actions artificially inflated the trading price of HealthSouth's publicly traded securities.

To perpetuate the fraudulent scheme, HealthSouth needed constant infusions of new capital to help cover up the true state of the Company's operations, to pay taxes on fictitious revenue, and to help fund the growth-by-acquisitions scheme.  Working side-by-side on an almost daily basis during the Class Period with Benjamin Lorello and William McGahan, HealthSouth completed scores of acquisitions, adding hundreds of millions of dollars in annualized revenues and selling more than $4 billion in new securities to investors.  McGahan and Lorello closely controlled the due diligence on the acquisitions and bond offerings to ensure the financial fraud remained hidden.  The UBS Defendants provided capital infusions through bond offerings and credit facilities that permitted HealthSouth to keep its doors open and the deception of HealthSouth's investors to continue.

Lorello, McGahan and Howard Capek had direct knowledge of the fraudulent nature of HealthSouth's accounting as they were helping HealthSouth to arrange its stream of acquisitions, selling billions of dollars of HealthSouth securities to investors, and issuing glowing analyst research reports, often "strongly" recommending that investors buy HealthSouth securities.

McGahan gained personal knowledge of the Company's financial fraud in 1993 and

provided his consulting services accordingly, so as to allow the fraud to continue.  In 1995,

McGahan showed HealthSouth CFO Martin how to "bake the books" through acquisitions of

other companies.  Capek had knowledge of the fraud by no later than the summer of 1999;

however, he continued to publish analyst reports touting HealthSouth's strong financial condition

and results.  In fact, Capek, at the very same time he had a "Strong Buy" recommendation on

HealthSouth securities and was publicly extolling the purported strength of HealthSouth's

business, privately told a favored client in writing that because HealthSouth was a "mess" and a

"pig" he "wouldn't own a share [of this stock]."  Lorello was also well aware of the fraud at

HealthSouth and, indeed, affirmatively took steps to ensure that it would continue.  Among other

things, Lorello worked with McGahan to devise strategies to avoid the exposure of the financial

fraud through due diligence on acquisitions and the debt offerings.  Lorello also worked to secure

credit line financing for HealthSouth and used his position at UBS to waive an underwriting fee

that was diverted to the former governor of Alabama in the form of a bribe on behalf of

HealthSouth and Scrushy.[9]

C.     Efforts to Market Bonds

By 1998, although the Company's financials were inflated by hundreds of millions of

dollars, it was unable to commence any customary public equity or debt offerings because it

feared SEC scrutiny of its registration statements.  As a result, Defendants McGahan and Lorello

– both aware of the Company's financial fraud – devised a plan that would continue financing

---

[9]In 2006, Scrushy was convicted of bribing Don Siegelman, former governor of Alabama.
The Eleventh Circuit recently affirmed that conviction.  *United States v. Siegelman*, No. 07-
13163, 2009 WL 564659 (11th Cir. Mar. 6, 2009).

and concealing the ongoing fraud, and also allow themselves and their employer (Citi/Salomon for the 1998 Offerings and UBS for all other Offerings) to pocket millions of dollars in fees: HealthSouth would issue debt through the Rule 144A/*Exxon Capital* exchange structure. Between July 1999 and May 2002, HealthSouth, Scrushy, UBS, Lorello, and McGahan, with E&Y's essential participation, conducted four Rule 144A/*Exxon Capital* offerings (the "Offerings") to raise over $2.4 billion – an amount that, taken together with the $1 billion raised in two offerings in 1998, equaled the approximate amount of HealthSouth's overstatement of income plus the taxes it owed on that nonexistent income.

The involvement of McGahan and Lorello along with UBS was not limited to "behind the scenes" scheming. Rather, they designed and implemented the Offerings; participated in both steps of the offering process; used these false offering documents to sell the bonds to UBS's large institutional clients; prevented other banks from conducting sufficient due diligence; issued analyst reports with the intent to maintain and further inflate the artificial price of HealthSouth debt and equity; instructed officers at HealthSouth on how to conceal the true nature of the fraudulent Offerings to the public; conducted "roadshows" to market the bonds; and communicated false information to the credit rating agencies to obtain the rating needed to make the bonds marketable.

In response to UBS's protestations that its conduct was behind the scenes, and thus that it could not be liable as a secondary actor,[10] the Stockholder Plaintiffs presented numerous exhibits,

---

[10]UBS has repeatedly argued that the Supreme Court abolished all theories of liability against "secondary actors" in *Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008). This court previously ruled that *Stoneridge* acknowledges potential liability of even "secondary actors" who commit a primary violation that is communicated to the public. *See* Order February 4, 2009 (doc. 1553).

including testimony and internal UBS memoranda, demonstrating the public nature of its

misrepresentations and deceptive conduct regarding the bond offerings.  Without belaboring the

point, those documents present evidence that UBS played a prominent role in the bond offerings.

UBS, whose name was prominently displayed on the front of each offering memorandum,

was an initial purchaser and held a leadership role in all four Private Placements; it served as the

"Sole Bookrunner and Lead Manager" in the first three Private Placements and served as one of

the "Joint Book-running and Lead Managers" on the fourth;[11] UBS distributed the offering

memoranda to each potential investor; in the September 2000 offering, UBS sold $350 million of

debt using "DebtWeb," a self described "'portal for our institutional clients to get the information

they need, and then entered orders or indications of interest,'" and from which "prospective

HealthSouth bond investors could learn online about the issuer and the bonds themselves, and

read the offering prospectus there;" McGahan and UBS drafted the roadshow presentations,

prepared scripts on how to field investor questions, and interacted extensively with investors at

the roadshows; and McGahan, Lorello and UBS coordinated the marketing of the debt offerings,

trained UBS salespersons on how to sell or place the offerings, generated sales memoranda and

set up one-on-one sales meetings between UBS and the largest institutional investors, who

subsequently bought millions of dollars of the debt from UBS.  McGahan, Lorello and Capek all

engaged investors in direct communications about the offerings.  Capek's UBS profile stated that

he was "personally responsible" for the $600 million transaction of HealthSouth senior notes in

September 2001 and for the $375 million transaction in January 2002.  As discussed in more

---

[11]Although the Plaintiffs previously argued that UBS actually participated in the "phase
II" registration statement and acted as an underwriter for Section 11 purposes, the court
previously found the evidence insufficient to classify UBS as an underwriter.

detail below, in UBS writings and at HealthSouth Board meetings, McGahan and UBS boasted about the impact of their efforts on the bond deals.

E&Y's role in the Offerings was also essential because its "clean" auditor's opinion constituted E&Y's "seal of approval" that allowed the bonds to enter the market.

This epic fraud came to a head on the evening of March 18, 2003, when the FBI raided HealthSouth's corporate headquarters based on tips provided by one of the Company's top officers.  On March 19, 2003, the fraud further unraveled with the filing of SEC actions against HealthSouth and Scrushy, and the first guilty plea of a HealthSouth officer.

II.     Procedural History

This consolidated case has a long and contorted history.  The first group of the cases was filed in 1998 and those were consolidated as *In re HealthSouth Corp. Sec. Litig.* CV-98-BE-2634-S.  Those cases asserted that HealthSouth, Scrushy and other officers and directors engaged in a common scheme of false statements and omissions to hide the effect of the Balanced Budget Act of 1997 on HealthSouth's financial condition.  They also claimed that various mergers were effectuated through the use of inflated HealthSouth stock as a result of the fraudulent representations.  The allegations of those 1998 cases are more fully discussed in the opinion in *In re HealthSouth Corp. Sec. Litig.*, 213 F.R.D. 447 (N.D. Ala. 2003), in which this court refused to certify a class because of intraclass conflicts.[12]

In August 2002 and more completely in early 2003, the extent of the accounting fraud at HealthSouth came to light and the house of cards built on it collapsed.  On March 18, 2003, the

_____

[12]Those conflicts were addressed early on in these consolidated cases with the use of subclasses.

FBI raided the corporate offices of HealthSouth.  As the HealthSouth fraud became public, 15 members of the HealthSouth financial and accounting staffs, including 5 former CFO's, pled guilty to various securities and accounting fraud crimes.  Richard Scrushy, founder and former CEO and Chairman of the Board, was also indicted, but a jury acquitted him of all charges on June 28, 2005.

Additional cases were filed by stockholders and bondholders in 2002 and 2003.  The stockholder cases, including the 1998 cases, were consolidated as *In re HealthSouth Corporation Stockholder Litigation,* CV-03-BE-1501-S.  Similarly, the Bondholder cases were consolidated as *In re HealthSouth Corporation Bondholder Litigation*, CV-03-BE-1502-S.  Recognizing overlapping factual and legal allegations, the court further consolidated those two consolidated cases as *In re HealthSouth Corporation Securities Litigation*, Master File CV-03-BE-1500-S.

After repeated efforts at mediation, a substantial settlement was reached in 2008 between the Stockholder and Bondholder Plaintiffs and HealthSouth that included the "non-pleading" directors,[13] excluding Richard Scrushy.  The court has approved the $445 million settlement (*see*

---

[13]The following former HealthSouth employees, who were initially named as defendants, pled guilty to various allegations of fraud: William T. Owens, Weston L. Smith, Michael D. Martin, Aaron Beam, Jr., Malcolm E. McVay, Emery W. Harris, Angela Ayers, Kenneth Livesay, Cathy C. Edwards, Rebecca Kay Morgan, Virginia B. Valentine, Richard E. Botts, Will Hicks, Jason M. Brown and Catherine Fowler.

The complaints also named as defendants other employees and members of the Board of Directors who were not indicted: Anthony J. Tanner, James P. Bennett, Robert E. Thomson, Thomas W. Carman, P. Daryl Brown, Patrick A. Foster, Brandon O. Hale, Larry D. Taylor, Susan M. Jones, William W. Horton, Larry R. House, Richard F. Celeste, C. Sage Givens, George H. Strong, Larry D. Striplin, Jr., Joel C. Gordon, John S. Chamberlin, Charles W. Newhall, III, Edwin M. Crawford, Jan L. Jones, Russell Maddox and Phillip C. Watkins. Those director defendants have been referred to throughout the litigation as the "non-pleading defendants."

docs. 533, 535, 1114).  After that settlement, the focus of the case shifted to Defendants Ernst &
Young and the UBS Defendants.

Some of the court's prior rulings bear on the decision concerning the two proposed
classes, and thus are summarized here.  In addressing motions to dismiss, the court ruled on June
14, 2006 (docs. 472, 471) that the statute of limitations barred various claims against UBS and
E&Y.  Specifically, the court dismissed Section 11 claims and Section 10b claims against E&Y
that accrued prior to July 30, 1999 (doc. 471), and dismissed Section 10b claims against UBS
that accrued  prior to July 30, 1999 (doc. 472).

This consolidated case comes before the court on Bondholder Plaintiffs' Motion for Class
Certification (doc. 939, filed 10/03/07); the Motion for Class Certification filed by Stockholder
Plaintiffs (doc. 940, filed 10/03/07); and the memoranda in support (docs. 943, 941 respectively).
The Plaintiffs also filed various declarations, exhibits and expert reports to support their motions
(*e.g.*, docs 944, 945, 946, 947).  The Defendants filed their opposition briefs (docs. 1205, 1217)
along with declarations, exhibits, and expert affidavits (*e.g.*, 1207, 1208, 1209), and numerous
other submissions.  The Plaintiffs then filed reply briefs (docs. 1421, 1431, 1436) with
supporting declarations (*e.g.*, 1425, 1432, 1435).  Along the way, Defendants sought and the
court granted discovery from the Plaintiffs and the claims administrator of the prior HealthSouth
settlement fund, Rust Consulting, Inc. (docs. 1358, 1490).  Upon joint request of the parties, the
court delayed submission of the certification motions to allow for supplemental expert discovery
limited to data produced by Rust Consulting, Inc. (doc. 1495).

The court's attention to the class certification issue was diverted when UBS filed "UBS
Defendants' Rule 12(c) Motion for Judgment on the Pleadings Dismissing Plaintiffs' Section

10(b) 'Scheme to Defraud' Claims" (doc. 1390, filed 5/27/08) and "UBS's Motion for Summary Judgment on Bondholders' Remaining Section 11 Claims (Substantial Participation Theory)" (doc. 1486, filed 9/12/08).  Among other things, UBS contended that the recent Supreme Court decision in *Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008), totally abolished the Plaintiffs' claims of liability based on "scheme to defraud."  After a hearing on January 27, 2009, the court disagreed as to Plaintiffs' Section 10(b) claims, finding that the Third Amended Complaint adequately alleged that UBS committed a primary violation or deceptive act that was communicated to the public as required by *Stoneridge* (doc. 1533).  The court, however, granted summary judgment in favor of UBS as to the Bondholders' Section 11 claims against it, finding that UBS was not an "underwriter" as that term is used in Section 11 (doc. 1545).

After the court's rulings in February 2009 on UBS's Motions, it requested leave for supplemental briefing addressing the remaining stockholder claims, and the court entered yet another briefing schedule (*see* doc. 1537, dated 2/13/09).  The motions for class certification thus finally came under submission on March 11, 2009.  The court conducted a hearing on these motions on March 27, 2009.

III.   Discussion

    A.   Standards for Class Certification

Whether to certify a class action rests within the sound discretion of the district court. *Cooper v. Southern Co.*, 390 F.3d 695, 711 (11th Cir. 2004).  But, the court is mindful that with this great power "comes great responsibility; the awesome power of a district court must be 'exercised within the framework of rule 23.'" *Klay v. Humana, Inc.*, 382 F.3d 1241, 1251 (11th Cir. 2004) (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996)).  The court

thus examines class certification questions with this admonition in mind.

The plaintiffs seeking class certification have the burden of proof. *Valley Drug Co. v. Geneva Pharm., Inc.,* 350 F.3d 1181, 1187 (11th Cir. 2003); *Rutstein v. Avis Rent-A-Car Sys., Inc.,* 211 F.3d 1228, 1233 (11th Cir. 2000); *Heaven v. Trust Co. Bank,* 118 F.3d 735, 737 (11th Cir. 1997); *Morrison v. Booth*, 763 F.2d 1366, 1371 (11th Cir. 1985); *Gilchrist v. Bolger*, 733 F.2d 1551, 1556 (11th Cir. 1984).  To qualify for class certification, the plaintiffs must prove the four requirements of Fed. R. Civ. P. 23(a) and at least one of the standards of Fed. R. Civ. P. 23(b) that is appropriate to the relief sought.  *Klay*, 382 F.3d at 1250-51; *Turner v. Beneficial Corp.,* 242 F.3d 1023, 1025 (11th Cir. 2001).  *See also Franze v. Equitable Assurance*, 296 F.3d 1250, 1253 (11th Cir. 2002); *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001). Failure to establish any one factor precludes class certification.  *Valley Drug Co. v. Geneva Pharm. Inc.*, 350 F.3d 1181,1188 (11th Cir. 2003).  *See generally Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 615-17 (1997) (describing the characteristics of class actions under the federal rules).

Rule 23(a) provides for certification of a class only if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These four prerequisites of Rule 23(a) have generally been referred to as "'numerosity, commonality, typicality and adequacy of representation.'"  *Franze*, 296 F.3d at 1253 (quoting *Piazza*, 273 F.3d at 1346); *see also Murray v. Auslander*, 244 F.3d 807, 810 (11th

Cir. 2001) (citing *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156 (1982)).  These

requirements serve to "'limit class claims to those fairly encompassed by the named plaintiffs'

individual claims.'" *Franze,* 296 F.3d at 1253 (quoting *Piazza*, 273 F.3d at 1346).

      In this case, Plaintiffs claim to meet the requirement of Rule 23(b)(3):

> questions of law or fact common to the members of the class
> predominate over any questions affecting only individual members,
> <u>and</u> . . . a class action is superior to other available methods for
> fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3) (emphasis added).  In summary, Plaintiffs must prove that common

questions predominate and the superiority of class treatment to meet Rule 23(b)(3).

      Class actions in securities fraud cases generally have received favorable treatment in the

Eleventh Circuit.  *See Kirkpatrick v. J. C. Bradford & Co.*, 827 F.2d 718, 727-28 (11th Cir. 1987),

*cert. denied sub nom.*, *Robinson Humphrey/Am. Express v. Sanders*, 485 U.S. 959 (1988).

Securities class actions benefit both the public interest in maintaining the integrity of the market

and the private interest of investors whose redress of grievances is not limited to a multitude of

small individual claims.  *Kirkpatrick*, 827 F.2d at 727.  However, class certification is not

automatic; the court must perform a "rigorous analysis" of the propriety of class certification.

*See Falcon*, 457 U.S. at 161; *Gilchrist*, 733 F.2d at 1555.  The court must conduct a searching

inquiry, including a possible "probe behind the pleadings before coming to rest on the

certification question."  *Falcon*, 457 U.S. at 160.  *See also  Amchem*, 521 U.S. at 615 (stating that

Rule 23 invites a "close look" before certifying a class); *Rutstein*, 211 F.3d at 1234 ("Going

beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts,

and applicable substantive law in order to make a meaningful determination of the certification

issues.") (internal quotation marks and citation omitted).

Although the Eleventh Circuit has admonished that the trial court should not determine the merits of the plaintiffs' claim at this stage, the court can – and indeed should – consider the merits of the case to the degree necessary to determine whether the plaintiffs have met the requirements of Rule 23.  *See, e.g. Valley Drug Co.*, 350 F.3d at 1188 n.5; *Love v. Turlington,* 733 F.2d 1562, 1564 (11th Cir. 1984) (stating that the limitation on examining the merits "should not be talismanically invoked to artificially limit a trial court's examination of the factors necessary to a reasoned determination of whether a plaintiff has met her burden of establishing each of the Rule 23 class action requirements."); *Upshaw v. Ga. Catalog Sales, Inc.*, 206 F.R.D. 694, 698 (M.D. Ga. 2002) (noting that although the court does not evaluate the probable outcome of the case, class determination often involves considerations of factual and legal issues enmeshed in a plaintiff's cause of action requiring the court to probe beyond the pleadings).

Indeed, several recent Eleventh Circuit cases have indicated that inquiry into some aspects of the merits of plaintiffs' claims remains necessary to determine whether the representatives meet the requirements of Rule 23.  *See, e.g., Heffner v. Blue Cross & Blue Shield of Ala.,* 443 F.3d 1330, 1337 (11th Cir. 2006) (stating that "it is appropriate to consider the merits of a case to the extent necessary to determine whether the requirements of Rule 23 will be satisfied"); *Valley Drug Co.*, 350 F.3d at 1188 & n.15 (stating that the court must conduct its own inquiry to determine whether named representatives adequately represented the class under Rule 23 when they asserted that some of the class members benefitted from allegedly illegal settlement agreements); *Franze*, 296 F.3d at 1254 (finding that the representative plaintiffs' claims barred by the statute of limitations because they were on "inquiry notice" more than one

16

year before suit was filed and, therefore, lacked typicality to pursue class claims); *Piazza*, 273 F.3d at 1347 (finding that the representative plaintiff's claim was time-barred and, therefore, he lacked standing to pursue class action); *In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1324 (N.D. Ga. 2007) (stating that although the plaintiff's likelihood of success on the merits is not a relevant consideration, the court must take a close look at the facts relevant to the certification question); *Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273, 296 (S.D. Ala. 2006) (stating that "this Circuit's jurisprudence recognizes that merits and Rule 23 issues are often intertwined, such that addressing Rule 23 criteria often requires some foray into the merits"); *Clopton v. Budget Rent-A-Car Corp.,* 197 F.R.D. 502, 506 (N.D. Ala. 2000) ("'It is inescapable that in some cases there will be overlap between the demands of Rule 23(a) and (b) and the question of whether plaintiff can succeed on the merits.'" (citation omitted)).

The Eleventh Circuit, however, has not clearly articulated the standard of proof required at the class certification stage when courts must perform a "rigorous analysis" of the Rule 23 prerequisites without determining the merits of the case.  Other circuits, recognizing their prior indistinct instructions, have reexamined the issue and clearly articulated that the district court must make an examination beyond the pleadings and resolve factual and legal disputes.  *E.g.*, *Brown v. Am. Honda*, 522 F.3d 6, 24-25 (1st Cir. 2008) (discussing developing standards among the circuits); *In re Initial Public Offering Sec. Litig.*, 471 F.3d 24, 38 (2d Cir. 2006) (same); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 316 (3d Cir. 2008); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 365 (4th Cir. 2004); *Unger v. Amedisys, Inc.*, 401 F.3d 316, 319 (5th Cir. 2005); *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676 (7th Cir. 2001); *Blades v. Monsanto Co.*, 400 F.3d 562, 575 (8th Cir. 2005).  While these courts have not all been uniform

17

in the precise standard of proof required at the class certification stage, the preponderance of the evidence standard seems to be gaining momentum.  *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 2002 (2d Cir. 2008); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 320.

In any event, counsel for the Plaintiff classes urged the court to apply the preponderance of the evidence test because of their stated confidence in meeting it.  Though the court does not presume to impose this standard in the Eleventh Circuit, the court finds the preponderance of the evidence standard appropriate in this case.  Indeed, if Plaintiffs can meet this standard of proof, they could meet any lesser standard the Eleventh Circuit may choose to adopt.

Despite the favorable treatment of class actions in general in securities fraud cases, class certification should not be automatically granted in light of Supreme Court and Eleventh Circuit precedent mandating "rigorous analysis" before certifying a class.  *See Gilchrist*, 733 F.2d at 1555.  Even though the court's look beyond the pleadings may overlap with the merits of the case, the court must be careful not to allow the defendants "to turn the class-certification proceeding into an unwieldy trial on the merits."  *In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 21 (D. Mass. 2008) (citing *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 17 (1ˢᵗ Cir. 2005)).  Such admonition resounds well in this case.  Although the court did not accept the Defendants' suggestion that it hold an evidentiary hearing, it did consider hundreds if not thousands of pages of expert reports, affidavits, and exhibits, as well as extensive briefs on the issues.  The court has looked well beyond the pleadings and examined the evidence proffered by the Plaintiffs to support their legal and factual allegations, as well as Defendants' offerings in opposition.  The court finds that the Stockholder Plaintiffs have met their burden of establishing by a

preponderance of evidence the requisites for class certification, with the modified class periods, and reserves ruling as to the Bondholder Plaintiffs' motion until receipt of the revised class definitions.

      B.      Rule 23(a) Analysis

      UBS does not seriously challenge the Rule 23(a) requirements for certification of the Stockholder class.[14]  Instead, the major challenges address the requirements of Rule 23(b)(3), specifically the requirement of predominance of common questions, which will be discussed below.  The court, however, must make its own evaluation of the Rule 23(a) requirements before addressing the Defendants' challenges under Rule 23(b)(3).  *See Love*, 733 F.2d at 1564.

      The four prerequisites of Rule 23(a) are:  (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.  The numerosity requirement examines whether the class is so large that joinder of all members would be impracticable. Fed. R. Civ. P. 23(a)(1).  The requirements of commonality, typicality, and adequacy overlap and tend to merge.  *Amchem*, 521 U.S. at 626 n.20.  Generally, typicality and commonality examine "whether a sufficient nexus exists between the legal claims of the named class representatives and those of individual class members to warrant class certification." *Piazza*, 273 F.3d at 1346 (citations omitted).  As the Eleventh Circuit has stated,

---

    [14]At the hearing, the court sought to clarify that UBS did not contest the Rule 23(a) requirements as to the Stockholders.  Counsel for UBS argued that they did challenge the ability of the named representatives to meet the typicality requirements and stated that issue was raised in their initial responsive brief.  However, UBS merely sets out the legal requirements of typicality with no argument that Plaintiffs have failed to meet those standards (doc. 1205 at 23-24).  UBS does specifically state that they do not challenge numerosity, nor separately address commonality, instead focusing on the more demanding requirements of Rule 23(b)(3) (doc. 1205 at 23 n.11).  The court again reviewed UBS's brief and could find no specific argument challenging typicality.  In any event, the court made its own evaluation of that requirement.

> [t]raditionally, commonality refers to the group characteristics of the class as a whole, while typicality refers to the individual characteristics of the named plaintiff in relation to the class. Typicality also encompasses the question of the named plaintiff's standing, for "[w]ithout individual standing to raise a legal claim, a named representative does not have the requisite typicality to raise the same claim on behalf of a class." "Adequacy of representation" means that the class representative has common interests with unnamed class members and will vigorously prosecute the interests of the class through qualified counsel.

*Piazza,* 273 F.3d at 1346 (citations omitted).

In this case, the court has carefully and thoroughly reviewed the remaining claims[15] of the Third Consolidated Amended Complaint. The Plaintiffs have submitted more than ample evidence to support the allegations relevant to the Rule 23 determination. The court has also had the benefit of countless submissions regarding these and prior motions before the court. In fact, the court has previously sustained the Complaint against various attacks on its sufficiencies. (*See e.g.* docs. 471, 472). Earlier this year, the court addressed UBS's motion for summary judgment (doc. 1486) and motion for judgment on the pleadings (doc. 1390) at which time evidence was submitted and some of the same arguments presented here were made. As to these motions to certify the classes, the parties have submitted extensive briefs, exhibits, and expert reports.

---

[15]As a result of the court's prior rulings and the settlement with E&Y, the remaining Stockholder claims are Counts I - VIII against Scrushy for violation of Section 11 and Section 15 of the Securities Act and Section 14(a) of the Exchange Act; Count IX against Scrushy, UBS, Lorello, Capek and McGahan for violation of Section 10(b) and Rule 10b-5; and Count X against Scrushy and Count XI against Lorello, McGahan, Capek and UBS under Section 20(a) of the Exchange Act.

1.      Numerosity

The plaintiffs meet the numerosity requirement if the proposed class is so large that joinder of all members is impracticable.  Fed. R. Civ. P. 23(a)(1).  "'Impracticable' does not mean 'impossible'; plaintiffs need only show that it would be extremely difficult or inconvenient to join all members of the class."  *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 698 (N.D. Ga. 1991) (citing 3 Newberg, *Newberg on Class Actions*, § 18.03 at 455 (1985)).  Courts generally presume that plaintiffs establish numerosity when the claims involve securities traded nationally.  *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir. 1981).  To support a finding of numerosity, the court can make "common sense assumption[s]."  *Id.*

Beginning in 1996, HealthSouth stock traded on the New York Stock Exchange.  As many as 423 million shares of HealthSouth stock were purchased or acquired by thousands of different people and entities during the purported class period.  The court, thus, makes a "common sense assumption" that the proposed Stockholder class meets the numerosity requirement of Rule 23(a)(1).

2.      Commonality

Plaintiffs must show that class members share common questions of law or fact.  Fed. R. Civ. P. 23(a)(2).  To do so, the plaintiffs must establish issues of law or fact common to all members of the putative class.  This minimal standard merely requires an identity of some factual or legal matter among members of the class.  *See Hudson v. Delta Air Lines, Inc.*, 90 F.3d 451, 456 (11th Cir. 1996).  All questions of law or fact, however, need not be common to the class. *See Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1557 (11th Cir. 1986), *cert. denied*, 479 U.S. 883 (1986).  "The question of commonality in Rule 23(a)(2) overlaps significantly with the

predominance requirement contained in Rule 23(b)(3)."  *In re Miller Indus., Inc., Sec. Litig.,* 186 F.R.D. 680, 685 (N.D. Ga. 1999).

The Stockholder Plaintiffs assert securities fraud claims against Scrushy and the UBS Defendants under Section 10(b) of the Exchange Act and Rule 10b-5.  To establish a cause of action for violation of Rule 10b-5, the plaintiffs must establish:  "'(1) false representation of a material fact (2) made with scienter (3) upon which the plaintiff justifiably relied[16] (4) that proximately caused the plaintiff's damages.'" *Friedlander v. Troutman, Sanders, Ackerman & Ashmore*, 788 F.2d 1500, 1503 n.3 (11th Cir. 1986) (quoting *Diamond v. Lamotte*, 709 F.2d 1419, 1422-23 (11th Cir. 1983)) (citations omitted); *see also Ross v. Bank South, N.A.,* 885 F.2d 723, 728 (11th Cir. 1989) (en banc), *cert. denied*, 495 U.S. 905 (1990).

The Plaintiffs assert that all of the claims of all class members arise out of the Defendants' common scheme of false statements or omissions concerning HealthSouth's true financial condition.  Plaintiffs presented evidence that the UBS Defendants made public misrepresentations or omissions concerning the bond placements that affected the overall market for HealthSouth stocks and bonds.  The Plaintiffs further offered evidence that UBS issued false or misleading analyst reports praising the strength of HealthSouth when it had knowledge that the financial statements were false.

At a minimum, the following common questions of law and fact exist in the Stockholders' case:

(1)      whether the UBS Defendants and Scrushy violated securities laws;

---

[16]The Plaintiffs submit that reliance is presumed under their fraud-on-the-market theory. The Defendants adamantly challenge the applicability of that theory as discussed in section III.C.1.a. below.

(2)     whether Defendants misrepresented material facts and/or omitted material facts necessary to cause the statements made not to be misleading in light of the circumstances;

(3)     whether the Defendants knew or recklessly disregarded that their statements were false and misleading;

(4)     whether the Defendants' material misrepresentations and/or omissions caused the prices of HealthSouth securities to be artificially inflated during the class period; and

(5)     whether and to what extent Defendants' misrepresentations and/or omissions caused damages to the members of the class.

These allegations arising from a fraudulent scheme illustrate the kind of common questions of law and fact anticipated by the commonality requirement. *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 490-91 (S.D. Fla. 2003); *AAL High Yield Bond Fund v. Ruttenberg*, 229 F.R.D. 676, 681 (N.D. Ala. 2005) (citing *Kirkpatrick v. J. C. Bradford & Co.*, 827 F.2d 718 (11th Cir. 1987)).

The court concludes that at a minimum some questions of law or fact are common to the class and, thus, Plaintiffs have met the minimum requirement of Fed. R. Civ. P. 23(a)(2).

3.     Typicality

To meet the typicality requirement, plaintiffs must show that the claims and defenses of the representative plaintiffs are typical of the claims and defenses of the class as a whole. Fed. R. Civ. P. 23(a)(3). In other words, both representative plaintiffs and the other class members must be able to travel to court on the same claims. *See Hudson*, 90 F.3d at 456. The requirement of

23

typicality precludes certification of a class "where the legal theories of the named plaintiffs potentially conflict with those of the absentees." *Georgine v. Amchem Prod. Inc.*, 83 F.3d 610, 631 (3rd Cir. 1996) *aff'd sub nom. Amchem Prod., Inc. v. Windsor*, 521 U.S. 591 (1997). (citations omitted).

The Eleventh Circuit established the standard for evaluating typicality in *Kornberg v. Carnival Cruise Lines, Inc.*:

> A class representative's claims or defenses must be typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). In other words, there must be a nexus between the class representative's claims or defenses and the common questions of fact or law which unite the class. A sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory. Typicality, however, does not require identical claims or defenses. A factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class.

741 F.2d 1332, 1337 (11th Cir. 1984), *cert. denied*, 470 U.S. 1004 (1985) (citations omitted); *see also Cheney*, 213 F.R.D. at 491. The important inquiry is whether the proposed class representatives' claims have the same essential characteristics as those of the proposed class. *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 n.14 (11th Cir. 2000).

The court specifically finds that the claims of the named representatives have the same essential characteristics as the claims of the other members of the class. Each Class Representative purchased or otherwise acquired HealthSouth stock during the applicable class period, and each representative's claims arise from the same pattern or practice based on the same legal theory as the class members. *See Cooper v. Pac. Life Ins. Co.*, 229 F.R.D. 245, 257

24

(S.D. Ga. 2005).

        4.      Adequacy of Representation

Under Fed. R. Civ. P. 23(a)(4), the plaintiffs must show that, as class representatives, they will fairly and adequately protect the interests of the class.  The adequacy evaluation encompasses two inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action.  *See Sosna v. Iowa*, 419 U.S. 393, 403 (1975); *In re Miller Indus., Inc. Sec. Litig.*, 186 F.R.D. 680, 686 (N.D. Ga. 1999).  Plaintiffs must show that their interests are not antagonistic to those of the putative class members and that their chosen attorneys are qualified, experienced, and generally able to conduct the litigation.  *Kirkpatrick*, 872 F.2d at 727.  UBS does not challenge the adequacy of the class representatives or of class counsel.

The court previously examined the qualifications of the Class Representatives and class counsel when selecting them as required by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 (1995).  (*See, e.g.*, docs. 1, 362, 454).  The court has had many opportunities since November 2001 to examine the work of class counsel and the supervision by the Class Representatives.  The court finds both to be far more than adequate.

        C.      Rule 23(b)(3)

The "predominance" and "superiority" requirements under Rule 23(b)(3) play critical roles in certifying a class.  Indeed, these requirements are "far more demanding" than the "commonality" prerequisites of Rule 23(a) because they test "whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997).

25

As stated above, to certify a class, not only must the plaintiffs establish all of the requirements of Rule 23(a), they must also prove one of the alternative requirements of Rule 23(b).  The Plaintiffs argue that in this case common questions of law or fact predominate and that a class action is superior to other methods, thus meeting the requirements of Rule 23(b)(3).  Here the UBS Defendants wage all out war.

> ### 1.      Predominance of Common Questions

As to whether common questions predominate, all questions of law or fact need not be common; but <u>some</u> questions must be common to the class and those questions must predominate over individual questions.  *See Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1557 (11th Cir. 1986).  The class issues subject to generalized proof must predominate over issues subject to individualized proof.  *See Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999, 1005 (11th Cir. 1997) (citing *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1557-58 (11th Cir. 1989)).  The inquiry of predominance "focuses on 'the legal or factual questions that qualify each class member's case as a genuine controversy,' and is 'far more demanding' than Rule 23(a)'s commonality requirement."  *Jackson*, 130 F.3d at 1005 (quoting *Amchem Prod., Inc., v. Windsor*, 521 U.S. 591, 594 (1997).

The Plaintiffs assert that the Defendants made a series of misrepresentations or omitted material information in violation of securities laws.  Proof of this alleged fraud will be common for the class.  The claims of the class indeed arise out of the same set of operative facts.  The class as a whole faces the legal question of whether the alleged misrepresentations and omissions qualify as securities fraud.  However, the UBS Defendants vehemently argue that individual questions of reliance instead predominate because the fraud-on-the-market presumption of

reliance does not apply.  Indeed, the focus of much of the written and oral debate centered on this issue.  UBS also argues that no class can be certified because the Plaintiffs failed to establish a common theory of loss causation.

a.      Reliance:  Fraud-on-the-Market Doctrine

The major thrust of the UBS Defendants' attack on class certification asserts the predominance of individual reliance; i.e., UBS argues that no presumption of reliance applies here and, therefore, individual reliance will be an issue defeating class certification.  Indeed "[r]eliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action.  It ensures that, for liability to arise, the 'requisite causal connection between a defendant's misrepresentation and a plaintiff's injury' exists as a predicate for liability."  *Stoneridge*, 128 S. Ct. 761, 769 (2008) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988).

The Supreme Court in *Basic* recognized that proof of reliance on a specific misrepresentation or omission may be virtually impossible to establish.  *Basic Inc. v. Levinson*, 485 U.S. 224, 245 (1988).  It, therefore, adopted the fraud-on-the-market doctrine that recognizes a rebuttable presumption of reliance.  "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business."  485 U.S. at 241.

(1)      Material Public Misrepresentations

UBS relies on the Fifth Circuit decision in *Regents of Univ. of Calif. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372 (5th Cir. 2007), *cert. denied* 128 S. Ct. 1120 (2008), to argue that the fraud alleged here by Plaintiffs against the UBS Defendants is not the kind of fraud

27

that affects an efficient market: "'to qualify for the [fraud-on-the-market] presumption. . . a plaintiff must not only indicate that a market is efficient, but must allege the defendant made public and material misrepresentations; *i.e.*, the type of fraud on which an efficient market may be presumed to rely.' [*Regents*,] 482 F.3d at 385-86."  UBS Opposition (doc. 1205) at 37.

Although UBS repeatedly argues that *Stoneridge* put an end to "scheme liability," it did not do so.  Under *Stoneridge* the Supreme Court made clear that a defendant who participates in a fraudulent scheme faces liability for its deceptive <u>public</u> acts or statements.  *Stoneridge*, 128 S. Ct. at 773-74; *see also In re Saloman Analyst*, 544 F.3d at 481.  The liability of the UBS Defendants thus arises from their intimate knowledge (scienter) of the accounting fraud at HealthSouth, hidden in its publicly filed reports coupled with the fraudulent representations, omissions and conduct by the UBS Defendants that perpetrated and/or hid that fraud.

UBS argues that any "deceptive conduct" by its very nature involves undisclosed, behind-the-scenes actions and thus could not have defrauded the market.  (doc. 1205, p. 38).  Indeed, much of the alleged deceptive conduct by UBS was hidden from public view.  These behind-the-scenes activities, however, establish scienter by UBS, through McGahan, Lorello, and Capeck, of the accounting fraud at HealthSouth.  This knowledge, acquired in behind-the-scenes conversations and interactions with HealthSouth, demonstrates the fraudulent nature of UBS's public statements and conduct.  While the behind-the-scenes activities alleged in the complaint and about which the Plaintiffs presented evidence[17] establish UBS's *knowledge* of the falsity of its analyst reports and endorsement of the bond placements, the alleged liability of UBS rests in

_____

[17]*See* Declaration of Coughlin and exhibits submitted (doc. 1558-2 with exhibits 1558-3 through 1558-10).

28

the *communications it made to the public*.  While UBS's *undisclosed* conduct did not defraud the market, the false representations UBS made to the public premised on HealthSouth's financial condition became part of the mix of information on which the market relied.

Conduct can constitute deception.  *Stoneridge*, 128 S. Ct. at 769.  Here, UBS leant its "good name" to the Rule 144A transactions by participating as initial purchasers of the bonds, as bookrunner and as lead manager.  The "statement" conveyed by such action was that "these bonds are good enough for UBS, so they must be good enough for you."  At the time of each of the six Rule 144A transactions, UBS knew – through McGahan and Lorello, who devised the transactions to avoid detection of the fraud – that HealthSouth financial reports were riddled with fraud.  Thus, these statements endorsing the Rule 144A transactions were false because they failed to disclose information necessary to prevent them from being misleading, and were intended to deceive the purchasers of the bonds.

For example, as to the various bond offerings, several internal UBS memoranda show that UBS, the "sole Bookrunner and Lead Manager" in the first three offerings and "Joint Bookrunner" and one of the "Lead Managers" in the fourth, (1) prepared the offering memoranda, roadshow materials and scripts; (2) pre-marketed the offerings to investors to identify and address concerns; (3) timed, priced, set the amount and had the offerings rated; (4) was an initial purchaser in the offerings; (5) distributed the offering materials to each potential investor; (6) sold the offerings via its own website – "DebtWeb;" (6) set up investor one-on-one meetings and roadshows; (7) trained UBS personnel on how to sell or place the offerings; (8) modeled the offerings' positive impact on HealthSouth's share price; and (9) kept the equity side of UBS involved throughout the process.  McGahan's team also provided debt offering

memoranda to credit rating agencies, knowing that the financial statements and information was misleading. These activities and representations were not behind the scenes, in the shadows, nor immaterial to the mix of information on which the market relied.

UBS argues that its statements and conduct regarding the bond offers were "non-public" and limited only to the Qualified Institutional Buyers ("QIBs") to whom the bonds were initially offered; therefore, it urges, those actions could not affect the market and the fraud-on-the-market presumption does not apply. First, UBS ignores the fact that the QIBs were significant participants in the market for HealthSouth's stock. Nearly 120 QIBs participated in the debt offerings at issue. These QIBs were among the largest stock traders in the American and worldwide markets. On a quarterly basis these QIBs, beyond their HealthSouth bonds, held between 20% and 30% of all of the Company's outstanding shares. Thus, the "private" QIBs held a beneficial interest in the "public" HealthSouth stock at four-to-six times above the generally recognized ownership level. No surprise that the market for HealthSouth stock jumped as UBS sold the debt offerings.

Second, the QIBs were not the only targeted audience during the marketing of the debt – UBS also targeted the equity market. For example, in September 2000 Capek sent an email to UBS's Managing Director for Equity Sales concerning the "HRC high-yield roadshow" encouraging him to "blast out an invitation to equities and equity clients" and to "feel free to invite clients." (doc. 1558, ex. 48).

UBS's argument that its activities regarding the bond offering had no effect on the stock price directly conflicts with the evidence Plaintiffs presented of the concurrent statements UBS made taking credit for the increase in HealthSouth's stock price. For example, in October 2000,

McGahan told the HealthSouth Board of Directors that two UBS "management teams met with over 65 investor accounts in 16 states over an 8-day roadshow," and that "HRC's stock price is up over 80%."  In March 2001, McGahan again touted "the positive momentum in the stock as a result of the successful bond offering and roadshow."  With the September 2001 debt offering, HealthSouth stock again increased, and McGahan again took credit for that increase at the November 2001 Board meeting.  Similarly, with the May 2002 offering, UBS boasted that because of the buzz generated by it and its management of the debt book, the size of the offering doubled and the stock rose 2.17%.  From UBS's own words, the court finds sufficient evidence to invoke the fraud-on-the-market presumption of reliance on its public statements and conduct.

Whether one views this deceptive conduct as misrepresentation or an omission – having chosen to take action viewed as an endorsement, UBS misrepresented or failed to disclose the financial status of HealthSouth – the result is the same: the market relied on UBS's expertise, intimate knowledge of HealthSouth as its investment banker, and its reputation in evaluating the merits of the bond offerings.  The behind-the-scenes scheming by McGahan and Lorello to construct the Rule 144A transactions took on a public face when UBS endorsed the bond offerings and actively marketed them.  The combined activities of the UBS Defendants thus created the market for the bonds.  Whether one calls it a "fraud on the market" or a "fraud creating the market" the result is the same: but for the active public participation by UBS, the Rule 144A transactions could not have occurred.

Not only did UBS "run" the bond offerings, it also issued allegedly false analyst reports. It argues, however, that analyst reports cannot be the basis of the fraud-on-the-market presumption (doc. 1205 at 67).  One reason, it argues, is that analysts "generally do not have unique access to information."  That proposition may be true <u>generally</u>, but the Plaintiffs have

presented more than sufficient evidence to the contrary in this case.

UBS argues that the *Basic* presumption should not be extended to analyst reports, citing *dicta* from *In re Initial Pub. Offerings Sec.-Litig.*, 471 F.3d 24, 43 (2d Cir. 2006) ("IPO") ("it is . . . doubtful whether the *Basic* presumption can be extended, beyond its original context, to . . . analyst reports.")[18]  The court disagrees.

As the Eleventh Circuit noted in *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840 (11th Cir. 2004): "Research analysts who study publicly traded companies and make recommendations on the securities of those companies exert considerable influence in the marketplace.  The reports and/or recommendations of such analysts can influence the price of a company's stock even when nothing about the company's prospects or fundamentals have changed."  *Id.* at 842.  The district court subsequently certified a class of plaintiffs seeking recovery for an analyst's statements that inflated the stock price.  *La Grasta v. First Union Sec. Inc.*, 2005 U.S. Dist. LEXIS 20207 (M.D. Fla. August 8, 2005).  In doing so, the court found the *Basic* fraud-on-the-market presumption applied to misrepresentations by the analyst.

The only Circuit Court yet to address directly whether the *Basic* fraud-on-the-market presumption of reliance can apply to misrepresentations by analysts held that it could.  *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474 (2d Cir. 2008).  The Second Circuit Court refused to adopt "a bright-line rule that bars application of the *Basic* presumption to a suit alleging misrepresentations by analysts."  *Id*. at 480.[19]  The court emphasized that all that is

_____

[18]The Second Circuit in *IPO* reversed class certification because initial public offerings by their very nature do not trade in an efficient market.  *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d at 56.  The case cited in *IPO* to support the quotation cited by UBS, *West v. Prudential Sec. Inc.*, 282 F.3d 935, 938 (7th Cir. 2002), likewise did not involve analyst reports but reversed class certification because *Basic* does not apply to private statements.

[19]Thus, the Second Circuit rejected the *dicta* of *IPO* discussed *supra* note 19.

needed to warrant the presumption is to show that "where a defendant has (1) publicly made (2) a material misrepresentation (3) about stock traded on an impersonal, well-developed (i.e., efficient) market, investors' reliance on those misrepresentations may be presumed." *Id.* at 481 (citing *Basic*, 485 U.S. at 248 n.27).  The court further explained that the logic of *Basic* counsels against limiting the presumption to misrepresentations made by issuers.  "The reason is simple: the premise of *Basic* is that, in an efficient market, share prices reflect 'all publicly available information, and, hence, any material misrepresentations.' [*Basic*, 485 U.S.] at 246 (emphasis added).  It thus does not matter, for purposes of establishing entitlement to the presumption, whether the misinformation was transmitted by an issuer, an analyst, or anyone else." *In re Salomon Analysts*, 544 F.3d at 481.[20]

This court agrees that any argument that the presumption can never apply to an analyst's public statement

> would be difficult to square with *Basic*, and with common sense. If, as *Basic* holds, the law assumes that 'the price of a company's stock is determined by the available material information' in the marketplace, 485 U.S. at 241, and that investors who rely on the market price indirectly rely on the accuracy of information disseminated to the market, the fraud-on-the-market theory must apply to any *material* false information.  While not every opinion by every self-proclaimed analyst will be material, the significant role of respected analysts as intermediaries in investors' assessments of value, and the lengths to which some analysts have allegedly gone to disguise their true opinions of stocks they wish to promote, make clear that such opinions will sometimes be material. As is the case in other legal contexts, the materiality of such information to the market is a question of fact.

---

[20]The District Court for Massachusetts also determined that the *Basic* presumption applies to analysts' reports.  *In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 28 (D. Mass. 2008). This court agrees.

*DeMarco v. Robertson Stephens Inc.*, 228 F.R.D. 468, 475 (S.D.N.Y. 2005).[21]

In *Basic*, the Court determined that a fact is material if it presents a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." 485 U.S. at 232. The question of materiality usually rests with the trier of fact. *Oxford Asset Mgt. v. Joharis*, 297 F.3d 1182, 1189 (11th Cir. 2002). The Plaintiffs submitted sufficient evidence that the alleged misrepresentations and omissions were material.

Applying the preponderance of the evidence standard, the court finds that the true financial status of HealthSouth was a material fact the omission of which made the UBS analysts's "Strong Buy" recommendations misleading at best. These UBS analyst reports were made public and widely disseminated, and thus became part of the mix of information that informed the market. Contrary to UBS's contention, Plaintiffs submitted more than enough evidence at this stage to show that these reports did impact the market by becoming part of the total mix of information. As UBS also played the role of HealthSouth's investment banker and presumably had greater knowledge of HealthSouth's finances than other analysts, its evaluation would carry significant weight. Further, by actually knowing the true state of those finances and making misleading representations without disclosing that fact to the unsuspecting public, UBS further affected the market. Nothing about the *Basic* presumption precludes its application to analyst reports, provided the Plaintiffs establish the requirements for application of the presumption.

-------------------

[21]UBS argued that *In re Initial Pub. Offering Sec. Litig.*, 471 F. 3d 241 (2d Cir. 2006) "overruled" the applicability of the *Basic* presumption to analyst statements as stated in *DeMarco*. However, the *Salomon Analyst* decision demonstrates that *IPO* did not "overrule" the statements concerning the applicability of *Basic* to analyst statements.

(2)     Efficient Market for HealthSouth Stocks and Bonds

To invoke the *Basic* presumption, in addition to public material misrepresentations, Plaintiffs must show that the market for HealthSouth stocks and/or bonds was an "efficient" one, and that the market price reflected the publicly available information.  *Basic*, 485 U.S. at 241-242.

For purposes of class certification, the UBS Defendants do not contest the efficiency of the market for HealthSouth stock at this stage (doc. 1205, at 87 n. 41).  Indeed, any such challenge would be disingenuous. However, the court must make an independent determination of the efficiency of the market to assess whether the *Basic* presumption applies.  As the Supreme Court explained, "[t]he fraud on the market theory is based on the hypothesis that, *in an open and developed securities market*, the price of a company's stock is determined by the available material information regarding the company and its business."  *Basic*, 485 U.S. at 241 (emphasis added).

Market efficiency involves three separate but related inquiries:

> An open market is one in which anyone, or at least a large number of persons, can buy or sell.  A developed market is one which has a relatively high level of activity and frequency, and for which trading information (*e.g.*, price and volume) is widely available.  It is principally a secondary market in outstanding securities.  It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).  An efficient market is one which rapidly reflects new information in price.  These terms are cumulative in the sense that a developed market will almost always be an open one.  And an efficient market will almost invariably be a developed one.

*Freeman v. Laventhoe & Horwath*, 915 F.2d 193, 198-99 (6th Cir. 1990).

Courts generally consider the following factors in evaluating an efficiently traded security:  (1) whether the security has a large weekly trading volume; (2) whether a significant

number of securities analysts followed and reported on the company's stock during the applicable period; (3) whether the stock had numerous market makers and arbitrageurs; (4) whether the company was entitled to file an S-3 Registration Statement in connection with public offerings; and (5) whether the security experienced an historical showing of immediate price response to unexpected corporate events or financial releases. *See e.g., Cammer v. Bloom*, 711 F. Supp. 1264, 1285-87 (D.N.J. 1989); *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005); *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 197 (6th Cir. 1990). As Stockholder Plaintiffs' expert Bjorn I. Steinholt demonstrates, HealthSouth's securities traded in an efficient market during the Class Period.

   (a)  Trading on NYSE

   During the Class Period, HealthSouth was listed on the NYSE and traded under the ticker symbol HRC. Every stock on NYSE is assigned to a specialist, whose responsibility it is to maintain a fair, competitive, orderly and efficient market for the securities assigned to him. The court agrees that "at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: The New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System." *Cammer*, 711 F. Supp. at 1292. In short, the listing of HealthSouth stock on the NYSE guaranteed that it was traded in an open market so that a large number of investors could readily buy or sell its stock.

   (b)  Weekly Volume

   The high level of trading activity of HealthSouth stock indicates that HealthSouth stock traded in a liquid market. During the Class Period, HealthSouth had a reported trading volume of more than 3.8 billion shares with a dollar trading volume of almost $45 billion. Average

reported daily trading volume during the Class Period was more than 2.5 million shares with an average daily dollar volume of more than $30 million.  The large amount of trading in HealthSouth's common stock demonstrates that HealthSouth common stock traded in an efficient market.

(c)     Analyst Coverage

The large number of security analysts reporting on the financial condition and prospects of HealthSouth further demonstrates that HealthSouth stock traded in an efficient market. During the Class Period, numerous analysts covered HealthSouth, including but not limited to UBS, Credit Suisse, First Boston, Salomon Smith Barney, J.P. Morgan, Chase H&Q, Bear Stearns, S.G. Cowen, Morgan Stanley and Goldman Sachs.  In addition to the analysts, hundreds of articles concerning HealthSouth appeared in major financial news sources such as the *Dow Jones News, Business Wire, Federal Filings Newswires* and *The Wall Street Journal*.  The large number of analysts constitutes definitive evidence that (i) securities analysts monitored HealthSouth and provided investors with research on the Company; and (ii) enough demand from investors for research on HealthSouth justified the economic cost for the investment research on the Company.  This evidence further demonstrates that HealthSouth's stock traded in an efficient market.

(d)     Market Makers and Arbitrage

During the Class Period, the short interest in HealthSouth common stock ranged from approximately 5 million shares to a high of more than 33 million.  Moreover, the majority of HealthSouth's shares were owned by large sophisticated institutions.  These facts further demonstrate that HealthSouth's stock traded in an efficient market.

(e)      Eligibility to File Form S-3

During the Class Period, HealthSouth filed Form S-3 registration statements, which further demonstrates the efficiency of the market for HealthSouth stock.

(f)      Price Reaction to New Material Information

The final factor by which to demonstrate market efficiency requires empirical evidence that HealthSouth stock quickly incorporated new material information into its stock price. Plaintiffs present an expert report that examined the publicly available, company-specific information contemporaneous with significant common stock price returns of HealthSouth common stock. Mr. Steinholt's comprehensive event study demonstrates that HealthSouth stock reacted to the release of new, material information regarding HealthSouth and thus traded in an efficient marked during the Class Period.[22]

Because Stockholder Plaintiffs' evidence establishes that HealthSouth common stock traded in an efficient market during the Class Period, they are entitled to the presumption of reliance and have satisfied the predominance requirement of Rule 23(b)(3). Stockholder Plaintiffs' evidence demonstrating that HealthSouth stock traded in an efficient market entitles them to invoke the presumption of reliance in support of all their claims under Rule 10b-5, including their claims under Sections (a) and (c) that Defendants made materially false statements and omissions and engaged in deceptive conduct as part of a scheme to artificially inflate the price of HealthSouth stock.

---

[22]Mr. Steinholt analyzed HealthSouth's price reaction following two key disclosures – the September 30, 1998, disclosure and the August 27, 2000, disclosure – that revealed, at least partially, HealthSouth's true economic prospect previously concealed by the fraud by HealthSouth, UBS, E&Y, and Scrushy. Mr. Steinholt opined that "HealthSouth's stock price reaction to the new, material information disclosed on September 30, 1998, and August 27, 2002, demonstrates that such new, material information was quickly incorporated into the Company's stock price, and, thereby, provides direct evidence that the market for HealthSouth's common stock was efficient."

(3)     Rebuttal Argument

In an effort to rebut the *Basic* presumption of reliance, UBS argues that the Plaintiffs failed to establish that the analyst reports and/or its activities involving the bond offerings caused any statistically significant impact on the price of HealthSouth stock.  The Stockholders' expert noted that Capek's February 11, 2000, and September 23, 2002, analyst reports directly affected HealthSouth stock price in a positive, statistically significant way.  UBS argues that the inability to link the other 28 reports to any positive stock price reaction destroys any applicability of the fraud-on-the-market presumption of classwide reliance.  (doc. 1541 at 12).

As to whether the fraud-on-the-market presumption of reliance applies, "Plaintiffs do not bear the burden of showing an impact on the price.  The point of *Basic* is that an effect on the market is *presumed*."  *In re Salomon Analysts*, 544 F.3d at 483 (emphasis in original).  Instead, the burden of showing the absence of any price impact rests on the Defendants at the rebuttal stage.  *Id.*  The Second Circuit vacated the order certifying the class and remanded the case for consideration of rebuttal evidence by the defendants.  *Id.* at 486.  In this case, the court provided Defendants an opportunity to rebut the presumption prior to certifying a class.

UBS contends that it has demonstrated the absence of a price impact, thus rebutting the presumption.  (doc. 1541 at 13).  However, UBS ignores the significant drops in stock prices on September 30, 1998,[23] and August 27-28, 2002,[24] in response to the "curative" statements that were actually false and misleading.

_____

[23]Before the market opened on September 30, 1998, HealthSouth warned that pricing pressure from managed care companies would adversely affect its operating results.  The stock dropped from $14.63 per share to $10.50 per share – a 28% decline.

[24]On August 27, 2002, HealthSouth announced that it was reducing its earnings guidance by $175 million annually and disavowing previous earnings guidance.  HealthSouth falsely attributed this decline to changes in Medicare billing rules.  The stock price plunged from $11.97 per share to $5.05 per share on August 28, 2002 – a loss of almost 60% in value.

The court finds that "the mere absence of a statistically significant *increase* in the share price in response to fraudulent information does not 'sever the link' between the material misstatements and the price of the stock.  Rather, price stability may just as likely demonstrate the market consequence of fraud where the alleged fraudulent statement conveys that the company has met market expectations, when in fact it has not."  *In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1340-41 (N.D. Ga. 2007).  Capek's reports, as well as UBS's participation in the bond offerings, conveyed to the public and the market the false impression that HealthSouth was financially healthy – what the market expected – when in fact it was desperately ill.  Even without a demonstrated increase in share price directly related to the fraudulent statements, Plaintiffs can travel on the fraud-on-the-market theory by showing that the negative truthful information that caused the share price to drop was related to the prior false positive statements.  Plaintiffs' expert Steinholt's event study analysis ties the drop in stock price to the revelation of the truth; Defendants' expert ignores the drops.

 "[W]here plaintiffs demonstrate that they relied upon the integrity of the market in purchasing or selling securities in an open and developed market, they need not establish that they relied on specific misrepresentations.*"  In re Amerifirst Sec. Litig.*, 139 F.R.D. 423, 429 (S.D. Fla. 1991) (quoting *Kirkpatrick,* 827 F.2d at 722).  "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company . . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements."  *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988); *see also Lipton v. Documation Inc.*, 734 F.2d 740, 747-48 (11th Cir. 1984) (stating the fraud-on-the-market theory recognizes that "reliance may be presumed where securities are traded on the open

market"). To invoke the "fraud on the market" presumption of reliance, plaintiffs need only make a preliminary showing that the market for their securities was informationally efficient; that is, the market price promptly responds to and thus reflects public information that is material to the investment. *See Cheney*, 213 F.R.D. at 501. The court finds, by a preponderance of the evidence, that Stockholder Plaintiffs have provided competent evidence to invoke the fraud-on-the-market presumption of class-wide reliance, which Defendants failed to rebut.

        b.    Loss Causation

        UBS argues that the Plaintiffs cannot show a common "loss causation" theory and, thus, argues that common issues do not predominate. UBS does not cite any Eleventh Circuit authority requiring proof of loss causation at the class certification stage, and counsel reluctantly admitted at the hearing that none exists. Instead, UBS argues that loss causation is "highly relevant to class certification" by relying on Fifth Circuit precedent. *See Regents/Enron*, 482 F.3d at 382. Indeed, the Fifth Circuit requires proof of loss causation at the class certification stage. *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 269-271 (5th Cir. 2007). However, the *Oscar* case has never been followed in the Eleventh Circuit and this court will not be the first to adopt it.

        Instead, under Eleventh Circuit law, loss causation requires only that a cause – defendants' fraud – be proximately linked to an effect – plaintiffs' economic losses. *See Robbins v. Kroger Props., Inc.,* 116 F.3d 1441, 1447 (11th Cir. 1997) ("[L]oss causation describes the 'link between the defendants' misconduct and the plaintiff's economic loss.'") (quoting *Rousseff v. E.F. Hutton Co.*, 843 F.2d 1326, 1329 n.2 (11th Cir. 1988)). Not even UBS argues that Plaintiffs could not establish a unified loss causation theory as to what it terms the HealthSouth financial fraud. What the UBS Defendants argue is that they were not a part of that fraud, or

41

should not face liability for it.  Plaintiffs' evidence demonstrates otherwise – that the false analyst reports and the public funding activities undertaken and engaged in by UBS were a necessary and an inextricably intertwined part of that fraud.

The fact that UBS's primary violations ran in tandem with HealthSouth's deception does not shield UBS from liability.  That UBS's conduct is a "substantial cause" of Plaintiffs' economic loss is sufficient.  *Robbins*, 116 F.3d at 1447 ("'[P]laintiff need not show that the defendant's act was the sole and exclusive cause of the injury suffered; he need only show that it was substantial, *i.e.*, a significant contributing cause.'") (citations omitted)

To the extent UBS's claim is that the August 2002 and March 2003 disclosures lack details as to UBS's role in the fraud, no law requires that any specific reference be made to any individual or entity's role in the revealing disclosure that resets market expectations.  *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 170 (S.D.N.Y. 2008) (rejecting defendant's argument that plaintiffs failed to establish loss causation as to him because no mention was ever made to the market of defendant's role in the fraud).

At its core, UBS's argument is that it should not be liable for the injury it views HealthSouth as causing.  But loss causation addresses the existence of damages, not their precise allocation.  While the Private Securities Litigation Reform Act establishes joint and several liability for knowing violations such as this, the factfinding underlying damage allocation is a jury question not resolvable – or even reachable – on class certification.  *See* 15 U.S.C. § 78u-4(f)(2)(A).

### 2.    Superiority of Class Action

As a general rule, class action treatment presents a superior method for the fair and efficient resolution of securities fraud cases.  *See Kirkpatrick*, 827 F.2d at 727; *In re Vesta Ins.*

*Group, Inc.*, 1999 U.S. Dist. LEXIS 22233 at *44; *In re Miller Indus., Inc.,* 186 F.R.D. at 684.

When common issues of law and fact are involved, a class action is particularly

appropriate. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 155 (1982). In such cases, "the class action

device saves the resources of both the courts and the parties by permitting an issue potentially

affecting every class member to be litigated in an economical fashion under Rule 23." *Id*. Thus

class actions, in appropriate cases, promote judicial efficiency and economy of litigation.

Further, "the class-action device also provides a key to the courthouse for parties with legitimate

claims whose access to justice may be slammed shut because the individual amounts of their

claims make it economically infeasible to pursue them on an individual basis." *Upshaw*, 206

F.R.D. at 697 (citing *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 329 (1980)).

The court also takes note of cases discussing the adverse impact that class actions can

have on defendants, forcing them to settle rather than face the expenses of litigation. *See Klay*,

382 F.3d at 1274-75 (citing *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 746 (5th Cir. 1996)).

While "certification may induce some defendants to settle," not certifying a meritorious class

action "may create similar 'hydraulic' pressures on the plaintiffs, causing them to either settle or

– more likely – abandon their claims altogether." *Klay*, 382 F.3d at 1275 (citing *Newton v.*

*Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 156 (3d Cir. 2001) ("On the one

hand, some of the securities claims pressed by the putative class members may be too small to

survive as individual claims. On the other hand, certifying the class may place unwarranted or

hydraulic pressure to settle on defendants. Either way, an adverse certification decision will

likely have a dispositive impact on the course and outcome of the litigation.")). "Mere pressure

to settle is not a sufficient reason for a court to avoid certifying an otherwise meritorious class

action suit." *Klay*, 382 F.3d at 1275. The court thus balances the pros and cons of a class action,

and finds that in this case, the pros outweigh the cons.

The UBS Defendants argue that class certification is not appropriate here, because these claims are not the "ordinary" securities fraud claims, and that a class action would be unwieldy. UBS asserts that class certification should be denied because Plaintiffs' "claims against UBS Defendants are anything but ordinary."  The court agrees that the claims against the UBS Defendants are not "ordinary" ones.  The court is not aware of any other securities fraud case where employees of an investment bank are alleged to have been so intimately involved with the creation, extension and maintenance of such a wide-spread financial fraud scheme.

The numerous class members, and the common questions of law and fact that predominate in this case make it particularly appropriate for class certification.

D.    Class Certification as to Defendant Richard Scrushy

Richard Scrushy filed no objections to the motions for class certification as to the claims asserted against him.[25]  Therefore, after an independent evaluation of the propriety of the motions, the court will certify the following class and subclasses as against Defendant Scrushy:

> All persons who, between April 24, 1997 and March 18, 2003 (the "Stockholder Class Period"), purchased or otherwise acquired the stock or options of HealthSouth Corporation ("HRC," "HealthSouth" or the "Company"), and were damaged thereby (the "Stockholder Class").  Included in the Stockholder Class are persons who acquired HealthSouth securities in exchange for the stock or options of the National Surgery Centers, Inc. ("NSC"), Horizon/CMS Healthcare Corporation ("Horizon") and The Company Doctor ("TCD") mergers (the "Merger Subclasses").  Excluded from the Stockholder Class and Merger Subclasses are current and former defendats, the directors, officers, subsidiaries and affiliates of HealthSouth, any person, firm, trust, corporation,

---

[25]The Stockholder Plaintiffs assert the following claims against Scrushy: Count I through VIII - violations of Section 11 and Section 15 of the Securities Act and Section 14(a) of the Exchange Act; Count IX - violations of Sec. 10(b) and Rule 10b-5; and Count X - under Section 20(a) of the Exchange Act.

> officer, director or other individual or entity in which any current
> or former defendant has a controlling interest, and the legal
> representatives, affiliates, heirs, successors-in-interest, or assigns
> of any such excluded party.

Having heard no objection from Defendant Scrushy, the court appoints the following representatives for the Stockholder Class: Central States, Southeast and Southwest Area's Pension Fund, New Mexico State Investment Council and the Educational Retirement Board of New Mexico, the State of Michigan Retirement Systems and Julius McQueen.  For each of the Merger Subclasses, the court appoints Marsha Kouba, David Dubrow (NSC Merger); Donald Angle, Jack Kennedy, Dale Willetts (TCD Merger); and Franklin and Rosalyn Ross, Trustees of the Franklin A. Ross and Rosalyn J. Ross Revocable Living Trust (Horizon Merger).

Finally, the court affirms the appointment of Coughlin Stoia Geller Rudman & Robbins LLP and Labaton Sucharow LLP as Co-Class Counsel, and consistent with this court's June 24, 2003 Order (doc. 1), affirms Schatz Nobel Izard P.C. and Ragsdale LLC as additional counsel for the Merger Subclasses.

IV.    Conclusion

For the reasons stated above, the court finds that the Stockholder Plaintiffs have established by a preponderance of the evidence, even though such a stringent burden may not be necessary, each of the Rule 23(a) and 23(b)(3) requirements for class certification.  The court finds no reason why the *Basic* fraud-on-the-market presumption of reliance should not apply here, and the UBS Defendants have not rebutted that presumption.  Thus, common issues of law and fact predominate over any individual issues.  Further, the court specifically finds that in this case, class action treatment provides a superior mechanism for resolution of this complex case.

Therefore, the court will, by separate order, certify the following class as against the UBS Defendants:

All persons who, between September 20, 2000 and March 18, 2003 (the "Stockholder Class Period against UBS"), purchased or otherwise acquired the stock or options of HealthSouth Corporation and were damaged thereby ("the UBS Stockholder Class").[26]

DONE and ORDERED this 31st day of March 2009.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

---

[26]As previously noted, because of the court's prior rulings on the statute of limitations issues, any claims of the Merger Classes based upon acquiring stock through the mergers would predate the liability period against UBS.  Any surviving claims those merger subclass Plaintiffs might have would be as a result of acquiring stock during the Stockholder Class Period against UBS.  Those claims are adequately represented by the named representatives and class counsel without the need for subclasses because the potential conflicts no longer exist as to stock acquired apart from the mergers.