FILED

2009 Sep-30  PM 12:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| In re HEALTHSOUTH CORPORATION SECURITIES LITIGATION<br><br>This Document Relates To:<br>    All Actions. | ] ] ] ] ] ] ] ] | Master File No. CV-03-BE-1500-S |
| In re HEALTHSOUTH CORPORATION STOCKHOLDER LITIGATION<br><br>This Document Relates To:<br>    All Actions. | ] ] ] ] ] ] ] ] | Consolidated Case No.<br>    CV-03-BE-1501-S |
| In re HEALTHSOUTH CORPORATION BONDHOLDER LITIGATION<br><br>This Document Relates To:<br>    All Actions. | ] ] ] ] ] ] ] ] ] | Consolidated Case No.<br>    CV-03-BE-1502-S<br><br>CLASS ACTION |

## MEMORANDUM OPINION

This case is before the court on "Bondholder Plaintiffs' Motion for Class Certification"

(doc. 939).  To say the matter has been well briefed by all sides is the proverbial understatement.[1]

---

[1]*See* Bndh. Pls.' Mem. of Law in Support of Mot. Class Cert. (doc. 943); UBS Defs.' Mem. of Law in Opp. to Mot. Class Cert. (doc. 1205); E&Y's Am. Mem. of Law in Opp. to Mot. Class Cert. (doc. 1217); Bndh. Pls.' Reply Mem. of Law (doc. 1421); E&Y's Notice of Recent Auth. (doc. 1482); UBS Defs.' Supp. Br. in Opp. (doc. 1541); Bndh. Pls.' Sub. of Supp. Auth. (doc. 1560); UBS Defs.' Resp. to Bndhs.' Sub. (doc. 1564); E&Y's Resp. to Bndhs.' Sub. (doc. 1565); Notice of Filing Rev. Class Def. (doc. 1582); E&Y's Resp. to Bndhs.' Rev. Class Def.

Lead Plaintiff in the HealthSouth Bondholder Litigation, the Retirement Systems of

Alabama ("RSA"), and named plaintiffs Houston Firefighters' Relief and Retirement Fund

("HFRRF") and State Universities Retirement System of Illinois ("SURS") (collectively, the

"Bondholder Plaintiffs"), seek certification of a class to prosecute their claims against

Defendants Ernst & Young ("E&Y"); UBS AG and UBS Warburg (collectively "UBS") together

with Benjamin Lorello, William McGahan and Howard Capek (collectively the "UBS Individual

Defendants") (with both collective UBS groups referred to in combination as the "UBS

Defendants"); and Richard Scrushy.

Bondholder Plaintiffs seek appointment as representatives of the Bondholder Class

pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3).  The Revised Class Definition[2] they propose

reads:

> All persons and entities who purchased, exchanged or otherwise acquired
> HealthSouth bonds during the periods (a) beginning July 30, 1999 through and
> including March 18, 2003 (as to claims against Richard Scrushy), or (b) beginning
> March 30, 2000 through and including March 18, 2003 (as to claims against Ernst
> & Young LLP), or (c) beginning September 20, 2000 through and including
> March 18, 2003 (as to claims against the UBS Defendants), and who were
> damaged thereby.[3]

---

(doc. 1586); UBS Defs.' Resp. to Bndh. Pls.' Notice of Filing Rev. Class Def. (doc. 1587); Bndh.
Pls.' Reply Br. in Support of Rev. Class Def. (doc. 1589); E&Y's Supp. Mem. (doc. 1621);
Bndh. Pls.' Supp. Mem. (doc. 1622); UBS Defs.' Supp. Mem. (doc. 1623).

[2]See Notice of Filing Revised Class Definition (doc. 1582) filed April 1, 2009.

[3]Excluded from the class are (a) current or former defendants; (b) any officer or director
during the Bondholder Class Period of HealthSouth or any of its subsidiaries or affiliates; (c)
members of the immediate families of any of the current or former Individual Defendants; (d)
any entity in which any current or former Defendant has or had a controlling interest; and (e) the
legal representatives, heirs, successors or assigns of any such excluded party.

Bondholder Plaintiffs also seek appointment of their counsel Bernstein Litowitz Berger & Grossmann LLP and Cunningham, Bounds, Crowder, Brown & Breedlove, L.L.C., as Bondholder Class Counsel, and Donaldson & Guin, L.L.C. as Bondholder Class Liaison Counsel pursuant to Fed. R. Civ. P. 23(g).

Bondholder Plaintiffs have alleged that the individual and corporate UBS Defendants; Ernst & Young LLP; and Richard M. Scrushy, the founder and former Chief Executive Officer of HealthSouth Corporation; and others, made misrepresentations and engaged in a fraudulent scheme and common course of conduct to misrepresent  HealthSouth's true financial condition. The claims asserted against the Defendants allegedly involve the same unlawful acts undertaken in the same unlawful manner against every person who purchased any HealthSouth security – whether stock or bond, registered or unregistered – during the Class Period.  Thus, Bondholder Plaintiffs claim to have alleged the very type of fraudulent scheme perpetrated on a large number of individuals that the Eleventh Circuit has found particularly appropriate for class certification.[4] They assert claims under Sections 11 and 15 of the Securities Act, and Sections 10(b) and 20(a) of the Exchange Act.

E&Y challenges class certification of the Section 11 claims against it as to primary market purchasers, and the court will address those challenges separately.  Both E&Y and UBS Defendants challenge class certification of the Section 10(b) claims on numerous grounds, but their strongest attack aims at the predominance requirement of Rule 23(b)(3).  They argue that the bondholders are not entitled to a presumption of reliance under any theory, and that

---

[4]*See, e.g., Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 725 (11th Cir. 1987); *Kennedy v. Tallant*, 710 F.2d 711, 718 (11th Cir. 1983).

individual issues of reliance thereby would defeat class certification.  None of the Defendants[5] make any specific challenges based strictly on the Section 20(a) and Section 15 claims; the suitability of class certification of those claims that arise out of the same facts as the other claims will be covered by the general discussion of the Rule 23 requirements.

For the reasons stated below, the court disagrees with the majority of the Defendants' challenges and finds that the Bondholder Plaintiffs have met the requirements of Rule 23 for certification of a class.  However, the court limits the class definition for Section 11 claims to secondary market purchasers, as discussed in this opinion, and therefore will modify the class definition accordingly in the Order filed simultaneously.  Otherwise, the court finds that the Bondholder Action is the prototypical securities class action, meets all of the requirements of Rules 23(a) and 23(b)(3), except as noted, and thus, shall be certified and counsel appointed as requested.

Facts

The over-arching facts of the HealthSouth Corporation massive fraud that underlies this case and the procedural history of this consolidated case were more fully discussed in the Memorandum Opinion granting the Stockholder Plaintiffs' class certification motion.  *See In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 266-71 (N.D. Ala. 2009) (hereinafter "Stockholder Op.")[6].  The following facts are particularly relevant to the Bondholders' claims

---

[5]Defendant Scrushy did not file an objection or opposition to Bondholders' Motion for Class Certification.

[6]In that Opinion, the court also addressed and rejected many of the arguments raised by UBS in challenging both purported classes.  For example, the court rejected UBS's arguments that *Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.*, 522 U.S. 148, 128 S.Ct. 761 (2008) precludes liability for their public deception (257 F.R.D. at 277); that fraud-on-the-market theory

and are stated here for clarity of the discussion.

The claims of the Bondholder Class can be traced back to at least 1995, when HealthSouth, at Defendant McGahan's suggestion, began "baking" (*i.e.*, inflating) its earnings. By 1998, although HealthSouth's financials were inflated by hundreds of millions of dollars, it was unable to undertake any customary public equity or debt offerings because of SEC scrutiny of its registration statements.  As a result, according to the Bondholder Plaintiffs, Defendants McGahan and Lorello – both of whom were aware of the Company's financial fraud[7] – devised a plan to obtain financing and conceal the ongoing fraud, and to allow themselves and their employer (Citi/Salomon for the 1998 Offerings and UBS for all other Offerings) to pocket millions of dollars in fees:  HealthSouth would issue debt through the Rule 144A/*Exxon Capital*[8] exchange structure.  Between July 1999 and May 2002, HealthSouth, Scrushy, UBS, Lorello, and McGahan, with E&Y's participation, conducted four Rule 144A/*Exxon Capital* offerings  to raise over $2.4 billion.

The HealthSouth bonds at issue were initially offered under Rule 144A and, pursuant to the terms of the initial offering, a registration statement was issued within a few months, allowing holders of the 144A unregistered bonds to exchange them for registered bonds.  Each of

_____

cannot apply to analyst statements (*Id.* at 279); and that Plaintiffs (bond and stock) failed to show loss causation could be established on a class-wide basis (*Id.* at 283-84).  The court specifically adopts and incorporates the Stockholder Opinion as it applies to UBS's challenges to certification of the Bondholder class.

[7]*See* Stockholders Op., 257 F.R.D. at 267.

[8]An *Exxon Capital* transaction is a capital-raising technique that involves two steps, the first involving a private offering exempt under Rule 144A from registration requirements, and the second involving a SEC-registered exchange offering.  *See* Exxon Capital Holding Corp., SEC No-Action Letter (May 13, 1988).

the HealthSouth bonds at issue[9] was initially purchased for resale under Rule 144A by one or more investment banks, including UBS.  Each of the HealthSouth Registration Statements filed on Form S-4 states that the initial purchasers have made a market in the 144A bonds, and intend to continue doing so, but are not obliged to do so.  The unregistered bonds were then offered to "Qualified Institutional Buyers" ("QIBs"), who had the option to exchange the unregistered notes for registered ones after the issuance of the registration statement.  Only QIBs could purchase the unregistered notes, but the registered notes could be sold to any investor.

In addition to allegedly concocting the plan to fund HealthSouth while hiding the fraud in its financial statements, the UBS defendants participated in marketing the bonds, and served as an initial purchaser and as bookrunner for the issues.  In the process, the UBS Defendants touted investing in HealthSouth.

---

[9]HealthSouth issued the following bonds through the Rule 144A-process:
(1)$500 million ($567.75 million with overallotment) 3 1/4% Convertible Subordinated Debentures due April 1, 2003; 144A issuance March 1998 with Registration Statement effective June 3, 1998.
(2)$250 million 6 7/8% Senior Notes due June 15, 2005; 144A issuance June 22, 1998 with Registration Statement effective September 14, 1998 and Exchange concluded October 14, 1998.
(3)$250 million 7% Senior Notes due June 15, 2008; 144A issuance June 22, 1998 with Registration Statement effective September 14, 1998 and Exchange concluded October 14, 1998.
(4)$350 million 10 3/4% Senior Subordinated Notes due October 1, 2008; 144A issuance September 25, 2000 with Registration Statement effective December 15, 2000 and Exchange concluded January 24, 2001.
(5)$375 million 8 1/2% Senior Notes due February 1, 2008; 144A issuance February 1, 2001 with Registration Statement effective March 30, 2001 and Exchange concluded May 30, 2001.
(6)$200 million 7 3/8% Senior Notes due October 1, 2006; 144A issuance September 28, 2001 with Registration Statement effective November 19, 2001 and Exchange concluded January 17, 2002.
(7)$400 million 8 3/8% Senior Notes due October 1, 2011; 144A issuance September 28, 2001 with Registration Statement effective November 19, 2001 and Exchange concluded January 17, 2002.
(8)$1 billion 7 5/8% Senior Notes due June 1, 2012; 144A issuance May 17, 2002 with Registration Statement effective August 22, 2002 and Exchange concluded September 25, 2002.

E&Y's role in the Offerings involved its "clean" auditor's opinion that constituted E&Y's "seal of approval" and allowed the bonds to enter the market.  Its audited financial statements appeared in the registration statements and had been publicly disseminated through HealthSouth's SEC filings.

This epic fraud began unraveling on the evening of March 18, 2003, when the FBI raided HealthSouth's corporate headquarters based on tips provided by one of the company's top officers.  On March 19, 2003, the fraud further came to light with the filing of SEC actions against HealthSouth and Scrushy, and the first guilty plea of a HealthSouth officer.  The SEC suspended trading in HealthSouth securities retroactively for two days on March 19, 2003; when trading resumed on March 21, 2003, the value of the HealthSouth bonds was cut in half.

<u>Bondholders' Legal Claims</u>

The Bondholder Plaintiffs assert claims falling under four general categories:

(1)     Section 11 of the Securities Act arising out of bond offerings in September of 2000, February of 2001, September of 2001, and May of 2002.  These claims are asserted against E&Y and Scrushy in eight Counts.

(2)     Section 15 of the Securities Act arising out of the same bond issues against Scrushy in four Counts.

(3)     Section 10(b) of the Exchange Act and Rule 10b-5 promulgated under that act, against Scrushy; UBS and the Individual UBS Defendants; and E&Y, in one Count each.

(4)     Section 20(a) of the Exchange Act against Scrushy; and UBS Warburg in one Count each.

The first category alleges violations of Section 11 of the Securities Act, 15 U.S.C. § 77k(a), claiming that E&Y as HealthSouth's auditor and Scrushy as a principal officer of HealthSouth are liable because of materially misleading HealthSouth registration statements.  To

establish their Section 11 claims, Bondholder Plaintiffs must demonstrate that they acquired a

registered security or securities and that "any part of the registration statement [for that security

or securities] contained an untrue statement of material fact or omitted to state a material fact

required to be stated therein or necessary to make the statements therein not misleading. . . ." 15

U.S.C. § 77k(a); *see Ehlert v. Singer*, 245 F.3d 1313, 1315-16 (11th Cir. 2001) ("[T]o state a

claim under §§ 11. . . Plaintiffs must allege [only] that there was a material misrepresentation or

omission.")  The issue of materiality requires the assessment of "whether a reasonable man

would attach importance to the fact misrepresented or omitted in determining his course of

action."  *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1323 (11th Cir. 1982).

Section 11 includes "no state of mind element . . . and liability is 'virtually absolute, even

for innocent misstatements.'" *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1277 (11th

Cir. 2006)  (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)).  "Purchasers

may sue if they purchased at the time of the initial public offering, . . . or if they are 'aftermarket

purchasers who can trace their shares to an allegedly misleading registration statement.'" *In re

Worldcom, Inc. Sec. Litig.*, 219 F.R.D. 267, 288 (S.D.N.Y. 2003) (quoting *DeMaria v. Andersen*,

318 F.3d 170, 175 (2d Cir. 2003)).  A plaintiff cannot recover under Section 11 when his

investment decision occurred prior to the filing of the registration statement.  *APA Excelsior III

L.P. v. Premiere Techs., Inc.*, 476 F.3d 1261, 1272-73 (11th Cir. 2007).

The second broad category of claims arise under Section 15 of the Securities Act.

Bondholder Plaintiffs claim that Scrushy was a controlling person of HealthSouth and caused

HealthSouth to engage in wrongful conduct in connection with HealthSouth bond offerings.  "To

make out a prima facie case of a §15 violation, Plaintiffs must prove that Defendants '(1) each

had power or influence over the controlled person and (2) each induced or participated in the alleged violation.'" *Ehlert*, 245 F.3d at 1320 (quoting *Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990)).

Bondholder Plaintiffs also bring suit under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated under that Act.  They claim that Scrushy, UBS, the Individual UBS Defendants, and E&Y carried out a public scheme to deceive the investing public and caused Bondholder Plaintiffs to purchase notes at artificially inflated prices.  To state a claim under Section 10(b) and Rule 10b-5, "a plaintiff must show the following: '(1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on which plaintiff relied, (5) that proximately caused his injury.' *Bryant [v. Avado Brands, Inc.]*, 187 F.3d [1271,] 1281 [(11th Cir. 1999)]. A showing of severe recklessness satisfies the scienter requirement.  *See McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989)." *Ziemba v. Cascade Intern., Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001).

The remaining category includes claims that Scrushy and UBS Warburg violated Section 20(a) of the Exchange Act.  Bondholder Plaintiffs assert that Scrushy, as a controlling person of HealthSouth and the pleading HealthSouth employees, and that UBS Warburg, as a controlling "person" of Individual UBS Defendants Lorello, McGahan, and Capek, caused the controlled persons to engage in wrongful conduct connected with the materially misleading HealthSouth financial statements and/or HealthSouth registration statements.  To prevail on their Section 20(a) claims, Bondholder Plaintiffs "must establish that the defendant 'had the power to control the general business affairs' of the controlled person, and 'had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary

9

liability' of the controlled person." *Ledford v. Peeples*, 568 F.3d 1258, 1310 n. 145 (11th Cir. 2009) (quoting *Theoharous v. Fong*, 256 F.3d 1219, 1227 (11th Cir. 2001)).

The factual support for these claims swirls around each Defendant's participation in the overall scheme of fraudulently representing to the public that HealthSouth's financial condition was far better than it actually was.

Standard of Review

As discussed in detail in the Stockholders' Class Opinion, the Eleventh Circuit has not clearly articulated what standard a court should apply in a securities case when conducting a "rigorous analysis" of the Rule 23 requirements without determining the merits of the case.  257 F.R.D. at 272; *e.g., Heffner v. Blue Cross & Blue Shield of Ala. Inc.*, 443 F.3d 1330, 1337 (11th Cir. 2006).

In one of the Eleventh Circuit's most recent pronouncements on this matter, it summarized the standard in this Circuit:

> "Although the trial court should not determine the merits of the plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." *Valley Drug*, 350 F.3d at 1188 n.15. . . .  "It is inescapable that in some cases there will be overlap between the demands of [Rule] 23(a) and (b) and the question of whether [a] plaintiff can succeed on the merits." *Huff v. N.D. Cass Co. of Ala.*, 485 F.2d 710, 714 (5th Cir. 1973) (en banc).  Thus, the principle that district courts should not evaluate the merits of plaintiffs' claims "should not be talismanically invoked to artific[i]ally limit a trial court's examination of the factors necessary to a reasoned determination of whether a plaintiff has met her burden of establishing each of the Rule 23 class action requirements." *Love v. Turlington*, 733 F.2d 1562, 1564 (11th Cir. 1984). . . .  While we avoid merits determinations to the extent practicable, this case does require the Court to look beyond the pleadings and examine

the parties' claims, defenses, and evidence to ensure that class
certification would comport with Rule 23's standards.

*Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1190 (11th Cir. 2009) (footnote and citations
omitted).

     *Babineau*, however, did not involve the complex determinations presented here regarding

application of presumptions of reliance in securities fraud cases.  As discussed in the

Stockholders' Opinion, many courts have required that Plaintiffs meet the preponderance of

evidence standard to qualify for class certification.  *See* Stockholders Op., 257 F.R.D. at 272.

     As with the Stockholder Plaintiffs' class certification motion, upon urging by the

Plaintiffs, the court will apply the preponderance of evidence standard without presuming that

the Eleventh Circuit would adopt such standard.  *See* 257 F.R.D. at 272.  However, the court tests

the evidence only to the extent necessary to evaluate whether the Bondholder Plaintiffs have met

the Rule 23 requirements, not as to whether they will prevail at trial.

     Most of the following discussion about the class requirements applies to all of the claims

asserted by the class against all of the Defendants.  In general, no serious hurdles exist

concerning the Plaintiffs' ability to meet the Rule 23(a) requirements.  However, E&Y does

assert some specific challenges to the typicality requirement of the named Plaintiffs' Section 11

claims; the court will address the Section 11 claims against E&Y separately.  Both E&Y and

UBS mount aggressive attacks against the predominance requirement of Rule 23(b)(3) as to the

Section 10(b) claims, arguing that individualized issued of reliance will predominate because the

Bondholder Plaintiffs are not entitled to a class-wide presumption of reliance.

     The court will first address the general Rule 23(a) requirements, then the question of

reliance as it relates to Rule 23(b)(3) predominance for the Section 10(b) claims, before

examining E&Y's challenges to certification of the Section 11 claims.

While the court has thoroughly examined the sufficiency of these claims at several junctures[10] and has taken another serious look at the merits of those claims in evaluating various challenges made to class certification, it need not – and does not – determine whether the bondholders will ultimately succeed on their claims.  *See Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1358 (11th Cir. 2009).  The court has considered the merits only to the extent necessary to evaluate the requirements of Rule 23.  *See Babineau*, 576 F.3d at 1190; *Heffner*, 443 F.3d at 1337.

<u>Class Certification Discussion</u>

To qualify for class certification, the Bondholder Plaintiffs must prove the four requirements of Fed. R. Civ. P. 23(a) and at least one of the requirements of Fed. R. Civ. P. 23(b).  *See Klay v. Humana, Inc.*, 382 F.3d 1241, 1250-51 (11th Cir. 2004); *Turner v. Beneficial Corp.*, 242 F.3d 1023, 1025 (11th Cir. 2001); *see also Franze v. Equitable Assurance*, 296 F.3d 1250, 1253 (11th Cir. 2002); *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001).  Failure to establish any one requirement precludes class certification.  *Valley Drug Co. v. Geneva Pharms. Inc.*, 350 F.3d 1181, 1188 (11th Cir. 2003); *see generally Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615-17 (1997) (describing the characteristics of class actions under the federal rules).

_____

[10]*See, e.g.*, Order dated June 30, 2006 (doc. 478) on UBS's motion to dismiss (doc. 247); Order dated June 30, 2006 (doc. 479) on E&Y's motion to dismiss (doc. 257); Order dated September 6, 2007 (doc. 908) with accompanying Memorandum Opinion (doc. 907) on motions to dismiss by UBS (docs. 247 & 299) and E&Y (doc. 257); Order dated February 14, 2009 (doc. 1533) on UBS's motion for judgment on the pleadings (doc. 1390); Order dated February 26, 2009 (doc. 1545) and accompanying Memorandum Opinion (doc. 1544) on UBS's motion for summary judgment on Section 11 claims (doc. 1486).

Rule 23(a) provides for certification of a class only if

> (1) the class is so numerous that joinder of all members is
> impracticable; (2) there are questions of law or fact common to the
> class; (3) the claims or defenses of the representative parties are
> typical of the claims or defenses of the class; and (4) the
> representative parties will fairly and adequately protect the interests
> of the class.

Fed. R. Civ. P. 23(a).  These four prerequisites of Rule 23(a) have generally been referred to as

"'numerosity, commonality, typicality, and adequacy of representation.'" *Franze*, 296 F.3d at

1253 (quoting *Piazza*, 273 F.3d at 1346); *see also Murray v. Auslander*, 244 F.3d 807, 810 (11th

Cir. 2001) (citing *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156 (1982)).  These

requirements serve to "'limit class claims to those 'fairly encompassed' by the named plaintiffs'

individual claims.'" *Franze*, 296 F.3d at 1253 (quoting *Piazza*, 273 F.3d at 1346).

In this case, in addition to the Rule 23(a) requirements, Plaintiffs claim to have met the

requirements of Rule 23(b)(3) by showing that

> questions of law or fact common to class members predominate
> over any questions affecting only individual members, <u>and</u> . . . a
> class action is superior to other available methods for fairly and
> efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3) (emphasis added).

In summary, Bondholder Plaintiffs must prove all the requirements of Rule 23(a), and

further, the predominance of common questions and the superiority of class treatment to meet

Rule 23(b)(3).

A.    Rule 23(a)

1.    Numerosity

Rule 23(a)(1) requires that the class be so numerous that joinder of all

class members is "impracticable," though not impossible.  Plaintiffs "need only show that it would be extremely difficult or inconvenient to join all members of the class."  *Anderson v. Garner*, 22 F. Supp. 2d 1379, 1384 (N.D. Ga. 1998) (internal quotations omitted); *see also In re Theragenics Corp. Sec. Litig.*, 205 F.R.D. 687, 693 (N.D. Ga. 2002).  Plaintiffs need not establish the exact size of the class, but may estimate its size to demonstrate numerosity.  *See Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983); *Upshaw v. Georgia Catalog Sales, Inc.*, 206 F.R.D. 694, 698 (M.D. Ga. 2002); *Anderson v. Bank of the South, N.A.*, 118 F.R.D. 136, 145 (M.D. Fla. 1987).  Even "where the numerosity question is a close one, a balance should be struck in favor of a finding of numerosity."  *Evans*, 696 F.2d at 930.  Where, as here, a case involves nationally traded securities, numerosity may be assumed.  *Theragenics*, 205 F.R.D. at 694; *In re Miller Indus., Inc. Sec. Litig*, 186 F.R.D. 680, 685 (N.D. Ga. 1999).

The Defendants do not dispute numerosity.  All of the HealthSouth bonds, registered and unregistered, were actively traded among hundreds of investors.  At least 140 different market makers and dealers in HealthSouth bonds bought and sold bonds for multiple Bondholder Class members around the country.  Data from institutions such as the National Association of Insurance Commissioners and Lipper, Inc. identified over three hundred insurance company investors, and hundreds of other pension fund and mutual fund investors in HealthSouth bonds.

The amount of debt securities offered to the market (over $3.4 billion), combined with the high trading volume of the debt securities (discussed *infra*), the large number of market makers and dealers, and the preliminary identification of hundreds of class members, supports the conclusion that joinder of such a large group of investors is presumptively impracticable.  *See AAL High Yield Bond Fund v. Ruttenberg*, 229 F.R.D. 676, 684 (N.D. Ala. 2005) (finding that

14

class of at least eighty bondholders met numerosity requirement).  The court thus finds that the Bondholder Plaintiffs have established numerosity.

2.      Commonality

Rule 23(a)(2) provides that a class may only be certified if "questions of law or fact [are] common to the class."  Fed. R. Civ. P. 23(a)(2).  As the Eleventh Circuit recently reiterated, "'[u]nder the Rule 23(a)(2) commonality requirement, a class action must involve issues that are susceptible to class-wide proof.'  *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001).  Commonality requires 'that there be at least one issue whose resolution will affect all or a significant number of the putative class members.'  *Stewart v. Winter*, 669 F.2d 328, 335 (5th Cir. 1982) (footnote omitted)."  *Mohawk*, 568 F.3d at 1355.

To satisfy "commonality," all questions of fact or law do not need to be common to all members of the class.  Indeed, "[t]he inherent legal and factual questions arising from the alleged existence of a single fraudulent scheme against many investors are illustrative of the kind of common questions contemplated by the commonality requirement."  *AAL*, 229 F.R.D. at 681 (citing *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718 (11th Cir. 1987)).  Thus, with respect to "a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable."  *Cooper v. Pac. Life Ins. Co.*, 229 F.R.D. 245, 262 (S.D. Ga. 2005) (quoting *Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975)).

The Bondholder Plaintiffs alleged a common course of deceptive conduct in this case.  As Plaintiffs contend, Defendants together furthered a common scheme and public course of conduct

that defrauded the market by misrepresenting the financial health of HealthSouth in materially

false audited financial statements filed with the SEC; offering memoranda, prospectuses and

registration statements used to conduct the Offerings; analyst reports issued by UBS;

communications by UBS to credit rating agencies including S&P and Moody's; press releases;

etc.  If prosecuted separately, all class members would have to prove the identical facts and

address the same legal issues.  The facts alleged by the Bondholder Plaintiffs address a fraudulent

scheme, the proof of which will be the same for all class members, and to a large extent for all

claims.

These issues present common questions of law and fact because each bondholder would

have to prove these same facts to establish the elements of their individual claims of securities

fraud in asserting liability against E&Y, the UBS Defendants, and Scrushy.  *See Mohawk*, 568

F.3d at 1356.  These common questions satisfy the "low hurdle of Rule 23(a)(2)."  *Id*.; *Cheney v.

Cyberguard Corp.*, 213 F.R.D. 484, 490 (S.D. Fla. 2003) (commonality met where plaintiffs

alleged defendants "perpetrated a massive fraudulent scheme against investors through uniform

misrepresentations and omissions in filings made with the SEC, in [defendants'] press releases,

and in other documents"); *Walco Invs., Inc., v. Thenen*, 168 F.R.D. 315, 325 (S.D. Fla. 1996)

(commonality met where plaintiffs allege defendants participated in unified scheme to defraud

investors).

      3.     Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative

parties [be] typical of the claims or defenses of the class" before a class may be certified.  Fed. R.

Civ. P. 23 (a)(3).  "The claim of a class representative is typical if the claims or defenses of the

class and the class representative arise from the same event or pattern or practice and are based on the same legal theory. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). A class representative must possess the same interest and suffer the same injury as the class members to be typical under Rule 23(a)(3). *Auslander*, 244 F.3d at 811. The typicality requirement may be satisfied despite substantial factual differences . . . when there is a strong similarity of legal theories.' *Id.* (Internal quotation marks omitted)." *Mohawk*, 568 F.3d at 1357.

Typicality does not mean "identical"; it refers to the nature of the claims of the class representatives, rather than to the specific facts from which the claims arose. *See Cooper v. Southern Co.,* 390 F.3d 695, 714 (11th Cir. 2004); *Murray*, 244 F.3d at 811 ("typicality requirement may be satisfied despite substantial factual differences"); *Kornberg*, 741 F.2d at 1337. It requires only that the representative plaintiffs share "the *same essential characteristics* as the claims of the class at large." *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 n.14 (11th Cir. 2000) (emphasis in original) (quoting *Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir. 1985)). As long as defendants "committed the same unlawful acts in the same method against an entire class[,]" a plaintiff establishes the necessary typicality. *Kennedy v. Tallant*, 710 F.2d 711, 717 (11th Cir. 1983). Typicality generally presents a low burden that is easily satisfied. *See Taylor v. Flagstar Bank, FSB*, 181 F.R.D. 509, 517 (M.D. Ala. 1998).

Here, Bondholder Plaintiffs seek to recover damages pursuant to the same legal theories and based on the same common course of deceptive conduct devised and implemented by Defendants against the entire Bondholder Class. These claims asserted by the Bondholder Plaintiffs are typical of the claims of the class members because they are all based on the same facts and legal theories, and have the same essential characteristics. *See Mohawk*, 568 F.3d at

1357.  The claims of each class member rise or fall on the same facts and legal theories as those alleged by the representatives.  Thus, the Bondholder Plaintiffs have met the requirement of typicality.

    4.    Adequacy of Representation

    As the Eleventh Circuit has stated, the adequacy requirement has two different prongs: "'(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action.'" *Valley Drug*, 350 F.3d at 1189 (quoting *In re HealthSouth Corp. Sec. Litig.*, 213 F.R.D. 447, 460-461 (N.D. Ala. 2003)); *see also Griffin v. Carlin*, 755 F.2d 1516, 1533 (11th Cir. 1985) ("The adequate representation requirement involves questions of whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation, and of whether plaintiffs have interests antagonistic to those of the rest of the class.").

    Bondholder Plaintiffs were injured by the same wrongful course of conduct; their best interest is to vigorously prosecute this action on behalf of the Bondholder Class.  They share an interest in establishing that E&Y's auditor's reports were false and misleading; that the offering memoranda, registration statements and analyst reports were false and misleading; that Scrushy falsely represented the Company's financial condition; that the bonds' credit ratings were obtained through fraud; and that UBS schemed to bring HealthSouth bonds to market to finance and further the fraud, and made public false statements to market the bonds.  Each Bondholder Plaintiff purchased HealthSouth bonds during the Class Period and suffered substantial losses once the fraud was disclosed; each is an institutional investor  –  the type of large investor Congress intended should represent injured investors in class actions; each is committed to the

vigorous prosecution of this action; and each has no disabling conflicts with the Bondholder Class.[11]

Lead Plaintiff RSA and named plaintiffs HFRRF and SURS have participated extensively in the prosecution of this action.  The court has no doubt that RSA, HFRRF and SURS will continue their active role in this action and will continue to protect the interests of the Bondholder Class.

Bondholder Plaintiffs' counsel are also qualified, experienced and able to vigorously conduct the proposed litigation.  Bondholder Plaintiffs' counsel have extensive experience in securities and class action litigation and have successfully prosecuted numerous complex actions on behalf of injured investors across the country.  In the six years since these consolidated cases were filed, Bondholder Plaintiffs' counsel have filed an initial and two amended complaints, defended a series of motions to dismiss and motions for summary judgment brought by various Defendants and based on complex legal theories under the federal securities laws, and conducted extensive discovery.  Moreover, counsel negotiated a successful partial settlement with HealthSouth and certain former officers and directors of the Company.  Bondholder Plaintiffs' counsel have vigorously prosecuted this litigation and will continue to do so.  The court finds that the class representatives and their counsel will "adequately prosecute" this case.

Having established that the Bondholder Plaintiffs met the requirements of Rule 23(a), the court must next examine whether the purported class meets the more exacting standards of Rule 23(b)(3).

---

[11]In fact, this court has already addressed the issue of potential conflicts, and structured the representation in the Stockholder and Bondholder actions to avoid any conflicts.  *See* July 8, 2005 Mem. Opin. and Order (doc.362).

B.     Rule 23(b)(3): Predominance and Superiority

The Eleventh Circuit reiterated the standards of Rule 23(b)(3) predominance and

superiority in *Mohawk*:

> "Common issues of fact and law predominate if they 'ha[ve] a
> direct impact on every class member's effort to establish liability
> and on every class member's entitlement to injunctive and
> monetary relief.'" *Klay*, 382 F.3d at 1255. . . . "'[S]erious
> drawbacks to the maintenance of a class action are presented where
> initial determinations, such as the issue of liability *vel non*, turn
> upon highly individualized facts.'" *Rutstein v. Avis Rent-A-Car
> Sys., Inc.*, 211 F.3d 1228, 1235-36 (11th Cir. 2000). . . . "[T]he
> Rule requires a pragmatic assessment of the entire action and all
> the issues involved." 5 James Wm. Moore et al., *Moore's Federal
> Practice* § 23.45[1], at 23-217 (3d ed. 2008). "Where, after
> adjudication of the classwide issues, plaintiffs must still introduce
> a great deal of individualized proof or argue a number of
> individualized legal points to establish most or all of the elements
> of their individual claims, such claims are not suitable for class
> certification under Rule 23(b)(3)." *Klay*, 382 F.3d at 1255. "Even
> if Rule 23(a)'s commonality requirement may be satisfied . . . , the
> predominance criterion is far more demanding." *Amchem Prods.,
> Inc. v. Windsor*, 521 U.S. 591, 623-24, 117 S.Ct. 2231, 2250, 138
> L.Ed. 2d 689 (1997).

*Mohawk*, 568 F.3d at 1357 (citations omitted).

Although more demanding, the Supreme Court has noted that "predominance is a test

readily met in certain cases alleging . . . securities fraud." *Amchem Prods., Inc. v. Windsor*, 521

U.S. 591, 625 (1997).  Unless individual issues overwhelm common questions, the requirement

of predominance is satisfied.  *See Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1233

(11th Cir. 2000) ("[T]he issues in the class action that are subject to generalized proof, and thus

applicable to the class as a whole, must predominate over those issues that are subject only to

individualized proof.") (quoting *Kerr v. City of W. Palm Beach*, 875 F.2d 1546, 1558 (11th Cir.

20

1989)).  Where "the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then common issues are likely to predominate." *Klay*, 382 F.3d at 1255.

In addressing class certification in the context of RICO actions, the Eleventh Circuit has emphasized that when common issues of fact concerning *questions of liability* "'are quite substantial[,] [t]hey would tend to predominate over all but the most complex individual issues.' [*Klay*,] 382 F.3d at 1258-59.  'It is primarily when there are significant individualized questions *going to liability* that the need for individualized assessments of damages is enough to preclude 23(b)(3) certification.' *Id*. at 1260."  *Mohawk*, 568 F.3d at 1357-58 (emphasis added).

As to all claims except Section 10(b) claims, the court finds that the questions of liability are all common to the class.  The Defendants vehemently argue that individualized questions of reliance – required for liability under Section 10(b) – preclude certification of a class.

*Section 10(b) Reliance Question*

Many of the Defendants' most strenuous arguments against class certification focused on the issue of reliance.  Proof of reliance is required for a Section 10(b) claim, but is not relevant to Plaintiffs' claims under Section 11, Section 15 or Section 20(a).  As to those claims that do not involve issues of reliance, the court finds that common questions satisfy the predominance requirements of Rule 23(b)(3).  The court will examine the Defendants' argument that individual issues of reliance defeat class certification only as relevant to the Section 10(b) claims.

The heart of the claims remaining in this consolidated case, including the Stockholders Class claims, lies in Section 10(b) of the Exchange Act, which serves as a "catchall provision." *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 206 (1976).  To state a claim pursuant to Section

10(b) and Rule 10b-5, a plaintiff must show: (a) a misstatement or omission, (2) of a material

fact, (3) made with scienter, (4) on which plaintiff relied, (5) that proximately caused his injury.

*Ziemba v. Cascade Intern., Inc.*, 256 F.3d 1194,1202 (11th Cir. 2001).  The form of reliance for a

Section 10(b) claim rests at the center of the Defendants' arguments against class certification.

The Defendants argue that individual issues of reliance predominate and thus defeat class

certification.  They argue that Bondholder Plaintiffs cannot establish a presumption of reliance

because the market for HealthSouth bonds was inefficient for a variety of reasons, including lack

of pricing transparency, insufficient liquidity, and lack of uniform price movement.[12]

*Presumption of Reliance Theories*

The Bondholder Plaintiffs assert that their Section 10(b) claims qualify for a presumption

of reliance under three alternative theories: fraud on the market, as recognized by the Supreme

Court in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988); fraud created the market, as recognized by

the former Fifth Circuit in *Shores v. Sklar*, 647 F.2d 462 (5th Cir. 1981) and as applied by the

Eleventh Circuit in *Ross v. Bank South, N.A.*, 885 F.2d 723 (11th Cir. 1989); and/or the common

course of fraud approach recognized by a line of Eleventh Circuit cases following *Kenney v.*

---

[12]UBS also argues that the reports from Bondholder Plaintiffs' Experts do not support a
finding of an efficient market for HealthSouth bonds because they are "irrelevant and unreliable."
UBS Mem. in Opp. (doc. 1205) at 101.  The court disagrees.  Not only are the Plaintiffs' Experts
well qualified, their reports make sense, particularly in light of the specifics of the bond market.
In contrast, the Defendants' experts' reports repeatedly tried to make bonds fit into the same
parameters as stocks.  However, in regard to expert reports at the class certification stage, the
court notes that it "must ensure that 'the basis of the expert opinion is not so flawed that it would
be inadmissible as a matter of law,'. . . and must use it not to evaluate the merits of the case, but
to determine whether the requirements of Rule 23 have been met. . .  The question is whether the
expert evidence demonstrates the existence or absence of common questions of fact warranting
class certification, not whether it will be persuasive at trial."  *Worldcom*, 219 F.R.D. at 296
(quoting *In re Visa Check/MasterMoney*, 280 F.3d 124, 135 (2d Cir. 2001)).

*Tallant*, 710 F.2d 711 (11th Cir. 1983).  The court will address each theory in turn.

          1.       Fraud on the Market

        When the Supreme Court in *Basic* embraced the fraud-on-the-market

theory for presuming reliance, it did so in the context of stocks trading on the NYSE.  *Basic*, 485

U.S. at 226.  The Court summarizes the rationale for the theory:

> "The fraud on the market theory is based on the hypothesis that, in
> an open and developed securities market, the price of a company's
> <u>stock</u> is determined by the available material information regarding
> the company and its business. . . .  Misleading statements will
> therefore defraud purchasers of stock even if the purchasers do not
> directly rely on the misstatements. . . .  The causal connection
> between the defendants' fraud and the plaintiffs' purchase of stock
> in such a case is no less significant than in a case of direct reliance
> on misrepresentations."  *Peil v. Speiser*, 806 F.2d 1154, 1160-61
> (CA3 1986).

*Basic*, 485 U.S. at 241-42.

        In confirming that "reliance is an element of a Rule 10b-5 cause of action," the Court

acknowledged "more than one way to demonstrate the causal connection."  *Id.* at 243.  Since the

Supreme Court recognized this presumption of reliance in *Basic*, "federal courts have wrestled

with determining in what securities settings classwide presumptions of reliance should apply

under a fraud on the market rationale."  *Camden Asset Mgmt. v. Sunbeam Corp.*, No. 99-CV-

8275, 2001 WL 34556527, at *8 (S.D. Fla. July 3, 2001).  The struggle continues here.

          a.       Efficient Market

        The court will keep these differences in mind when applying the factors

developed to test the efficiency of a stock market to the HealthSouth bonds at issue here.  From

the *Basic* discussion of an open and well-developed market evolved the concept of an efficient

market:

> An open market is one in which anyone, or at least a large number of persons, can buy or sell.
>
> A developed market is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available.  It is principally a secondary market in outstanding securities.  It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).
>
> An efficient market is one which rapidly reflects new information in price.  These terms are cumulative in the sense that a developed market will almost always be an open one.  And an efficient market will almost invariably be a developed one.

*Cammer*, 711 F. Supp. at 1276 n.17.

To invoke the fraud-on-the-market presumption of reliance, the Bondholder Plaintiffs presented reports from three experts[13] who concluded that the market for HealthSouth bonds was informationally efficient throughout the class period.  The court has thoroughly reviewed these reports and the reports of the Defendants' experts[14] and finds that the Bondholder Plaintiffs established by a preponderance of the evidence the efficiency of the market for HealthSouth bonds.

---

[13]Tavy Ronen, Associate Professor of Finance at Rutgers University (*see, e.g.,* docs. 944, 1021, 1422, 1557); H. Nejat Seyhun, Professor of Finance and Business Administration and Director of Financial Engineering at the University of Michigan (*see, e.g.,* docs. 946, 1423, 1557); Timothy A. O'Neill, former Senior Managing Director and former head of the Debt Syndicate Department of Bear, Stearns (*see, e.g.,* docs. 945, 1424, 1509 Att. 2; 1557).

[14]Michael R. Gibbons, Deputy Dean and Professor of Investment Banking at the Wharton School of the University of Pennsylvania (*see, e.g.,* docs. 1208, 1542, 1557); Kenneth Lehn, Professor of Finance in the Katz School of Business at the University of Pittsburgh (*see, e.g.,* doc. 1209); Christopher M. James, Dial Scholar in Finance and Economics at the University of Florida (*see, e.g.,* docs. 1217 Ex. 14; 1473, 1480; 1542, 1557).

b.     Bond Market is not Stock Market

While the court does not presume to understand all the differences between the trading of stocks and bonds, the numerous expert reports and the briefs of the parties have shed much light on those differences and have led to the conclusion that certainly some of those differences must be considered when evaluating the efficiency of a bond market.  In the Stockholders' Opinion, the court found that the market for HealthSouth stock traded in an efficient market, entitling the Stockholder Plaintiffs to invoke the fraud-on-the-market presumption.  257 F.R.D. at 280-83.  That finding, however, does not mean that the market for HealthSouth bonds was equally efficient.

The major relevant differences lie in how bonds are traded and how they are priced.  A corporate bond reflects a debt owed by the borrower/corporation to the bondholder that calls for periodic payments of interest at a specified rate, as well as a lump sum payment of the principal amount at a designated maturity date.  Securities regulations restrict the sale of unregistered or Rule 144A bond offerings only to QIBs – large, sophisticated institutional investors who met statutory requirements. Once the bonds are registered, anyone can buy or sell them in the secondary market.  The corporate bond market is primarily dominated by institutional investors, although individuals may also participate.

In contrast to stocks, virtually all trading in bonds takes place in the dealer-based over-the-counter market.  Seyhun Rept. I (doc. 946) ¶¶ 33-35.  However, a few electronic transaction systems for fixed income securities have recently evolved to allow investors to seek prices simultaneously from a number of dealers, and facilitate the buy or sell of bonds electronically.  See Ronen Decl. I (doc. 944) ¶ 26.  Bond dealers usually buy large blocks of bonds that they sell

off in smaller quantities to investors over time.  Ronen Decl. I ¶ 28.

To begin the process of pricing a new issue of investment grade bonds, the "Syndicate Desk" of an investment bank determines the appropriate "spread range," which is expressed in basis points and reflects the interest rate above the yield of the U.S. Treasury bond.  O'Neill Decl. I (doc. 945) ¶¶ 4-5.  To determine the appropriate spread range that will attract prospective buyers, the Syndicate Desk analyzes comparable bonds already trading in the secondary market, existing bonds of the issuer, and the credit rating of the issuer's other bonds.  The objective is to determine the market price for the new issue that reflects all the publicly available information that is material to the investors.  O'Neill Decl. I ¶¶ 6-7.  The pricing of Rule 144A bonds also reflects whether the unregistered bonds have registration rights:  "Often times, the credit spread required by purchasers would be slightly higher than for a registered offering, but typically lower than if the 144A offering did not include registration rights."  O'Neill Decl. I ¶ 10.

The price of bonds also reflects the present value of the expected future cash flow it generates, including periodic interest payments and the principal amount.  The present value depends on the interest rate; amount and timing of the interim payments; the likelihood of ultimate repayment of the principal amount, i.e., the likelihood of default of the issuing corporation; and the market interest rate for other comparable securities as well as the risk-free interest rates for Treasury bonds.  Seyhun Rept. I ¶¶ 36-37.  The changes in market price of corporate bonds most frequently reflect changes in risk-free interest rates (Treasury Bonds) and changes in the company's likelihood of default on its obligations, i.e., a company' credit risk.  *Id.* at ¶ 38.  Thus, information that affects the price of stocks, such as the announcement of a dividend or earning statements, would not be expected to affect the price of bonds.

26

Further, the credit risk associated with a bond issue is measured and reported by various rating agencies, such as Standard and Poor's (S&P), Moody's Investor Services, Duff and Phelps, and Fitch Investor Services.  Bonds generally are rated as investment-grade bonds or speculative-grade ("junk") bonds.  The risk of default of speculative-grade bonds is substantially higher than that of investment-grade bonds, and the degree of risk finds its way into the market price of the bonds.  Seyhun Rept. I  ¶¶ 39-40.  "The relative safety of the investment-grade bonds in effect separates the pricing of the investment-grade bonds from day-to-day stock price fluctuations of the issuing firm.  Consequently, in efficient capital markets, the price of the investment-grade bonds is not very sensitive to day-to-day stock price fluctuations, nor will it always react to corporate announcements . . . .  Hence, in efficient capital markets, most of the variation in the price of investment-grade bonds comes from the fluctuations in economy-wide interest rates, as opposed to firm-specific information."  Seyhun Rept. I ¶¶ 40-41 (footnote omitted).

Another distinction is that corporate bonds tend to trade less frequently because the outside influences and internal financial factors have less effect on bond prices.  Seyhun Rept. I ¶ 45.  Investors generally view bonds as "buy and hold" securities.  Therefore, a different pattern typically emerges for bonds than stocks: bonds are traded less frequently but in larger quantities than stocks.  Ronen Decl. I ¶ 38.  When bonds do trade, however, the trades tend to be at least fifty times as large as typical stock exchange transactions.  Ronen Decl. I ¶ 27.  The size of the bond market also dwarfs the stock markets; roughly $880 billion in bonds trade a day, as compared with $85.5 billion in stocks.  Ronen Decl. I ¶ 25.[15]

---

[15]The court notes that these numbers, from a 2004 report, may be significantly different after the effects of the current economic recession.

The primary and secondary markets for bonds are dominated by a universe of sophisticated and well-informed institutional investors and securities firms. These investors closely monitor developments in the credit markets. Most of these investors have in-house analysts and portfolio managers who evaluate the impact of news regarding the creditworthiness of new or existing issuers of bonds. O'Neill Decl. I ¶ 11.

        c.     Factors to Consider

Courts generally consider the following factors, known as the "*Cammer* factors;" in evaluating an efficiently traded security: (1) whether the security has a large weekly trading volume; (2) whether a significant number of securities analysts followed and reported on the company's stock during the applicable period; (3) whether the stock had numerous market makers; (4) whether the company was entitled to file an S-3 Registration Statement in connection with public offerings; and (5) whether the security experienced an historical showing of immediate price response to unexpected corporate events or financial releases. *See, e.g.*, *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005); *In re DVI Inc. Sec. Litig.*, 149 F.R.D. 196, 208 (E.D. Pa. 2008); *Cammer v. Bloom*, 711 F. Supp. 1264, 1285-87 (D.N.J. 1989).

Other courts have also considered additional factors: (6) the company's market capitalization; (7) the bid-ask spread; (8) the float, or issue amount outstanding excluding insider-owned securities; and (9) the percentage of institutional ownership. *See Unger*, 401 F.3d at 323; *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 313 (5th Cir. 2005); *In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1338 (N.D. Ga. 2007); *Krogman v. Sterritt*, 202 F.R.D. 467, 474, 478 (N.D. Tex. 2001). Professor Ronen also suggested an additional factor the court finds particularly relevant to the analysis at hand: (10) whether the bonds were rated by

28

credit rating agencies.

The Defendants' experts challenge whether these factors effectively evaluate the efficiency of the bond market, as opposed to the stock market.  They focus almost exclusively on the price response factor to argue that the HealthSouth market was not efficient,  and largely disregard the other factors.[16]  In fact, Professor Gibbons asserts that the factors other than price reaction are merely characteristics of securities trading in an efficient market and not economic tests of efficiency.  Gibbons Rept. I (doc. 1208) ¶ 39.

Granted, significant differences exist between stocks and bonds, the way each is priced, and the way each is traded.  However, few courts have wrestled with this issue and little separate guidance has been provided for analyzing the efficiency of the bond market.  As one court noted: "a comparison between equity and bond markets is a comparison between the proverbial apple and orange."  *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 755 (S.D. Tex. 2006).  In fact, when faced with an opportunity to "address the nettlesome question of whether, for the purposes of determining the applicability of the fraud-on-the-market doctrine, an adjusted set of *Cammer* factors or even a different analytical approach altogether is better suited to analyze market efficiency in securities cases arising from the sale of debt instruments," the Second Circuit declined that opportunity.  *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 205 n.11, 210-11 (2d Cir. 2008) (affirming district court's use of *Cammer* factors to deny class certification motion without accepting the factors as a test for market efficiency).

Even though the factors developed for assessing the market efficiency for stocks "are

---

[16]E&Y also challenges the liquidity of the HealthSouth bond market, and both Defendants argue a lack of price transparency as demonstrating market inefficiency.  These challenges are discussed below.

admittedly not well-suited for the analysis of debt securities[,]" courts generally apply the same factors to the efficiency question for bonds.  *DVI*, 249 F.R.D. at 214.  Indeed, trying to make a market for bonds fit into the factors recognized for stocks is sometimes like trying to make a square peg fit into a round hole.  Few courts have addressed the effect of the differences between the two markets on the efficiency factors.  The court agrees that "[n]evertheless, corporate bond investors cannot be categorically denied an opportunity to utilize the fraud-on-the-market theory simply because of a structural difference in the way that debt securities are marketed and traded vis-a-vis equity securities."  *Id.*  The Eleventh Circuit has yet to adopt a standard to determine whether the fraud-on-the-market applies to stocks <u>or</u> bonds, although some district courts in the Circuit have employed the *Cammer* factors.  *See, e.g., In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1333-39 (N.D. Ga. 2007); *AAL High Yield Bond v. Ruttenberg*, 229 F.R.D. 676, 683-85 (N.D. Ala. 2005); *Camden Asset Mgmt. v. Sunbeam Corp.*, No. 99-CV-8275, 2001 WL 34556527, at *9-11 (S.D. Fla. July 3, 2001).

In the absence of any guidance from the Circuit, and without a better test for bond market efficiency, the court finds that the *Cammer/Bell/Unger* factors, plus the additional factor suggested by Professor Ronen, are appropriate factors to evaluate the efficiency of the HealthSouth bond market while taking into account the differences in the trading of bonds from stocks.  Application of these factors developed primarily to evaluate the stock market may require slightly nuanced interpretations given the market structure differences.

        d.      Application of Market Efficiency Factors

In applying the factors courts have used to evaluate the efficiency of the market for a security, the court will keep in mind the distinctions between the bond and stock

market.  Further, these factors function as an "analytical tool" and not requirements or a "check list."  *See Xcelera.com Sec. Litig.*, 430 F.3d 503, 511-12 (1st Cir. 2005); *DVI*, 249 F.R.D. at 207-20 (certifying a class of purchasers of stocks and bonds even though both markets failed to meet all factors); *AAL*, 229 F.R.D. at 683 ("A plaintiff is not required to show the existence of each of these factors.").

(1)     Weekly Trading Volume

As recognized in the Stockholders Opinion, when a stock, such as HealthSouth, trades on the New York Stock Exchange (NYSE), a presumption is created that the market for that stock is developed and efficient.  257 F.R.D. at 281.  As previously noted, however, bonds are traded over the counter, although a small proportion of corporate bond trades are made on the NYSE.  HealthSouth bonds were not traded on the NYSE, therefore, this presumption of efficiency is not available for HealthSouth bonds.

Without the type and quantity of records of trading available from the NYSE, the Plaintiffs' two economist experts compiled historical trading data from a variety of sources, including information from NASD reports and the records of thirty bond dealers who responded to the Bondholder Plaintiffs' subpoenas.  Both experts analyzed the available data and concluded that the average weekly trading volume of all bonds exceeded the 2% threshold that the *Cammer* court recognized as creating a presumption of an efficient market.  Ronen Decl. I ¶¶ 47-53; Seyhun Rept. I ¶¶ 48-58; *see Cammer*, 711 F. Supp. at 1286 ("average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption").

Professor Seyhun also compared the trading activity of the HealthSouth notes to other

comparable notes based on the number of trading days and the dollar amount of the transactions. He found that HealthSouth notes traded "almost five to eight times more frequently than the most liquid, upper ten percentile of all corporate bonds in the U.S. during the same time period." Seyhun Rept. I ¶ 62.  The average dollar value of a single note transaction ranged from $500,000 to $1.5 million.  Seyhun Rept. I ¶ 63.  The relatively large average size of the transactions suggests substantial participation by large institutional investors and that the market for HealthSouth notes had sufficient liquidity to absorb large transactions.[17]  Seyhun Rept. I ¶ 64.

Although the incomplete data available supports the Plaintiffs' experts' conclusions concerning the weekly trading volume and meets the *Cammer* two percent presumption, the court notes that this *Cammer* factor may not always be well suited in evaluating the efficiency of the market for specific corporate bonds.  Because corporate bonds generally experience lower trading volumes than stocks, the trading level of notes should be viewed in the context of the bond market. *See DVI*, 249 F.R.D. at 215 (finding an efficient market for notes that traded in the "top 10% of all corporate bonds in terms of the fewest average days between trades, ranging between 1.92 to 4.63 days during the Class Period . . . .  Though such trading volume would not likely support a finding of an efficient market for equities, it is sufficient to support such a finding for corporate bonds.").  The comparisons Professor Seyhun made to the trading activity of other bonds are particularly helpful in that regard.

The court finds that the substantial trading in HealthSouth bonds, as reflected in the relatively high average weekly turnover, the high frequency of trading, and the large transaction

---

[17]The court finds from Professor Seyhun's analysis that the market for HealthSouth bonds was sufficiently liquid and rejects the Defendants' arguments to the contrary.

amounts demonstrate that the market for HealthSouth bonds was developed and efficient, and

that the secondary market was open throughout the class period.

(2)   Analyst Coverage

Courts also consider the number of analysts following and reporting on a

company's securities as another measure of efficiency.  *See, e.g.*, *Enron*, 529 F. Supp. 2d at 692;

*In re Polymedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 265 (D. Mass. 2006).  This factor

reflects the view that the greater the number of analysts who follow and report on a company, the

greater the likelihood that investors rely on information provided about the company.

*Xcelera.com*, 430 F.3d at 514; *Cammer*, 711 F. Supp. at 1286.  The presence of a substantial

number of professionals reporting on the security means that more information will likely be

reflected in the price of the securities and in the amount of trading.

A distinct group of analysts follow fixed-income securities, like the bonds involved here.

Investment banks published reports by bond analysts, as well as reports on the company's

equities.  During the class period, more than twenty different securities firms released more than

300 reports analyzing HealthSouth securities.  Seyhun Rept. I ¶ 68; Ronen Decl. I ¶¶ 59-62.

Specifically, 52 reports by Credit Suise, Keybanc, S&P's, and Moody's examined HealthSouth

bonds and its credit situation exclusively.  Seyhun Rept. I ¶ 69.  In addition, over 4,300 articles

appeared in over 350 news sources discussing HealthSouth.  Seyhun Rept. I ¶ 72.

The coverage by analysts of HealthSouth's equities also provided information of interest

to the bond market when concerned with the overall financial health of the issuing firm.  "While

positive equity reports do not necessarily imply higher prices for the Notes, negative equity

reports could imply lower prices" as a warning sign of a deterioration in the financial health of

the company.  Seyhun Rept. I ¶ 70.

The extensive coverage of HealthSouth in general and its bonds in particular by investment professionals, public media, and institutional investors reflects that HealthSouth notes traded in an efficient market.

        (3)    Market Makers

The presence of Market Makers supports the efficiency of a market because they "react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."  *Cammer*, 711 F. Supp. at 1287.

The SEC defines a "Market Maker" as

> a dealer who, with respect to a particular security, (i) regularly publishes bona fide, competitive bid and offer quotations in a recognized interdealer quotation system; or (ii) furnishes bona fide competitive bid and offer quotations on request; and, (iii) is ready, willing and able to effect transactions in reasonable quantities at his quoted prices with other brokers or dealers.

17 C.F.R. § 240.15c3-1[c][8] (2006).

The NASD data shows a minimum of 140 separately identifiable Market Makers for the HealthSouth bonds at issue.  Ronen Decl. I ¶ 63; Seyhun Rept. I ¶ 77.  Numerous Market Makers traded in the HealthSouth bonds at issue during the class period, supporting the efficiency of the market.

        (4)    Eligibility to File SEC Form S-3

The ability to file the abbreviated Form S-3 creates a presumption that the securities trade in an efficient market.  *Krogman*, 202 F.R.D. at 476; *Harman v. Lypho Med, Inc.*, 122 F.R.D. 522, 525 (N.D. Ill. 1988).  The significance of this factor rests in the SEC's rationale

for allowing certain companies to incorporate by reference other filings into the S-3 report:
"This form is predicated on the Commission's belief that the market operates efficiently for these
companies, i.e., that the disclosure in Exchange Act reports and other communications by the
registrant, such as press releases, has already been disseminated and accounted for by the market
place." *Cammer*, 711 F. Supp. at 1284, quoting SEC Securities Act Release No. 6331 (Aug. 13,
1981).

      HealthSouth was eligible to and did file Form S-3 during the class period – again
supporting a finding of market efficiency as recognized by the SEC.

            (5)    Price Reactions

          The price of bonds reacts differently to unexpected new information than
does the price of stocks.  Information that may be material to a stock price, such as the
announcement of a dividend, may not be material for a bond investor whose fixed return would
not be affected.  In contrast, the price of bonds may be affected by general, non-company specific
information, such as changes in risk-free interest rates, that would not affect stock prices.
Therefore, a court examining this "most important" *Cammer* factor should not expect to see the
same kind of price volatility with bonds as with stock.  However, material new unexpected
information concerning the creditworthiness of the issuer or the prospect of default on bond
obligations would be of interest to bondholders and affect the price.  Ronen Decl. I ¶ 67.

      Both Professors Ronen and Seyhun performed event studies of the price reactions of
HealthSouth bonds to unexpected information relevant to bonds, and noted prompt price
reactions.  Ronen Decl. I ¶ 79.  Although the event studies examined numerous days, specifically
on three days when HealthSouth surprised market participants with adverse news, the price of

bonds dropped dramatically.  On August 27, 2002, HealthSouth announced that changes in medicare payment rules would negatively impact operating income by $175 million.  The disclosure caused bond transaction prices to fall from 5 to 16 percent.  Ronen Decl. I ¶ 72; *see* Seyhun Rept. I ¶ 107 (citing drop between 10.1 and 15.4%, excluding one note that fell 4.9%).  On September 19, 2002, the Company revealed that the SEC was investigating its disclosures, accounting issues, and insider sales.  Bond prices fell from 2 to 12%.   Ronen Decl. I ¶ 75; *see* Seyhun Rept. I ¶ 107 (citing drop between 2.9 and 14.2%).  Then on March 19, 2003, the FBI raid became public; former CFO Weston Smith pled guilty to securities fraud charges; and the SEC charged HealthSouth and Scrushy with accounting fraud.  The SEC suspended trading retroactively for two days.   When normal trading resumed on March 21, 2003, bond prices were down in excess of 45 percent over the two day period, with senior notes quoted at 45 cents on the dollar.  Seyhun Rept. I ¶ 107; Ronen Decl. I ¶ 78.

The Defendants challenge these event studies with experts of their own.  However, they did not perform their own studies and most of the challenges stem from the differences between how stocks and bonds respond to different information.  Defendants' experts, Christopher James for E&Y and Michael Gibbons for UBS, asserted that the bond market was not informationally efficient because, among other things, the price of bonds and stocks reacted inconsistently to the same information.  Dr. Seyhun's ninety-five-page Reply Report[18] adequately addressed those, and other, challenges to the conclusion that the price changes reflect an efficient market.

The court declines to reject the findings of Professor Seyhun and Professor Ronen of market efficiency for the Bonds based on the Defendants' attacks.  These serious challenges

---

[18](doc. 1423).

relate to only one – albeit an important – factor for evaluating market efficiency.  The relationship between market price for bonds and public information may best be demonstrated by the cause and effect relationship of disclosure of *unexpected* information.  *See Scientific-Atlanta Inc.*, 571 F. Supp. 2d at 1339.  As Professor Ronen and Professor Seyhun's studies showed, the bond ratings and bond prices reacted promptly and dramatically to the unexpected disclosures of adverse financial information and of the unraveling of the extensive fraud.  These reactions, taken together with all the other strong indicia of market efficiency, demonstrate an efficient market for the HealthSouth bonds.

(6)     Market Capitalization

In addition to the five *Cammer* factors, some courts considering the efficiency of a stock market have also examined market capitalization.  *E.g., Unger*, 401 F.3d at 323; *Bell*, 422 F.3d at 313; *Krogman*, 202 F.R.D. at 478.  Market capitalization equals the stock price multiplied by the number of outstanding shares.  *Krogman*, 202 F.R.D. at 478.  For bonds, an analogous factor would be the total market value of the bonds calculated as the principal amount outstanding (face value) multiplied by the current price of the note.  Ronen Decl. I ¶ 80. According to Professor Seyhun, the market value of all HealthSouth notes during the class period ranged from approximately $870 million to $3.5 billion.  Seyhun Rept. I ¶ 87.  By March 31, 2003, the market value of the notes collapsed to approximately $1.2 billion, on average less than 40% of face value.  Seyhun Rept. I ¶ 87; *see* Ronen Decl. I ¶ 80 (citing 3/31/03 market value of $1.1 billion, less than 40% of face value).

The large market value of the HealthSouth Bonds reflects trading in an efficient market.

(7)     Bid-Ask Spread

The same courts have also considered bid-ask spreads useful in evaluating the efficiency of a securities market.  *Unger*, 401 F.3d at 323; *Bell*, 422 F.3d at 313; *Krogman*, 202 F.R.D. at 478.  "The bid-ask spread is the difference between the price at which investors are willing to buy stock and the price at which current stockholders are willing to sell their shares.  A large bid-ask spread is indicative of an inefficient market, because it sugges that the stock is too expensive to trade."  *Krogman*, 202 F.R.D. at 478.

Corporate bond markets lack widely reported bid-ask spreads.  Defendants' experts attack this lack of information as indicative of a lack of market transparency and thus reflective of an inefficient market for bonds in general.  *See* James Rept. I (doc. 1217 Ex. 14) ¶¶ 75-78; Gibbons Rept. I ¶¶ 24-27.  Again Defendants expect the bond market – a different animal – to function just like the stock market.  The lack of such readily-available information is not determinative of the efficiency of the market for HealthSouth bonds[19] when other factors support a finding of efficiency.

(8)     The Float

Another factor that has been considered is the "float" – the percentage of shares held by the public as opposed to corporate insiders.  *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 502 (S.D. Fla. 2003).  Debt is not generally held by corporate insiders.  Thus, this factor is less relevant to the efficiency of a bond market than it might be for stock.

---

[19]Both Professor Ronen and Professor Seyhun extrapolated information and concluded that the notes had relatively narrow bid-ask spreads.  Seyhun Rept. I ¶¶ 99-102; Ronen Decl. I ¶¶ 82-86.  Thus, they concluded that this factor also showed the efficiency of the market for HealthSouth bonds.

(9)     Institutional Ownership

During the class period, the number of institutions holding HealthSouth notes ranged from 118 to 489.  Seyhun Rept. I ¶ 95.  Included in these numbers are insurance companies, investment banks, pension funds and other institutional traders.  *See* Seyhun Rept. I ¶¶ 95-98; Ronen Decl. I ¶¶ 94-95.  The fact that a large number of institutions actively traded HealthSouth notes demonstrates an efficient market throughout the class period.

(10)     Credit Agency Ratings

An additional factor suggested by Professor Ronen examines whether credit rating agencies rated the bonds at issue.  Ronen Decl. I ¶ 23.  The court agrees, but finds that a more important consideration is *how* credit rating agencies processed and responded to information available to them.  The publicly available information concerning HealthSouth's financial condition impacted the credit ratings for the notes, which then affected the price.

Corporations do sometimes default on their promises to make future payments or abide by the bond covenants.  The likelihood of default affects the price and trading of the note.  Credit rating agencies, such as Moody's and S&P, measure and report on bond default or credit risk.  These agencies generally categorize bonds as investment grade bonds, with S&P's rating of BBB- or higher, and speculative-grade bonds, with ratings BB+ or lower.  Seyhun Rept. I ¶ 39.

Credit rating agencies provide an important source of information relied on by the bond market in assessing an issuer's creditworthiness and consequently the value of the bonds.  Credit rating agencies are independent entities that analyze issuers and their debt securities; investors use credit ratings and other information from these agencies to help assess value, including the riskiness of debt.  Each of the HealthSouth bonds at issue was rated by two of the major credit

39

rating agencies, Moody's and S&P, throughout the Class Period.  The agencies made their credit ratings and reports publicly available to investors.

In advance of a ratings determination meeting, S&P requires the following financial information from management, if possible: five years of audited financial statements; interim financial statements; operation and product descriptions; and draft registrations statements.  In addition, non-public information may be presented confidentially to the rating agencies to help them arrive at an appropriate rating.  While this information remains confidential, the fact that it is incorporated in the rating may give the investor additional confidence.  S&P states that it "provides a rating only when there is adequate information available to form a credible opinion and only after applicable quantitative, qualitative, and legal analyses are performed."[20]  Also the rating agencies are expected to look beyond the financial reports in assessing an issuer.  "Proper assessment of credit quality for an industrial company includes a thorough review of business fundamentals, including industry prospects for growth and vulnerability to technological change, labor unrest, or regulatory actions."[21]

Credit ratings have well-defined parameters that provide specific information to investors in a more precisely formulated way than information from other sources.  Credit ratings provide publicly available sources of information on bonds that assist investors in making better-informed decisions.  In addition, credit rating agencies publish reports and issue press releases, contributing to the overall public availability of information that can be incorporated into a

---

[20]Standard & Poor's Corporate Rating Criteria, 2006, page 10. http://www2.standardandpoors.com/spf/pdf/fixedincome/corporateratings_052007.pdf.

[21]*Id.*

bond's price.  S&P and Moody's issued ratings as new HealthSouth bond issues came to market, and in response to additional company news.

These rating agencies used HealthSouth's financial statements and other financial information to evaluate the creditworthiness of the HealthSouth bond issues.  They also were misled by the false financial information about HealthSouth.  Indeed, the rating agencies changed their ratings of the HealthSouth Bonds in response to significant changes in the financial condition of the Company.  At the start of the Class Period, the non-convertible bonds were rated Baa3 by Moody's and BBB by S&P, both characterized as "lower medium grade," but investment grade.  Their ratings subsequently declined as information that raised concerns about HealthSouth finances reached the public, and by March 18, 2003, the senior non-convertible bonds were rated Ba3 (Moody's) and BB- (S&P), characterized as "speculative."  Ronen Decl. I ¶¶ 98-104.  Other HealthSouth bonds saw similar changes in their ratings.  These changes in credit ratings consequently affected the prices at which the bonds traded.

The fact that credit rating agencies processed financial information concerning the creditworthiness of HealthSouth bonds, made the information available to the public, and reacted to the publicly-available information as to HealthSouth's financial condition provides further evidence that the market for HealthSouth bonds was efficient throughout the class period.  The publicly available financial information affected the credit rating for HealthSouth bonds in much the same way information affects the price of stock in an efficient market for stock; and the credit ratings – along with other publicly available information – likewise affected the price of the HealthSouth bonds.

e.      Defendants' Challenge to "Transparency"

As mentioned previously, the Defendants' experts challenge the "transparency" of the bond market in general, primarily because bonds trade over the counter instead of on an "impersonal stock exchange."  *See* James Rept. I ¶¶ 75-78; Gibbons Rept. I ¶¶ 25-28.  Defendants refer to the statement made in *Basic* that "[t]he modern securities markets, literally involving millions of shares changing hands daily, differ from the face-to-face transactions contemplated by our early fraud cases and our understanding of Rule 10b-5's reliance requirement must encompass these differences."  485 U.S. at 243.  The Defendants then argue that, unlike stock, bonds do not trade on a formal, impersonal, centralized exchange, like the NYSE; that over-the-counter transactions are conducted over the phone or by computer; that an investor has to seek out a dealer to get a quote on a bond and may in fact receive different quotes from different dealers; and that an investor would thus have difficulty determining the prevailing price for a specific corporate bond.  *See* E&Y's Amd. Mem. in Opp. (doc. 1217) at 59-60.

In effect, the Defendants argue that the market for *all* bonds is inefficient because it does not function like the stock market.  If the court were to accept these challenges, it would be

> denying application of fraud on the market to the bond market because it does not operate in the same way as a national exchange or trade in the same volume, frequency, or manner as equity on those exchanges [and would be like] throwing out oranges because they are not apples.  The Court finds that the issue is not whether the market for equity is more efficient than the market for debt securities, but whether the market for debt securities is adequately informationally efficient (whether the price reflect[s] all publicly available information) to trigger the fraud-on-the-market presumption of reliance.

*Enron*, 529 F. Supp. 2d at 768.

The court agrees that the test should not be whether bonds can be traded as efficiently as stocks listed on a national exchange.  Instead, the focus should be on "whether market makers in the over-the-counter-market, specifically the market for [the particular security], provided a sufficiently fluid and informed trading environment so that when material information about [the issuer] was disseminated, investors had available to them an opportunity to trade at informed, and therefore appropriate, bid and asked prices."  *Cammer*, 711 F. Supp. at 1282-83.

The Defendants conveniently ignore the vast amount of publicly-disseminated information available about HealthSouth in general, its financial condition, and its Bonds in particular.  The publicly available information logically impacted investors' decisions about whether to invest in HealthSouth bonds in the first place, whether to hold those bonds, or to sell them.  Bond traders at large institutions who make transactions of six figures or more simply do not trade on insufficient information, or information perceived to be unreliable, or on less than all publicly available information.  To argue that the investors in HealthSouth bonds did not have sufficient publicly available information in making their decisions about buying and/or selling HealthSouth bonds, and what would be a reasonable price for those bonds, defies logic and ignores the realities of the bond market in which billions of dollars trade hands.

Further, to exclude over-the-counter transactions from the fraud-on-the-market presumption of reliance would severely limit the public policy behind the securities laws.  "As the statute explaining the need for regulation and control of transactions in securities exchanges *and over-the-counter markets* states, these transactions are 'affected with a national public interest.'  Securities Exchange Act of 1934 § 2, 15 U.S.C. § 78b."  *DiRienzo v. Philip Servs.*

*Corp.*, 294 F.3d 21, 33 (2d Cir. 2002) (emphasis added).

Transparency has not to date been recognized as a requirement for an efficient market.  In any event, transparency is relative and relative matters should be compared like to like.  In terms of the bond market the court, therefore, concludes that the HealthSouth bond market traded on all the publicly available information and thus meets the test for informational efficiency.

    f.  Primary Market

      The Defendants argue that the primary market for newly issued HealthSouth bonds was not efficient, and, therefore, that a class should not be certified for primary market purchasers, i.e., the QIBs who purchased Rule 144A unregistered bonds.  Indeed, they cite numerous cases that have either directly held, or indicated in *dicta*, that such a market is not open or efficient or developed.  *See Ockerman v. May Zima & Co.*, 27 F.3d 1151, 1158-59 (6th Cir. 1994); *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990) ("[A] primary market for newly issued municipal bonds is not efficient or developed under any definition of these terms." (quotation omitted)); *In re Safety-Kleen Corp.*, No. 3:00-1145-17, 2002 WL 32349819 at *2 (D.S.C. Mar. 27, 2002).  None of the cases, however, discussed the kind of extensive evidence presented here by the Bondholder Plaintiffs and their experts.

    In arguing that Eleventh Circuit precedent precludes class certification as to the primary market purchasers, UBS cites *Lipton v. Documentation, Inc.*, 734 F.2d 740, 746 (11th Cir. 1984), for the proposition that "*[a]s a matter of law*, the fraud-on-the-market presumption of reliance does not apply to 'new securities' and, thus, cannot extend to a sale of newly issued HealthSouth bonds."  UBS Supp. Mem. (doc. 1623) at 9 (emphasis added).  The court does not read the *Lipton* decision as establishing "as a matter of law" that the fraud-on-the-market presumption can

never apply to a new bond issue because that issue was not before the Court.

In *Lipton*, the Eleventh Circuit addressed whether to adopt the fraud-on-the-market theory for stocks traded in an open market and the effect of the precedent decision of *Shores v. Sklar*, 647 F.2d 462 (5th Cir. 1981) (en banc), *cert. denied*, 459 U.S. 1102 (1983).[22]  Both *Lipton* and *Shores* pre-date the Supreme Court's decision in *Basic* that fully established the fraud-on-the-market theory for securities fraud cases.  The Eleventh Circuit Court specifically found "independently of the reasoning in *Shores* that this circuit should recognize the fraud on the market theory when applied to class actions alleging that the defendant's deception inflated stock prices in the open market."  *Lipton*, 734 F.2d at 747.

In *Lipton*, the Court discussed the distinctions between the case before it and *Shores* that had involved newly-issued bonds; *Shores* did not address the applicability of the fraud-on-the-market theory in the open market context.  734 F.2d at 745.  The Court in *Lipton* did note that as to the market for "new issues in an *undeveloped* market . . . it is not necessarily reasonable to presume that misinformation will affect the market price, as information on an *undeveloped* market does not readily affect market price and, in the case of new securities, the price will be set by the offeror and underwriters, not the market."  *Id.* at 746 (emphasis added).

This court has already discussed factors showing that the market for HealthSouth bonds – all of them – was well developed and efficient.  Throughout the class period, the market was flooded with information about HealthSouth, its (false) financial situation, and its securities; numerous market makers handled its bonds; credit rating agencies factored publicly available

---

[22]The Eleventh Circuit adopted as precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.  *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

information into the ratings of each new issue and those ratings affected the market for the new bonds; and a large volume of bonds traded regularly.  Furthermore, price is not and should not be the only determining factor in the fraud-on-the-market theory.  *See Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 492-93 (S.D. Fla. 2003).

Counsel for UBS also overstates the reach of *Basic* by arguing that "*Basic* itself rejects the extension of the fraud-on-the-market theory to primary market investors."  UBS Response to Rev. Class Def. (doc. 1587) at 1.  In recognizing the anonymity of the modern securities market as a reason for adopting the fraud-on-the-market presumption of reliance, *Basic*, 485 U.S. at 243-44, the Supreme Court did not rule, or hold, or suggest or "reject" the applicability of that theory to an efficient and developed primary market for over-the-counter transactions.  The Supreme Court to date has not "rejected" the extension of the fraud-on-the-market theory to stocks traded "in person" over-the-counter, or to bonds traded in the primary or secondary market.

However, to qualify for the fraud-on-the-market presumption of reliance, the Bondholder Plaintiffs must demonstrate that the market for HealthSouth bonds was not only well-developed but open.  The Supreme Court in *Basic* supported recognition of the presumption of reliance on "an *open and developed* securities market [in which] the price of a company's stock is determined by the available material information regarding the company and its business."  *Basic*, 485 U.S. at 241-42 (emphasis added).

The Defendants rely substantially on the decision in *Freeman v. Laventhol & Horwath*, 915 F.2d 193 (6th Cir. 1990), and cases following it.  The Sixth Circuit, in an interlocutory appeal from the denial of a motion for summary judgment, held that "a primary market for newly issued municipal bonds as a matter of law is not efficient."  915 F.2d at 199.  In so doing, the

court emphasized that the fraud-on-the-market presumption of reliance only applies to an efficient market. *Id.* at 198. The court recognized the *Cammer* factors, but did not apply them to test the efficiency of the market for the new bonds in question. Instead, the court considered only two factors in making its determination: (1) that the bonds did not trade in an impersonal market, decreasing the "probability that their price could be relied on reasonably as an accurate reflection of their true value[;]" and (2) that "the price of newly issued securities is set primarily by the underwriter and the offeror, not by the market." *Id.* at 199.

An argument could be made that the *Freeman* court's determination that a primary bond market is not efficient as a matter of law was hasty and conclusory. It leaves no room in the Sixth Circuit for evidence as to how the underwriter sets a price, the market for other bonds issued by the company, the effect of credit ratings on the market, or the consideration that the bonds would not sell if the price did not reflect the publicly available information concerning the credit worthiness of the issuer. Without any specific direction from the Eleventh Circuit, this court prefers a case-by-case approach, giving due considerations to the distinctions between the way the stock market and bond market function.

Nevertheless, the Supreme Court in *Basic* referred to an "open" market for securities as a reason for adopting the presumption of reliance. *See Basic*, 485 U.S. at 241. The primary market for the HealthSouth Rule 144A unregistered bonds in no way operated as an open market. As the Bondholder Plaintiffs' experts all acknowledged, securities regulations limit the potential purchasers of these unregistered bonds to large, sophisticated institutional investors who meet the requirements of a QIB. O'Neill Decl. I ¶ 9; Ronen Decl. I ¶ 43; Seyhun Rept. I ¶ 34 & n. 19. To qualify as a QIB, the institutional buyer must own at least $100 million in securities of

47

unaffiliated issuers.  *See* 17 C.F.R. § 230.  Even though a large number of QIBs may have

purchased the unregistered 144A bonds in the primary market, that market was not one in which

anyone could participate.  Thus, the primary market for HealthSouth bonds was not open as

required to invoke the *Basic* presumption.  *See Camden Asset Mgmt. v. Sunbeam Corp.*, 2001

WL 34556527 (S.D. Fla. July 3, 2001) (finding the primary market for a debenture coupon initial

offering not efficient because *inter alia* placement was limited to QIBs); *Enron*, 529 F. Supp. 2d

at 771-72 (finding that the "primary markets, with a single seller and with the private and

targeted solicitation of investors by the initial purchasers/underwriters' sales forces in the

primary markets here, cannot qualify as open markets[,]" but finding the secondary over-the-

counter markets for debt securities efficient).

The court at oral argument asked Bondholder counsel for cites to any case that had

applied the fraud-on-the-market theory to certify a class of purchasers of bonds in the primary

market.  The only case mentioned as doing so was *Worldcom*, 219 F.R.D. 267; as counsel

acknowledged, however, the defendants did not challenge the efficiency of the market for

Worldcom bonds.  Thus, that court's decision to certify such a class provides little comfort.

The lead Plaintiff RSA and the named Plaintiffs HFRRF and SURS all participated in the

primary market for 144A/*Exxon Capital* Exchange Bonds as QIBs.  Because that market was not

open, they cannot invoke the fraud-on-the-market presumption of reliance as to the primary

market purchases.  That conclusion, however, does not mean that the class is not entitled to a

class-wide presumption of reliance.[23]

---

[23]HFRRF and SURS also purchased bonds in the secondary market, which this court has
determined was efficient, so the *Basic* presumption is available to them for their secondary
market claims.

2.      Fraud Created the Market

In its continued discussion of *Shores*, the Court in *Lipton* stated: "it is reasonable to allow recovery on the fraud on the market theory where the securities could not have been marketed but for the fraud, because there the information in the Offering Circular and other documents will affect their *marketability*." *Lipton*, 734 F.2d at 746 (emphasis added). Here, the Bondholder Plaintiffs allege that the fraud affected the marketability of the notes – that they could not have been marketed at any price without the fraud.

In this regard, the Bondholder Plaintiffs assert, as an alternative basis for a presumption of reliance, the fraud-created-the-market theory adopted in *Shores*, 647 F.2d 462, and as last discussed by the Eleventh Circuit in *Ross v. Bank South, N.A.*, 885 F.2d 723 (11th Cir. 1989) (en banc).  To invoke this presumption, a Plaintiff must show that

> (1) the defendants knowingly conspired to bring securities onto the market which were not entitled to be marketed, intending to defraud purchasers,
>
> (2) [plaintiff] reasonably relied on the Bonds' availability on the market as an indication of their apparent genuineness, and
>
> (3) as a result of the scheme to defraud, [plaintiff] suffered a loss.

*Shores*, 647 F.2d at 469-70 (footnote omitted).

The Eleventh Circuit in *Ross* commented on the *Shores* standards:

> The burden imposed by the first element is a substantial one. *Shores* is based on the understanding that although it is reasonable to rely on the market to screen out securities that are so tainted by fraud as to be totally unmarketable, investors cannot be presumed to rely on the primary market to set a price consistent with the appropriate risk.  Thus, the *Shores* court defined fraudulently marketed bonds as those that could "not have been offered on the market at any price" absent the fraudulent scheme.  *Shores*, 647

49

> F.2d at 464 n.2; *see Lipton*, 734 F.2d at 747 (reading *Shores* to
> apply only to situations where *but for* the fraud the securities would
> not have been marketable).  In other words, the fraud must be so
> pervasive that it goes to the very existence of the bonds and the
> validity of their presence on the market.  If the plaintiff "proves no
> more than that the bonds would have been offered at a lower price
> or a higher rate, rather than that they would never have been issued
> or marketed, he cannot recover."  *Shores*, 647 F.2d at 470.

*Ross*, 885 F.2d at 729-30.

The Bondholder Plaintiffs allege sufficient facts and have presented evidence to invoke

this theory.  The Defendants argue that this theory has fallen out of favor, and that it should not

apply here because the Bondholder Plaintiffs cannot prove that the bonds could not have been

issued at any price.

Although UBS suggested otherwise,[24] the Eleventh Circuit Court specifically refused to

overrule *Shores*, and noted that it remains the law of this circuit.  *Ross*, 885 F.2d at 730, n. 11.

The Court in *Ross*, however, affirmed the summary judgment in favor of the defendants because

the plaintiffs did not present sufficient evidence to create a genuine issue of fact that the bonds

were not marketable.  *Id.* at 731, 732.  The court further noted that "[t]he facts in this case stand

in sharp contrast to the pervasive fraud allegedly present in *Shores*."  *Id.* at 731.  Similarly, the

Bondholder Plaintiffs' allegations and evidence in this case involve a "pervasive fraud" without

which they allege the bonds could not have been marketed.

The Bondholder Plaintiffs put forth evidence that, had the fraud at HealthSouth been

disclosed, the bonds could not have been issued at any price.  In fact, the managing director of

---

[24]UBS stated that the en banc Eleventh Circuit in *Ross* "subsequently refined – if not
overruled" *Shores*.  UBS Supp. Mem. (doc. 1623) at 16.  The criticism of the fraud-created-the-
market theory contained in Judge Tjoflat's concurring opinion, 88 F.2d at 732-45, did not reflect
the view of the majority of the Court.

UBS's High Yield Capital Markets trading desk testified that had the magnitude of the fraud been publicly disclosed, the HealthSouth Bond issues "would never have seen the light of day."

The Plaintiffs also presented evidence that had the true financial condition been known the bonds could not legally have been issued because the company would have been in default of its financial covenants.  O'Neill Decl. I ¶¶ 14-20.

Healthsouth's true financial situation at the time of the Bond issues was so dire that the issuance of any Bonds – much less Bonds with the same terms and conditions of the Bonds it did issue – could not have occurred.  *See* O'Neill Decl. II (doc. 1424) ¶¶ 12-18 (discussing all the waivers of conditions needed and the financial realities that would make it impossible for HealthSouth to issue $2.35 billion in debt during this period.)

To avoid the legal impediments to the bond issue, Plaintiffs allege that (1) E&Y had to approve false financials showing that the covenants were satisfied; (2) the Defendants had to share those false financials with credit rating agencies to get the necessary credit ratings; (3) the Defendants then had to get the bonds priced as investment grade (even though they knew that HealthSouth was on brink of insolvency); and (4) UBS and E&Y had to share those false financials with the SEC, bond investors and the market.  Had HealthSouth, Scrushy, UBS or E&Y reported the Company's true financial condition at the time of the bond issues, even without disclosing the fraud as such, HealthSouth would have been legally prohibited from issuing those same bonds.

In the case described by Bondholder Plaintiffs as the "seminal Section 11 case,"[25] *Feit v.*

_____

[25]*See* Bndh. Pls' Reply Br. in Support of Rev. Class Def. (doc. 1589) n.5.  Plaintiffs cited *Feit* for the proposition that numerous courts have applied Section 11 to an exchange of securities.  However, in *Feit*, the exchange of stocks arose as part of a take-over operation – not

*Leasco Data Processing Equip. Corp.*, the court discussed the requirements for and rationale

behind Section 11 actions.  332 F. Supp. 544, 568-75 (E.D.N.Y. 1971).  Although *Feit* did not

involve the fraud-created-the-market theory, the court explained the operation of the securities

market.  For example, the court discussed the role of the SEC in examining the integrity of an

offering:

> A considerable *in terrorem* effect is generated by the SEC's
> examination of registration statements and its use of orders
> refusing to permit registration statements to become effective (15
> U.S.C. § 77h(b)) and stop orders when uncorrected
> misrepresentations appear (15 U.S.C. § 77h(d)). . . .  But this
> power of the SEC to intercede is, as a practical matter, limited to
> more flagrant misstatements and omissions obvious on the face of
> the prospectus or from other information at hand.  To expect the
> hard pressed SEC staff to conduct an independent field study of
> every prospectus is unrealistic.

*Id.* at 566-67.

The court in *Feit* also made observations relevant to the ability of investors to rely on the

integrity of the market:

> Section 11 holds underwriters to the . . . burden of establishing
> reasonable investigation and reasonable ground to believe the
> accuracy of the registration statement.  The courts must be
> particularly scrupulous in examining the conduct of underwriters
> since they are supposed to assume an opposing posture with
> respect to management.  The average investor probably assumes
> that some issuers will lie, but he probably has somewhat more
> confidence in the average level of morality of an underwriter who
> has established a reputation for fair dealing. . . .
>
>      . . . Only the underwriter and the accountant are free to
> assume an adverse role, have little incentive to accept the risk of
> liability, and possess the facilities and competence to undertake an
> independent investigation.  They may therefore reasonably be

───────────────

as part of a Rule 144A exchange.

> required to share the burden of verification. . . .
>
> Dealer-managers . . . are expected to exercise a high degree of care in investigation and independent verification of the company's representations.  Tacit reliance on management assertions is unacceptable; the underwriters must play devil's advocate.

332 F. Supp. at 581-82 (citations omitted).

The investing public should be able to rely upon these market protections afforded by SEC review and reasonable investigation by a reputable underwriter and accountant, as well as civil and criminal penalties for willful violations, to presume that the securities being offered are legitimate.  The fraud-created-the-market theory rests on

> the premise that "[t]he securities laws allow an investor to rely on the integrity of the market to the extent that the securities it offers to him for purchase are entitled to be in the marketplace." [*Shores*,] 647 F.2d at 471.  Consequently, where a security could not have been issued but for a fraudulent scheme, the fact that the investor may have relied on other factors in deciding to purchase that security at a particular price does not minimize the essential fact that the purchaser relied on the market's integrity to ensure that the security was worthy of being issued.

*Kirkpatrick*, 827 F.2d at 723.

The challenges asserted by the Defendants and their academic experts to the marketability of the bonds absent the fraud demonstrate a lack understanding of the bond market.  They argue that because the bonds *traded* after the revelation of the fraud in March 2003, the bonds could have been *issued* as new securities.  See James Aff. (doc. 1542-2) ¶¶ 133-46; E&Y Amd. Mem in Opp. (doc. 1217) at 101.  In the turbulent weeks following the disclosure of the fraud, the prices for the bonds fluctuated widely from 11% of par to 40% of par.  Trading at these prices, however, does not equate to the ability *to be issued* at such prices or under the same covenants.

As O'Neill points out, according to HealthSouth's restated financials, the company's true net worth was *negative* $529 million.  O'Neill Decl. I ¶ 15; O'Neill Decl. III (doc. 1557-2) ¶ 12.  O'Neill found no basis in reality for the assumption that such a large new issuance of distressed company bonds with dramatically deep price discounts could have been issued to achieve an effective yield high enough to reflect the HealthSouth credit risk.  In his opinion, "investors would not purchase newly issued HealthSouth bonds given these credit statistics" that the true financial situation would have yielded.  O'Neill Decl. III ¶ 12.

"[H]ad HealthSouth reported its true financial position at the time the Bonds were being priced, **those bonds** could not have been issued **at any price**. . . .  HealthSouth was in violation of several financial covenants of its main bank facility throughout this period, in most cases by significant amounts.  Those covenant violations would have created an event of default for HealthSouth under the terms of its bank credit agreement." O'Neill Decl. II ¶ 11 (emphasis in original).  Therefore, HealthSouth could not have truthfully represented that it was not in default, as required to issue the Bonds.  Thus, the Company could not have issued the Bonds at any price.

Further, as UBS's own witness acknowledged, with true financial information, the trade would not have closed because "you actually can't settle into a known default."  David Barth Dep. at 29.  Neither Professors James nor Gibbons seriously challenged O'Neill's position, bolstered by testimony from two UBS witnesses, that had the fraud been known to the public, the Bonds could not have been marketed at any price. Thus, the Bondholder Plaintiffs presented sufficient evidence that they are entitled to invoke the fraud-created-the-market theory and its attendant presumption of reliance as to the bonds purchased in the primary market.  Accordingly, the court will certify a class that also includes initial purchasers.  *See also In re Taxable Mun.*

54

*Bonds Litig.*, No. MDL 863, 1994 WL 532079 (E.D. La. Sept. 26, 1994) (certifying bond class based on (1) fraud created the market as to initial offering and (2) fraud on the market as to secondary market.)

3.     Common Fraudulent Scheme

The Bondholder Plaintiffs argue that if initial purchasers are not entitled to the presumption of reliance via either fraud on the market or fraud created the market, then the uniform misrepresentation common fraudulent scheme theory provides a basis for class certification.  They rely upon several Eleventh Circuit cases that have found that individual issues of reliance do not predominate in cases of a common course of fraud.  *See Klay v. Humana, Inc.*, 382 F.3d 1241, 1246-49 (11th Cir. 2004); *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 724-25 (11th Cir. 1987); *Kennedy v. Tallant*, 710 F.2d 711, 717-19 (11th Cir. 1983); *Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 333 (S.D. Fla. 1996).

This Eleventh Circuit approach began in *Kennedy v. Tallant*, 710 F.2d 711 (11th Cir. 1983).  In affirming class certification in a securities case, the Eleventh Circuit found that the degree of each plaintiff's reliance and other factual distinctions did not preclude certification.  *Id.* at 717.  The Court instead acknowledged the practical consideration that a "suit involving a single conspiracy and fraudulent scheme against a large number of individuals is particularly appropriate for class action."  *Id.* at 718.  The fact that the claims involved allegations that the defendants employed the same method to commit the same unlawful acts against the entire class satisfied the predominance requirement.  *Id.* at 717.

Similarly, in *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718 (11th Cir. 1987), the Court followed *Kennedy* in reversing the denial of class certification.  The court held "[i]n view of the

overwhelming number of common factual and legal issues presented by plaintiffs'
misrepresentation claims, . . . the mere presence of the factual issue of individual reliance could
not render the claims unsuitable for class treatment.  Here, . . . each of the complaints alleges a
single conspiracy and fraudulent scheme against a large number of individuals and thus is
'particularly appropriate for class action'." *Id.* at 724-25 (quotation omitted).

The Eleventh Circuit followed *Kirkpatrick* and took the same approach regarding RICO
claims when it affirmed class certification in *Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir.
2004).  The Court found that individual reliance could be established through common proof.  *Id.*
at 1259.  The same facts were "essential elements of each plaintiff's RICO claims."  *Id.* at 1257.
*See also Mohawk*, 568 F.3d at 1357-58.

Several district courts within the Circuit have also certified a class "even without the
presumption of reliance, based on the single, common fraudulent scheme alleged."  *Bruhl v.
Price Waterhousecoopers Intern.*, 257 F.R.D. 684, 694 (S.D. Fla. 2008); *Medine v. Washington
Mut., FA*, 185 F.R.D. 366, 371 (S.D. Fla. 1998); *Walco Invs. Inc. v. Thenen*, 168 F.R.D. 315,
336-37 (S.D. Fla. 1996).  As the court in *Bruhl* noted, "to obtain class certification under the
'common fraudulent scheme' theory, [the plaintiffs must demonstrate] that the same or
substantially similar misrepresentations were made to the putative class and that they were of
such a nature that it can be presumed that all members of the class relied upon them either to
invest in the first instance, to remain in the investment, or to redeem their interest in the
investment."  257 F.R.D. at 696.

Following this Eleventh Circuit precedent provides a logical resolution to questions that
may still linger as to whether either the fraud-on-the-market theory or fraud-created-the-market

theory applies to the class members who purchased bonds in the primary market.  While the court

believes that both theories could apply, logic and common sense – as well as the *Kennedy* line of

cases – support a finding here that individual issues of reliance do not predominate over

questions common to the class.  The Bondholder Plaintiffs allege that throughout the class period

E&Y, the UBS Defendants, and Scrushy publicly made oral and written misrepresentations about

the financial well being of HealthSouth and the strength of its securities.  These false statements

about finances were precisely the kind of representations upon which investors regularly and

routinely rely in deciding whether to purchase, hold or sell a security.

     As the Supreme Court noted in *Basic*, presumptions arise "out of considerations of

fairness, public policy, and probability, as well as judicial economy. . ."  485 U.S. at 245.  The

fraud-on-the-market presumption "is supported by common sense and probability."  *Id.* at 246.

As demonstrated by the *Kennedy* line of cases, "[c]ourts presume reliance 'where it is logical to

presume that reliance in fact existed.'  *Chris-Craft Indus.*, [*Inc. v. Piper Aircraft Corp.*], 480

F.2d 341, 375 (2d Cir. 1973)."  *In re Worldcom Sec. Litig.*, 219 F.R.D. 267, 292 (S.D.N.Y.

2003).

     Those same considerations support application of the presumption of reliance here.

Probability and common sense lead to the presumption that investors – especially institutional

investors who held significant amounts of HealthSouth notes – made their decisions to buy, hold

or sell HealthSouth notes based upon the complete mix of publicly available information about

the creditworthiness of those notes and the Company that issued them.  When that information

turned out to be based on extensive fraud that fooled the credit rating agencies, analysts, and the

securities market as a whole, the court finds it reasonable and probable to find that the purchasers

of HealthSouth bonds relied upon those misrepresentations and relied on the integrity of the market place throughout the class period.

Further, to satisfy the Rule 23(b)(3) requirement, Bondholder Plaintiffs do not have to show a preponderance of common issues of law or fact as to each element of their claims; rather Plaintiffs must show an overall preponderance of common issues for the case as a whole. *See Walco Invs. Inc.,* 168 F.R.D. at 325-27. Bondholder Plaintiffs have done at least that here.

The claims of all the Bondholder Class members are based on a common nucleus of facts surrounding a common course of conduct by the Defendants. Questions of law likewise are common to the class. Thus, the court concludes that common questions of law will predominate over any individual issues that may arise.

*Superiority*

In many respects, a finding that common issues predominate over individual issues leads to an inescapable conclusion that a class action presents the more desirable vehicle for adjudicating the plaintiffs' claims. *See Mohawk*, 568 F.3d at 1358 (quoting *Klay*, 382 F.3d at 1269). As previously mentioned, the proposed class members' claims are predicated on a common set of facts and concern the same legal theories. Bondholder Class claims are based on the same materially false and misleading statements contained in, or material facts omitted from, documents and statements disseminated to the investing public, including offering memoranda, press releases, conference calls, registration statements, annual reports, audited financial statements, credit ratings and related reports, and analyst reports. Each bond was issued using offering documents that contained the same types of misrepresentations and omissions. Each bond was initially sold pursuant to a materially false and misleading offering memorandum

bearing UBS's name on its cover.  Each Offering conducted during the Class Period violated

HealthSouth's lending agreements and pre-existing bond covenants.  Each registered note was

issued pursuant to a registration statement filed with the SEC that was signed by Scrushy and

included E&Y's false "clean" auditor's reports.  Accordingly, Defendants' common course of

deceptive conduct injured the Bondholder Plaintiffs and every other member of the Class in the

same manner.  Because these claims involve many common questions of law and fact applicable

to the claims of a large number of purchasers of HealthSouth bonds, a class action will be

superior to other available methods for fairly and efficiently adjudicating this controversy.

Therefore, based on the extensive record and evidence presented, the court is convinced

that Bondholder Plaintiffs have met their burden of establishing the requirements of Rule

23(b)(3).

Section 11 Claims vs. E&Y

E&Y does not vigorously challenge the certification of Section 11 claims for those who

purchased registered HealthSouth bonds after the completion of the Rule 144A/*Exxon Capital*

Exchange, i.e. those who purchased in the secondary market.  Therefore, for the Section 11

claims, the court will certify against E&Y a class of purchasers of registered bonds for the

reasons contained in the prior discussion.

E&Y does contest the inclusion within the class of the QIBs who voluntarily exchanged

their unregistered bonds for registered bonds.  It argues that QIBs cannot establish a Section 11

claim because they purchased unregistered bonds before the filing of the registration statement,

and that the "irrevocable commitment theory" discussed in *APA Excelsior III L.P. v. Premiere

Techs., Inc.*, 476 F.3d 1261, 1277 (11th Cir. 2007), precludes the QIBs' claims.

In *APA Excelsior,* the Eleventh Circuit held that plaintiffs cannot recover under Section 11 when their investment decision occurred prior to the filing of the registration statement on which the Section 11 claim was based.  476 F.3d at 1272-73.  In reaching this decision, the Court analyzed the legislative history of Section 11 and recognized Congress's understanding that only investors who acquired their securities *after* the date of the registration statement could be impacted by misrepresentations in the registration statement.  *Id.* at 1273-76.  The Court, in fact, noted Congress's determination that Section 11's presumption of reliance on a registration statement should not be applied when, in all likelihood, the purchase decision was not based on the registration statement.  *Id.* at 1275-76.  Consequently, an investor cannot recover under Section 11 "where it is certain that a purchase of the securities was motivated by factors other than the registration statement."  *Id.* at 1275-76.

Every court that has addressed this issue after APA *Excelsior* has agreed that plaintiffs who acquired registered bonds through a voluntary 144A/*Exxon Capital* exchange are precluded from asserting claims under Section 11.  *See, e.g., In re Levi Strauss & Co. Sec. Litig.,* 527 F. Supp. 2d 965, 976-77 (N.D. Cal. 2007); *In re Refco, Inc. Sec. Litig.,* 503 F. Supp. 2d 611, 633-37 (S.D.N.Y. 2007).  These courts recognized the obvious: a registration statement cannot be the basis for an investment decision where an investor made its investment decision *before* the registration statement had been filed.[26]

_____

[26]The court in *Refco* stated that common sense and logic make clear that the investment decision occurs before the registration statement in an exchange scenario and thus the exchange cannot serve as a basis for a Section 11 claim.  503 F. Supp. 2d at 633-35.  The court in *Levi Strauss* pointed out that the registration statement did not likely influence the decision to exchange, because the purpose of the exchange was to provide freely tradable bonds – i.e., investors either continue to hold the unregistered bonds that could only be sold under limited circumstances, or exchange them for identical registered bonds that were more freely tradable in

Bondholder Plaintiffs argue that E&Y seeks to add reliance as an element to a Section 11 claim when neither the statute nor case law require one. Indeed, a plaintiff in a Section 11 case does not need to prove reliance; the statute presumes that one whose purchase of a security can be traceable to a registration statement containing a misrepresentation would have relied on that registration statement. *APA Excelsior III L.P. v. Premiere Techs.*, *Inc.*, 476 F.3d 1261, 1271 (11th Cir. 2007). Requiring that a purchase be traceable to a registration statement does not require a plaintiff to prove reliance upon that statement. The QIBs who acquired their registered notes via a Rule 144A/*Exxon Capital* Exchange simply did not receive those registered notes pursuant to or traceable to a registration statement that was issued *after* they bought the Rule 144A notes.

When they purchased the unregistered bonds through a 144A/*Exxon Capital* Exchange, the QIBs knew that they would most likely exchange the unregistered bonds for registered bonds once the registration occurred because a registered bond is more freely tradable and, hence, far more valuable, than the same bond when it is unregistered. Consequently, Bondholders' industry expert Timothy O'Neill acknowledged that investors pay a higher price for unregistered bonds that have registration rights than they do for unregistered bonds that lack registration rights. O'Neill Dep. at 48, 87-89; *see also* O'Neill Decl. I ¶ 10. Indeed O'Neill and another Bondholder expert, Nejat Seyhun, admitted that no reason exists not to exchange the bonds, and according to O'Neill, it would be "inexplicable" for an investor not to exchange. Seyhum Dep. at 146-47; O'Neill Dep. 89. Predictably, over 99.5% of the unregistered HealthSouth bond holdings were converted to registered bonds. Ronen Decl. I at ¶ 26, n.25; Seyhun Rept. I at ¶ 96, n.65. Hence

_____

the public market. 527 F. Supp. 2d at 977.

the decision to own a registered bond occurred when investors decided to purchase the unregistered bond.  And that decision occurred *before* the filing of the registration statement.

The Bondholder Plaintiffs argue that no reasonable investor would have seriously considered exercising the option to exchange unregistered for registered bonds had the registration statements disclosed the true state of HealthSouth's financial condition.  They further assert that "[i]t defies logic to believe that, had such disclosures been made, the SEC even would have permitted such a registration statement to become effective and the exchanges to take place."  Bndh. Pls' Supp. Mem. (doc. 1622) at 3.  That may be so but, Plaintiffs fail to recognize that had the SEC not allowed the registration, the QIBs would have been stuck with unregistered bonds.  The harm, thus, would have occurred *without the registration of the bonds*.  The misrepresentations in the subsequent registration statements as to HealthSouth's financial condition, therefore, had nothing to do with damages they may have suffered from participating in the Rule 144A Exchange and they cannot travel under Section 11 to remedy their losses.[27]

Similarly, Bondholders' attempt to limit *APA Excelsior* to its facts by arguing that it does not apply because it involved a "binding legal commitment" rather than an "investment decision" does not work.  No court has ever limited *APA Excelsior* in such a manner, and the decision itself provides clear guidance for analyzing Section 11 claims.  The Eleventh Circuit's reasoning did not turn on any inquiry into the existence of a "binding legal commitment;" it turned on the application of common sense.  If simple logic shows that the plaintiff's investment decision occurred *before* the registration statement, then the decision is not traceable to a registration

---

[27]This finding, of course, does not preclude the Bondholder Plaintiffs from seeking recovery under their Section 10(b) claims for alleged misrepresentations that affected their decision to participate in the Rule 144A offerings.

statement and no basis arises for a Section 11 claim.

Here, the QIBs purchased unregistered bonds prior to the filing of the registration statement with the understanding that the bonds could later be exchanged for identical registered versions. They necessarily made their decision to purchase the registered bonds before the filing of the registration statement so that their purchase of the nonregistered bonds with the intent to exchange them cannot be traceable to the registration statements. Consequently, the QIBs cannot recover under Section 11, and the Bondholder Class must exclude them as to any bonds obtained through the Rule 144A Exchange; they may, however, be included in the class as to any registered bonds they *purchased* after the registration statement was filed.

E&Y argues that because each of the proposed class representatives is a QIB who acquired registered HealthSouth bonds through a 144A/*Exxon Capital* Exchange, their claims are atypical and they cannot represent a class. RSA acquired all of its registered bonds through an exchange and thus decided to acquire those bonds before HealthSouth filed a registration statement. E&Y asserts, therefore, that RSA cannot recover as a matter of law, does not have standing to raise Section 11 claims, and cannot be a class representative for those claims. *See Wooden v. Bd. of Regents of the Univ. Sys. of Ga.*, 247 F.3d 1262, 1288 (11th Cir. 2001) ("plaintiff cannot represent a class unless he has standing to raise the claims of the class he seeks to represent"). The court agrees as to RSA.

However, the fact that RSA does not have standing to pursue the Section 11 claims does not render class certification improper. Inevitably, in cases where a lead plaintiff has been selected under the requirements of the PSLRA, a lead plaintiff may not have standing to sue on every available claim. *See Hevesi v. Citigroup Inc.,* 366 F.3d 70, 82 (2d Cir. 2004). In such

cases, as here, additional named plaintiffs may be needed to aid the lead plaintiff in representing

the class.  *Id.* at 83.  "[J]ust as a class representative can establish the requisite typicality under

Rule 23 if the defendants 'committed the same wrongful acts in the same manner against all

members of the class,'. . . so too can lead plaintiffs."  *Id.* at 82-83 (quoting *In re Prudential Sec.*

*Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 208 (S.D.N.Y. 1995) (internal quotation marks

omitted)); *see also In re Worldcom, Inc. Sec. Litig.,* 219 F.R.D. 267, 281 (S.D.N.Y. 2003)

(certifying a class even though sole lead plaintiff did not purchase bonds and could not assert

Section 11 claims when additional named plaintiffs were bondholders and the facts supporting

the claims were common to the class).[28]

     In this case, named Plaintiffs HFRRF and SURS acquired a portion of their registered

---

[28]*See, e.g., In re Friedman's, Inc. Sec. Litig.* 385 F. Supp. 2d 1345, 1373 (N.D. Ga. 2005) (class plaintiffs who only purchased shares in 2003 stock offering had standing to bring claims against auditor and underwriter defendants for stock offered in both 2002 and 2003*); Sanders v. Robinson Humphrey/American Exp., Inc.*, 634 F. Supp. 1048, 1057 (N.D. Ga. 1986), *aff'd in part and rev'd in part on other grounds sub nom.*, *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718 (11th Cir. 1987) (plaintiff who purchased one type of security had standing to represent class members who had purchased other securities for both § 11 and § 10(b) claims where defendants "engaged in a uniformly fraudulent course of conduct, disseminated virtually identical false prospectuses, financial statements, and other financial information, and failed to disclose material information regarding operations of [the Company] to purchasers during the class period"); *See also Teamsters Local 445 Freight Div. Pension Fund v.* Bombardier, *Inc., No. 1898, 2005 WL* 2148919, at *8 (S.D.N.Y. Sept. 6, 2005) (plaintiff may "represent a class of all purchasers [of each series of certificates] who relied on the same repeated material misstatements and thus suffered the same injury when the value of their securities declined") (citation omitted); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318, 2000 WL 1357509, at *3 (S.D.N.Y. Sept. 20, 2000) ("Courts have repeatedly held that on allegations such as these, class representatives need not have invested in each security so long as the plaintiffs have alleged a single course of wrongful conduct with regard to each security.  Courts have not addressed this concern vis a vis the doctrine of standing, but rather have examined such concerns pursuant to Rule 23(a)(3)'s typicality requirement."); *First Interstate Bank of Nevada, N.A. v. Nat'l Republic Bank of Chicago*, No. 80 C 6401, 1985 WL 1118, at *11 (N.D. Ill. March 10, 1985) (purchaser of one set of bonds can be class representative for purchasers of all four sets of bonds).

bonds through a Rule 144A Exchange; however, they also purchased registered bonds on the open market *after* issuance of a registration statement that contained the false financial information, including E&Y's audited financial report.  Therefore, HFRRF and SURS have standing to pursue the Section 11 claims and their claims are typical of those of the class.  RSA's other claims against E&Y are based on its false financial statements that were included in the registration statements for the bond issues, and in HealthSouth's SEC filings, as well as the same core course of conduct at issue in the Section 11 claims.  Thus RSA's claims remain typical of the class.

E&Y also asserted that the class definition is overly broad because it includes investors who did not suffer a loss.  This argument is deflected by the class definition itself that only includes those who acquired HealthSouth bonds during the class period and "*who were damaged thereby.*"  If an investor cannot prove damage, it is not a class member by definition.  The possibility that an investor may have to prove that it suffered damage to be a class member does not preclude class certification.  *See In re Amerifirst Sec. Litig.*, 139 F.R.D. 423, 428 (S.D. Fla. 1991) (noting individual differences concerning damages will not defeat class certification).

As discussed in relation to the Section 10(b) claims, the class members' Section 11 claims all center around the same facts to establish liability, no significant individual issues require separate proof, and the Bondholder Plaintiffs have met the predominance requirement of Rule 23(b)(3) regarding these Section 11 claims.  They have likewise demonstrated the superiority of proceeding as a class.

Conclusion

Having found that the Bondholder Plaintiffs have met the requirements for class

certification, the court will enter an order certifying the class and appointing counsel as requested.  However, the claims of QIBs will be excluded from the class for Section 11 purposes as to any bond purchases not traceable to a registration statement, i.e., bonds acquired via a Rule 144A/*Exxon Capital* exchange.

The certified Bondholder class will be:

> All persons and entities who purchased, exchanged or otherwise acquired HealthSouth bonds during the periods (a) beginning July 30, 1999 through and including March 18, 2003 as to claims against Richard Scrushy; or (b) beginning March 30, 2000 through and including March 18, 2003 as to claims against Ernst & Young LLP; or (c) beginning September 20, 2000 through and including March 18, 2003 as to claims against the UBS Defendants; and who were damaged thereby.  For the purposes of Section 11 claims only, this class does not include claims of QIBs as to bonds obtained through a Rule 144A/*Exxon Capital* Exchange.[29]

A separate order will be entered simultaneously.

DONE and ORDERED this 30th day of September 2009.

*Karon O. Bowdre*
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

---

[29]Excluded from the class are (a) current or former Defendants; (b) any officer or director during the bondholder Class Period of HealthSouth or any of its subsidiaries or affiliates; (c) members of the immediate families of any of the current or former Individual Defendants; (d) any entity in which any current or former Defendants has or had a controlling interest; and (e) the legal representatives, heirs, successors or assigns of any such excluded party.